# EXHIBIT 1

Westlaw.

Slip Copy
Slip Copy, 2007 WL 4531790 (N.D.Ill.)
(Cite as: 2007 WL 4531790 (N.D.Ill.))

Page 1

**C**
Illinois Bell Telephone Co., Inc. v. Global Naps
Illinois, Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
ILLINOIS BELL TELEPHONE COMPANY, INC.,
Plaintiff,
v.
GLOBAL NAPS ILLINOIS, INC.; Global Naps
Inc.; Global Naps New Hampshire, Inc.; Global
Naps Network, Inc; Global Naps Realty, Inc.; and
Ferrous Miner Holdings, Ltd., Defendants.
No. 06 C 3431.

Dec. 17, 2007.

Christian Frederick Binnig, Dennis G. Friedman,
Hans J. Germann, J. Tyson Covey, Mayer, Brown,
Rowe & Maw, LLP, Chicago, IL, for Plaintiff.
Philip John Fowler, Daniel Patrick Jackson,
Stephanie L. Stewart, Gloor Law Group, LLC,
Chicago, IL, James R.J. Scheltema, Global Naps,
Inc., Pace, FL, Jeffrey C. Melick, Global Naps,
Inc., Norwood, MA, Benjamin H. Green, Eric C.
Osterberg, Joseph M. Pastore, III, Dreier, LLP,
Stamford, CT, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOHN W. DARRAH, District Judge.
*1 Plaintiff, Illinois Bell Telephone Company, Inc.
("AT & T Illinois"), filed a ten-count Amended
Complaint against Defendants-Global NAPs
Illinois, Inc. ("Global Illinois"); Global NAPs, Inc.;
Global NAPs New Hampshire, Inc.; Global NAPs
Network, Inc.; Global NAPs Realty, Inc.; and Fer-
rous Miner Holdings, Ltd.-for violation of federal
and state tariffs and for violation of an interconnec-
tion agreement ("the Agreement"). Global Illinois
now contends that this Court must dismiss the
Amended Complaint pursuant to Federal Rules of
Civil Procedure 12(b)(1) and 12(h)(3) for lack of

subject-matter jurisdiction.

### The Telecommunication Agreement of 1996

The Telecommunications Act of 1996 ("the Act")
sought to deregulate the telecommunications in-
dustry. 47 U.S.C § 251, *et seq.* (2006). The Act re-
quires that an incumbent or existing local exchange
carrier ("ILEC") provide competing local exchange
carriers ("CLECs") access to interconnect to its net-
work for the "transmission and routing of telephone
exchange service and exchange access."47 U.S.C, §
251(c)(2).

Under Sections 251 and 252 of the Act, ILECs and
CLECs have the duty to negotiate in good faith to
establish the terms and conditions of agreements re-
garding reciprocal compensation for the transport
and terminations of certain calls. 47 U.S.C. §§
251(c), 252. If the parties are unable to reach an
agreement, either party may petition the state public
utility commission or Federal Communications
Commission ("FCC") for arbitration. 47 U.S.C §
252(b)(1). A final agreement, whether negotiated or
arbitrated, is to be reviewed by the state commis-
sion or FCC in order to determine if the agreement
complies with the Act. "Any interconnection agree-
ment adopted by negotiation or arbitration shall be
submitted for approval to the State commission. A
State commission to which the agreement is sub-
mitted shall approve or reject the agreement, with
written findings as to any deficiencies."47 U.S.C. §
252(e)(1).

The state commission may only reject an agreement
that has been negotiated if it finds that: "the agree-
ment (or portion thereof) discriminates against a
telecommunications carrier not a party to the agree-
ment" or (2) "the implementation of such agree-
ment or portion is not consistent with the public in-
terest, convenience, and necessity."47 U.S.C. §
252(e)(2)(A).

An agreement adopted by arbitration may be rejec-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4531790 (N.D.Ill.)
(Cite as: 2007 WL 4531790 (N.D.Ill.))

ted if the state commission finds that it "does not meet the requirements of section 251 of [the Act], including the regulations prescribed by the Commission pursuant to section 251 of this title, or the standards set forth in subsection (d) of [section 252]."47 U.S.C. § 252(e)(2)(B). The Act further allows any party that is "aggrieved" to bring an action in federal court to challenge the terms of the interconnection agreement:

> In any case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission make a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

**\*2** 47 U.S.C. § 252(e)(6).

## BACKGROUND

AT & T Illinois is an Illinois corporation, which has its headquarters and principal place of business in Chicago, Illinois. AT & T Illinois is an ILEC, as defined in Section 251(h) of the Act, in its authorized service areas in Illinois. 47 U.S.C. § 251(h).

Global Illinois is a Delaware corporation with its principal place of business in Massachusetts. Global Illinois is certified by the Illinois Commerce Commission ("ICC") as a CLEC to provide telecommunication services in Illinois. The remaining Defendants are all Delaware corporations and all have their principal place of business located at 10 Merrymount Street in Quincy, Massachusetts. AT & T Illinois alleges that all the Defendants are controlled as a single economic entity that provides telecommunications and related services under the "Global NAPs" name. AT & T Illinois contends

that all the Defendants should be treated as a single enterprise.

AT & T Illinois and Global Illinois engaged in negotiations of the terms and conditions for the Agreement. The parties then arbitrated the remaining unresolved issues before the ICC in ICC Docket No. 01-0786. The ICC approved the final version of the Agreement in ICC Docket No. 03-0296. The Agreement was signed and took effect on February 10, 2003. The Agreement established the rates, terms, and conditions for the reciprocal compensation between AT & T Illinois and Global Illinois, as well as "transiting" service. Pursuant to this Agreement and AT & T Illinois' state and federal tariffs, AT & T Illinois has provided products and services to Global Illinois.

In order to serve its customers, Global Illinois obtained a number of services from AT & T Illinois. These services are ordered and provided under either AT & T Illinois' federal or state access tariffs or under the Agreement. Tariffs are public documents filed by a telephone company that define the rates, terms, and conditions on which it will provide certain services and facilities. When a customer orders services or facilities under a tariff, it accepts those rates, terms, and conditions. The two tariffs allegedly at issue in this case are; (1) AT & T Illinois' federal FCC Tariff No. 2, which governs interstate access service, the provision of dedicated "special access" facilities, the provision of Signal Transfer Protocol ("STP") dedicated network access links, and local number portability queries; and (2) AT & T Illinois' Illinois Commerce Commission Tariff 21, which governs intrastate access service and the provision of intrastate special access facilities.

AT & T Illinois filed its Complaint on June 23, 2006, alleging that Global Illinois has violated federal and state tariffs, as well as the Agreement, by refusing to pay any of the charges associated with the tariffs and the Agreement.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4531790 (N.D.Ill.)
**(Cite as: 2007 WL 4531790 (N.D.Ill.))**

Page 3

### ANALYSTS

In reviewing a motion to dismiss for lack of subject-matter jurisdiction, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the petitioner. *See Alicea-Hernandez v. The Catholic Bishop of Chicago,* 320 F.3d 698 (7th Cir.2003): *Long v. Shorebank Dev. Corp.,* 182 F.3d 548, 554 (7th Cir.1999). If the motion to dismiss is based on denials of the truth of the allegations, however, the court may "look beyond jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject-matter jurisdiction exists."*Grafon Corp. v. Hausermann,* 602 F.2d 781, 782 (7th Cir.1979); *see also Capitol Leasing Co. v. Federal Deposit Insurance Corp.,* 999 F.2d 188, 191 (7th Cir.1993); *Amoakowaa v. Reno,* 94 F.Supp.2d 903, 905 (N.D.Ill.2000), A litigant cannot rely on frivolous claims to establish jurisdiction. *See Williams v. Aztar Ind. Gaming Corp.,* 351 F.3d 294, 300 (7th Cir.2003)(*Williams* ).

*3 Here, AT & T Illinois alleges federal-question jurisdiction. Federal-question jurisdiction arises when a complaint establishes that federal law created the cause of action or that the litigant's right to relief necessarily depends on the resolution of a substantial question of federal law.*Williams,* 351 F.3d at 298. Counts I-IV allege that Global Illinois has utilized various services from AT & T Illinois under the FCC Tariff No. 2 and that Global Illinois has refused to pay the duly rendered bills. AT & T Illinois asserts that this Court has jurisdiction to resolve Counts I-IV of this Complaint under 28 U.S.C. §§ 1331, 1332, 1337, 2201, 2202, and 47 U.S.C. §§ 203 and 206-07, and that supplemental jurisdiction exists over Counts V-X under 28 U.S.C. § 1367. Global Illinois contends that each of AT & T Illinois' claims arise out of disputes over the interpretation of the Agreement entered into by the parties. As a result, Global Illinois argues that this Court does not have original jurisdiction to hear disputes regarding the interpretation and enforcement of the Agreement, as the disputes have not been addressed by the ICC, which approved the Agreement.

This Court does have subject-matter jurisdiction to hear requests for enforcement of federal tariffs. As the Seventh Circuit has recognized, a filed tariff is not to be treated as a mere contract under state law; rather, "tariffs are something more-at least the equivalent of federal regulations or law-so suits to challenge or invalidate tariffs arise under federal law."*Dreamscape Design, Inc. v. Affinity Network, Inc.,* 414 F.3d 665, 668-69 (7th Cir.2005), *citing Cahnmann v. Sprint Corp.,* 133 F.3d 484, 488-89 (7th Cir.1998)(*Cahnmann* ). In *Cahnmann,* a consumer brought a state class-action suit against a long distance carrier, Sprint, which was removed to federal court, *Cahnmann,* 133 F.3d at 486. The Seventh Circuit affirmed the district court's grant of removal to federal court, as well as the district court's judgment on the pleadings, as the class had called for the district court to invalidate a federal tariff, which was prohibited by the Act.*Cahnmann,* 133 F.3d at 486. Most instructive as to the present issue in this case, the Seventh Circuit went on to discuss the significance of and remedy for a violation of a tariff. The Court stated that if:

> Sprint violated the tariff to her [plaintiff's] detriment, she would be entitled to proceed against Sprint under federal law. She could either seek reparations in an administrative proceeding before the FCC, or bring a suit for damages directly under the Communications Act, 47 U.S.C. §§ 206, 207....

*Cahnmann,* 133 F.3d at 487 (internal citations omitted), *citing United States v. Western Pacific R.R.,* 352 U.S. 59, 63-65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *City of Peoria v. General Electric Cablevision Corp.,* 690 F.2d 116, 120-21 (7th Cir.1982); *National Communications Ass'n, Inc. v. American Tel. & Tel. Co.,* 46 F.3d 220, 222-23 (2d. Cir.1995); *Allnet Communications Service, Inc. v. National Exchange Carrier Ass'n, Inc.,* 965 F.2d 1118 (D.C.Cir.1992).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4531790 (N.D.Ill.)
(Cite as: 2007 WL 4531790 (N.D.Ill.))

*4 Thus, a federal tariff is equal to that of a federal regulation; "and so a suit to enforce it, ... arise[s] under federal law."*Cahnmann,* 133 F.3d at 488-89,*citing Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 555, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983) (*per curiam* ); *Louisville & Nashville R.R. v. Rice,* 247 U.S. 201, 38 S.Ct. 429, 62 L.Ed. 1071 (1918); *MCI Telecommunications Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1093-96 (3d Cir.1995); *Ivy Broadcasting Co. v. American Tel. & Tel. Co.,* 391 F.2d 486 (2d. Cir.1968). Accordingly, following the Seventh Circuit's guidance in *Cahnmann,* this Court has subject-matter jurisdiction to proceed with AT & T Illinois' suit for damages arising from the FCC Tariff No. 2 pursuant to 47 U.S.C. §§ 206-07.

### Supplemental Jurisdiction

Pursuant to 28 U.S.C § 1367(a), the state-law claims alleged against the Defendants fall within this Court's supplemental jurisdiction if they are "so related to [the federal] claims ... that they form part of the same case or controversy."The "federal court's original jurisdiction over federal questions carries with it jurisdiction over state-law claims that 'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court compromises but one constitutional 'case.' "*Groce v. Eli Lilly & Co.,* 193 F.3d 496 (7th Cir.1999), *quoting City of Chicago v. International College of Surgeons,* 522 U.S. 156, 164-65, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). The test is simply whether "a plaintiff's claims are such that he would be ordinarily expected to try them all in one judicial proceeding."*United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, a court may decline to exercise supplemental jurisdiction over a claim if "the claim raises a novel or complex issue of State law."28 U.S.C. § 1367(c)(1).

AT & T Illinois asks this Court to exercise supple-

mental jurisdiction over Counts V and VI, which involve collection claims under AT & T Illinois' state tariffs; over Counts VII-IX, which involve collection claims under the Agreement entered into under the Act; and over Count X, which requests damages in *quantum meruit.*Global Illinois argues that 47 U.S.C. § 252(e)(6) deprives this Court of jurisdiction over the claims.

### Counts VII-IX

As other circuits have appreciated, Congress has not spoken on the method of interpretation and enforcement procedures of disputes arising from previously approved interconnection agreements. *Core Communications, Inc. v. Verizon Pa., Inc.,* 493 F.3d 333, 340-41 (3d Cir.2007)(*Core* ). Under *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), federal courts must defer to an implementing agency's interpretation of a statute if (1) "the statute is silent or ambiguous with respect to the specific issue" in dispute and (2) "the agency's answer is based on a permissible construction of the statute."*In the Matter of Starpower Communications, LLC,* 15 F.C.C.R. 11277 (F.C.C.2000), the FCC recognized the statute's silence, stating, "[i]n applying Section 252(e)(2), we must first determine whether a dispute arising from interconnection agreements seeking interpretation and enforcement of those agreements is within the states' 'responsibility' under Section 252, We conclude that it is." The Third Circuit noted the "responsibility" of a state commission in this regard can be subject to two interpretations: a narrow interpretation, which would suggest that a state commission has, at a minimum, a non-exclusive authority to enforce an interconnection agreement; or, alternatively, a broad interpretation, which allows for a state commission to have sole authority to hear the enforcement proceeding initially, subject to appellate review by a federal court. *Core,* 493 F.3d at 341-43. The *Core* court determined that a broad interpretation was appropriate, given the "symmetrical and coherent regulatory scheme" for which the Act provides through the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                         Page 5
Slip Copy, 2007 WL 4531790 (N.D.Ill.)
**(Cite as: 2007 WL 4531790 (N.D.Ill.))**

state commissions. *Core,* 493 F.3d at 342-43. Moreover, as the Fifth Circuit held, "the Act's grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of the agreements that state commissions have approved."*Sw. Bell Tel. Co. v. PUC,* 208 F.3d 475, 479-80 (5th Cir.2000) (*Sw. Bell Tel. Co.*).

**\*5** Although the Seventh Circuit has not encountered this enforcement issue in the same context, in *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.,* 222 F.3d 323, 338 (7th Cir.2000)(*MCI* ), the Seventh Circuit "decline[d] to read subsection 252(e)(6) so narrowly," holding "[a] state's commission's authority to approve or reject interconnection agreements under the Act necessarily includes the authority to interpret and enforce, to the same extent, the terms of those agreements once they have been approved by that commission," In *Illinois Bell Tel. Co. v. Worldcom Tech., Inc.,* 179 F.3d 566, 574 (7th Cir.1999), the Seventh Circuit clarified a federal district court's role in deciding issues under the Act:

Lest there be any misunderstanding about what this conclusion means, we add that any issues of state law remain open for determination in the proper forum. Section 252(e)(6) authorizes a federal court to determine whether the agency's decision departs from federal law. A decision "interpreting" an agreement contrary to its terms creates a different kind of problem-one under the law of contracts, and therefore one for which a state forum can supply a remedy.

The Supreme Court, in *Verizon Maryland, Inc. v. Public Service Com'n of Maryland,* 535 U.S. 635, 642, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)(*Verizon* ), held that Section 252(e)(6) does "not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law."Therefore, a federal district court can review a state commission's "interpretation or enforcement of an interconnec-

tion agreement"; but nothing in *Verizon* indicates or suggests that a federal district court has jurisdiction to decide such issues without prior review by the state commission.

In this case, AT & T Illinois did not seek enforcement of the Agreement through the ICC; and, thus, this Court cannot review a decision or determination which has yet to be made by the ICC Accordingly, this Court lacks subject-matter jurisdiction over these claims. *See AT & T Communications of Ill. Inc. v. Illinois Bell Tel. Co.,* 1998 WL 525437 (N.D.Ill. Aug.18, 1998) (holding that the court lacked subject-matter jurisdiction over claims that were not the subject of the ICC's determination).

AT & T also argues that a clause in the parties' Interconnection Agreement ("ICA") provides that it may pursue its remedies in this Court. Once the ICC approved the parties' ICA, the parties are bound to that agreement; and AT & T is within its right to bring suit in federal court to resolve a dispute arising under the ICA.

An agreed ICA must be submitted to the State commission for approval. 47 U.S.C, § 252(a)(1); (b)(1). The State commission may reject an ICA if it finds that it discriminates against a telecommunications carrier not a party to the ICA; it is inconsistent with the public interest, convenience or necessity; or does not meet the requirements of Section 251 of the Telecommunications Act. 47 U.S.C. § 252(e)(2)(A),(B).

**\*6** The Formal Dispute Resolution section of the parties' ICA relied upon by AT & T provides, in relevant part, that if certain claims, including all claims arising under federal or state statute, "are not resolved through informal dispute resolution, they will not be subject to arbitration and must be resolved through any remedy available to a party pursuant to law, equity or agency mechanism."

AT & T reads this clause as allowing it to bring its breach of contract claims directly to the ICC if it chose to do so; but it does not require it to do so, al-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6
Slip Copy, 2007 WL 4531790 (N.D.Ill.)
**(Cite as: 2007 WL 4531790 (N.D.Ill.))**

lowing it to bring its claims to this Court. However, AT & T reads the clause too broadly. The remedy must be available pursuant to law, equity or agency mechanism. As discussed above, the *law,* pursuant to the Act, requires that AT & T first bring its claims to the ICC. The parties cannot contract for jurisdiction in this Court, *see Adkim v. Illinois Central R.R. Co.,* 326 F.3d 828, 833 (7th Cir.2003), and cannot contract for judicial review that is contrary to the requirements of the Act. *See Bell Atlantic-Virginia, Inc. v. Worldcom Tech. of Virginia,* 70 F.Supp.2d 620, 626 (E.D.Va.1999).

For the reasons set forth above, this Court refuses to grant supplemental jurisdiction to Counts VII-IX. Additionally, this Court refuses to grant supplemental jurisdiction as to Counts V and VII, state-law tariff-collection claims, and as to Count X, a claim in *quantum meruit,* as these contractual matters are more appropriately handled in a state for- um.

## CONCLUSION

For the foregoing reasons, Global Illinois' Motion to Dismiss is denied as to Counts I-IV. As discussed above, this Court refuses to extend supplemental jurisdiction to Counts V-X.

N.D.Ill.,2007.
Illinois Bell Telephone Co., Inc. v. Global Naps Illinois, Inc.
Slip Copy, 2007 WL 4531790 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.))**

**C**
Garelli Wong & Associates, Inc. v. Nichols
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
GARELLI WONG & ASSOCIATES, INC.,
Plaintiffs,
v.
William M. NICHOLS, Defendant.
No. 07 C 6227.

Jan. 16, 2008.

David N. Michael, Mark Douglas Brookstein,
Gould & Ratner, Chicago, IL, Robert G. Riegel, Jr.,
Fowler WhiteBoggs Banker PA, Jacksonville, FL,
for Plaintiffs.
Daniel Patrick Hogan, McCabe & Hogan, Palatine,
IL, for Defendant.

### MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge.
**\*1** Before this Court is Defendant's motion to dismiss Plaintiff's three-count Complaint. For the following reasons, Defendant's motion is granted.

### BACKGROUND

According to the allegations of the complaint, which we must accept as true for purposes of this motion, Plaintiff Garelli Wong and Associates, Inc. ("Garelli Wong") is an Illinois corporation. Garelli Wong operates three Illinois offices located in the cities of Chicago, Schaumburg, and Oakbrook. Garelli Wong provides temporary and permanent accounting and financial personnel and services to its clients. The company has devoted substantial time and expense to identify clients receptive to Garelli Wong's services by finding the decision makers within their clients' organizations, cultivating their client relationships and learning their clients' needs and preferences, determining how those needs match the capabilities of its employees, and by working out client-specific pricing and service arrangements.

Garelli Wong employees who are temporarily assigned to work for clients are referred to as its "consultants," and prospective consultants are termed "candidates." Garelli Wong created a database ("the Database") that contains candidate and client activity tracking information (including billing rates; margins; candidate identities and status; employee information; client identities and the names of client contacts; decision makers; and requirements). Garelli Wong does not share this information with its competitors but rather has made efforts to maintain the confidentiality of the information contained in the Database. The Database is housed in a secure server and can only be accessed by an authorized user who enters a personalized password. Garelli Wong's employees use the information in the Database to expand client relationships and build goodwill.

Around April 2006, MPS Group, Inc. ("MPS") purchased and became the owner of Garelli Wong. As owner, MPS acquired Garelli Wong's existing assets, which included any employment agreements that Garelli Wong had with its employees. Defendant William Nichols ("Nichols") was one such employee who had entered into an employment agreement with Garelli Wong prior to the purchase.

Nichols, an Illinois resident, began working as a Senior Staffing Consultant out of Garelli Wong's Chicago office around December 1, 2003. In that capacity, Nichols was Garelli Wong's primary contact with certain of its clients and prospective clients. Nichols met with candidates and clients and used the Database in an effort to match the candidates' and clients' needs, preferences, and requirements. In doing so, Nichols developed personal relationships with certain clients, employees, candidates, and consultants whom Garelli Wong recruited. From these relationships, Nichols acquired know-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.))

ledge about the clients' hiring managers, who according to Garelli Wong are often the most important client contacts. Nichols' employment with Garelli Wong also allowed him to obtain information about Garelli Wong's pool of screened consultants who serve its clients, including the rates Garelli Wong pays to its various consultants, the mark-up on those rates, and the flexibility Garelli Wong has for different clients on project-specific, or sometimes client-specific, placement.

**\*2** When Nichols began working for Garelli Wong he signed a Confidentiality and Non-Solicitation Agreement ("the Agreement") "that would be governed by, construed, and enforced in accordance with the laws of the state of Illinois."Paragraph 2 of the Agreement states:

Except as permitted by this Agreement or with the written consent of the Company, the Employee shall not at any time during or after employment with the Company, divulge, disclose or communicate, directly or indirectly, to any person, corporation or other entity, or use for his/her own benefit or for the benefit of anyone other than the Company, any of the Company's trade secrets or confidential or proprietary information, including, but not limited to, Client or Potential Client identities and contacts; Client or Potential Client lists; Client or Potential Client financial, business or personal information; other information relating to Client or Potential Client accounts, feedback or directions; financial and business information relating to the Company and its transactions; and any other confidential information relating to the Company, its business, or its Clients or Potential Clients, including the Company's candidate database.

Employee agrees that all confidential and proprietary information shall belong to and be the sole and exclusive property of the Company.

Paragraph 3 of the Agreement states:
Immediately upon termination of employment with the Company, the Employee shall return to the Company all materials that relate to the Company, its business, its Clients or Potential Clients which came into the Employee's possession during the Employee's employment by the Company.

Paragraph 4 of the Agreement states that for the six-month period following the end of Nichols' employment with Garelli Wong, he would not, for the benefit of any "Competitive Business":
directly or indirectly perform services for or solicit (or assist other persons or entities to perform services for, or solicit) any Client for which the Employee, during the one-year period prior to the termination of the Employee's employment with the Company: 1) performed services, 2) had any direct Client or Potential client, or 3) received financial credit for any placements.

After MPS purchased Garelli Wong, Nichols entered into a Restricted Stock Agreement (the "RSA") with MPS. The RSA specifically provided that, for purposes of the restrictive covenants set forth in the RSA, the term "Employer" included subsidiaries or affiliates of MPS. As per the RSA, Nichols was entitled to 1,500 unvested shares of MPS Group's common stock, which had a vesting date (the "Vesting Date") of March 7, 2008. If Nichols ended his employment prior to the Vesting Date, he forfeited all 1,500 shares. Nichols also agreed to a restrictive covenant clause in the RSA, which states, in part:

In consideration of being offered the Award herein, Employee hereby agrees that during his ... employment with the Company ... and for the period of twelve (12) months immediately following the termination of Employee's employment such that Employee is no longer employed in any capacity with the ... Company ... Employee shall not, either directly or indirectly ... engage in or assist others in ...:

**\*3** (c) entering into, engaging in, being employed by, being connected to, consulting or rendering services for, any enterprise that is offering or performing services similar to, or in competi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.))**

tion with, business or services offered or performed by Employer at the time of the termination of Employee's employment from the Employer ... within a 50 square mile radius of each office to which Employee was assigned or, if in management, each office or offices under Employee's managerial authority, at any time during the twelve (12) month period immediately preceding the termination of Employee's employment from the Employer ...

On September 28, 2007, Nichols voluntarily resigned from employment with Garelli Wong. According to the complaint, Nichols is currently working in direct competition with Garelli Wong. Prior to his resignation, Garelli Wong alleges that Nichols compiled significant amounts of Garelli Wong's confidential and proprietary client and candidate information by entering the Database without proper authority to do so. According to Garelli Wong, Nichols attempted to send this information to his personal e-mail account and/or copied it for his personal use.

Garelli Wong alleges that immediately following Nichols' resignation, he contacted a Garelli Wong candidate and attempted to recruit that candidate for a position on behalf of his new and current employer. In order to contact that candidate, Nichols used information to which only Garelli Wong employees had access.

In October 2007, Garelli Wong learned that Nichols had solicited and attempted to recruit a Garelli Wong candidate. Garelli Wong also learned that Nichols contacted or was trying to contact one or more Garelli Wong clients to set up meetings. Garelli Wong believes that Nichols is now working for a new company in a capacity similar to the position he held with Garelli Wong and is using the confidential and proprietary information he obtained from Garelli Wong to contact, solicit, recruit, or attempt to solicit and recruit Garelli Wong's candidates in order to compete against Garelli Wong for those clients.

On November 2, 2007, Garelli Wong filed a three-count complaint against Nichols. The complaint sets out two breach of contract claims and one violation of federal law. The first count alleges that Nichols violated the Agreement he entered into with Garelli Wong. The second count alleges Nichols breached the RSA he entered into with MPS. The final count states that Nichols violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.* Nichols filed a motion to dismiss Garelli Wong's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). Nichols argues that Garelli Wong's CFAA count fails to state a claim upon which relief can be granted and contends that if the CFAA claim is dismissed, Garelli Wong's two remaining counts should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) because federal jurisdiction would not be present.

## LEGAL STANDARD

**\*4** Fed.R.Civ.P. 12(b)(6) evaluates the legal sufficiency of a plaintiff's complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe all allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). To be cognizable, the factual allegations contained within a complaint must raise a claim for relief "above the speculative level." *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). However, a pleading need only convey enough information to allow the defendant to understand the gravamen of the complaint. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 627 (7th Cir.1999).

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) is to dismiss claims over which a federal court lacks subject matter jurisdic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.))

Page 4

tion. Jurisdiction is the "power to decide" and must be conferred upon a federal court. *In re Chicago, Rock Island & Pac. R.R. Co.,* 794 F.2d 1182, 1188 (7th Cir.1986). The plaintiff bears the burden of establishing that the jurisdiction requirements have been met. *see Kontos v. U.S. Dep't of Labor,* 826 F.2d 573, 576 (7th Cir.1987). When a defendant moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), the plaintiff must support its allegations with competent proof of jurisdictional facts. *Thomson v. Gaskillwsa,* 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942).

With these principles in mind, we consider the instant motion.

## DISCUSSION

### I. Computer Fraud and Abuse Act

The subject matter jurisdiction of Garelli Wong's complaint is premised entirely upon its CFAA count. As such, we will look to the sufficiency of this claim first. As Nichols correctly points out, the complaint does not specify the sections of the statute upon which it relies. However, 18 U.S.C. § 1030(g) mandates that a civil action pursuant to the CFAA "may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)." The allegations in Garelli Wong's complaint contain language that could apply to violations of § 1030(a)(5)(B)(i) as it pertains to § 1030(a)(5) (A)(i), (ii), and (iii):

Whoever-

(5) (A)(i) knowingly causes the transmission of ... information ... and as a result of such conduct, intentionally causes *damage* without authorization, to a protected computer;

(ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes *damage;* or

(iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes *damage ...; and*

**\*5** (5) (B)(i) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused *...loss* to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value.

(emphasis added).

A point of contention between the parties exists at to whether a plaintiff must allege both damage *and* loss in order to sufficiently plead a civil action under the CFAA or whether pleading damage *or* loss is enough. A thorough reading of the text above shows that it is necessary for a plaintiff to plead both damage *and* loss in order to properly allege a civil CFAA violation.

The CFAA defines "damage" as "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss" is defined under the CFAA to mean:

any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. 18 U.S.C. § 1030(e)(11).

Incorporating these definitions into its argument, Nichols contends that his alleged unauthorized acts of copying and emailing Garelli Wong's computer files did not impair the integrity or availability of the information in the Database and did not cause any interruption to the computer service. More pointedly, Nichols' argument is that one cannot be held civilly liable under the CFAA for copying information from a computer without authority to do so; a violation requires more.

### A. Damage

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)
(Cite as: --- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.))

According to Nichols, Garelli Wong's CFAA count should be dismissed because the complaint does not and cannot allege damage or loss as defined by the CFAA. Nichols cites *Airport Centers, LLC v. Citrin* in support of his position that the unauthorized copying and emailing of files from a computer is not enough to form the basis of a civil action under the CFAA. 440 F.3d 418 (7th Cir.2006). In *Citrin,* the defendant was employed by the plaintiff and given a company laptop to use and record data he collected while working. *Id.* at 419.The defendant then quit his job with the plaintiff and began working for himself. *Id.* Before returning the laptop to the plaintiff, the defendant deleted all the data on it and installed a secure-erasure program to prevent recovery of the deleted files. *Id.* In finding that the plaintiff had sufficiently stated a civil claim under the CFAA, the Seventh Circuit confirmed that installing a program intended to erase and delete files is sufficient to show damage as it is defined under the CFAA because the installation of such a program impairs the integrity or availability of data, programs, or information on the computer. *Id.*

Although the principal discussion in *Citrin* involved the meaning of the term "transmission" as used in § 1030(a)(5)(i), the damage referred to the computer files (as opposed to the physical computer), that is, the deletion of data stored in the computer. The statutory requirement of *damage* was satisfied since the defendant's acts impaired the integrity or availability of data. No similar allegation is made in the instant case.

**\*6** In further support of his position, Nichols cites *ResDev v. Lot Builders* and *Worldspan v. Orbitz, LLC,* two unpublished cases, which discuss "integrity" as it is used in the CFAA's definition of damage. 2005 WL 1924743 (M.D.Fla. Aug.10, 2005); 2006 WL 1069128 (N.D.Ill. April. 19, 2006). We believe the discussion of "integrity" in these cases lends guidance in the instant matter. In *ResDev,* defendants allegedly visited their former employer's website and accessed information that was not password protected. 2005 WL 1924743 at

\*1. The plaintiff in *ResDev* sought to recover damages under the CFAA based on the defendants viewing of the information and the information's alleged trade secret value. *Id.* Ultimately, the *ResDev* court held that the CFAA's use of the word "integrity" to define damage required "some diminution in the completeness or useability of data or information on a computer system" and concluded that the defendants' alleged conduct "did not come within the CFAA's meaning[;]" and therefore did not violate the CFAA. *Id.* at \*5.

The *Orbitz* court's analysis of the *ResDev* court's discussion of "integrity" is also worth mentioning. In *Orbitz,* the court found that the plaintiff's complaint "merely parrot[ed] the 'causing damage' text of the CFAA in conclusory fashion and fail[ed] to allege any facts indicating that the completeness, useability, or availability of [the plaintiff's] data was impaired."*Orbitz* 2006 WL 1069128 at \*5. As a result, the *Orbitz* court rejected the plaintiff's argument that "the mere 'taking of information' constitute[d] 'damage' under the CFAA."*Id.*

Garelli Wong cites several district court cases in opposition to Nichols' arguments. However, we find none of these cases persuasive. First, Garelli Wong cites *George S. May Intern. Co. v. Hostetler,* a 2004 case decided by this court, where we held: "we see no principled reason, nor has [defendant] offered one, why infringement of copyrighted material taken from a protected computer system would not qualify as impairment of the integrity of the copyrighted information."2004 WL 1197395, \*4. In *Hostetler,* the plaintiff alleged that the defendant used his access to his company's computer system to take several copyrighted documents with him when he ended his employment and, then, later used these documents to the detriment of his former employer. *Id.* at \*3. As our holding in *Hostetler* makes clear, the defendant in *Hostetler* did not provide us with any reasons on which to base a finding in its favor. *Id.* at \*4. We also point out that the CFAA was amended after the decision in *Shurgard Storage Centers, Inc. v. Safeguard Self Stor-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.))**

*age, Inc.,* 119 F.Supp.2d 1121. (W.D.Wash.2000), a case relied on in *Hostetler.* Such reliance is no longer compelling in light of the statutory amendments and other cases decided post-amendment.

Similarly, we are not inclined to follow *Pacific Aerospace & Electronics, Inc. v. Taylor,* which Garelli Wong cites to show that misappropriation is considered to be damage or loss under the CFAA. The *Taylor* court conducted an extensive review of the CFAA before it explained that "caselaw supports an employer's use of the CFAA's civil remedies to sue [its] former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer systems."295 F.Supp.2d 1188, 1195 (E.D.Wash.2003). The conclusion reached in *Taylor* does not take into account that a civil violation of the CFAA requires "impairment to the integrity or availability of data, a program, a system, or information" and "interruption in service." 18 U.S.C. § 1030. Allegations of trade secret theft and misappropriation do not suggest such a violation. Furthermore, the *Taylor* court partly based its conclusion on *Shurgard,* which we no longer find influential for reasons given above.

*7 Ultimately, we find that *ResDev* and *Orbitz* set out the correct analysis to be performed in deciding whether allegations are sufficient to properly plead damage under the CFAA. Though Garelli Wong would like us to believe that recent amendments to the CFAA are intended to expand the use of the CFAA to cases where a trade secret has been misappropriated through the use of a computer, we do not believe that such conduct alone can show "impairment to the integrity or availability of data, a program, a system, or information."18 U.S.C. § 1030(e)(8). Therefore, we conclude that Garelli Wong has failed to sufficiently plead damage under the CFAA.

**B. Loss**

As previously mentioned, Nichols believes that

Garelli Wong's CFAA count should be dismissed because the complaint does not and cannot allege loss as defined by the CFAA. Garelli Wong cites *Patriot Homes, Inc. v. Forest River Housing, Inc.* for the proposition that it asserted a cognizable claim under the CFAA by alleging that it suffered "losses" in excess of $5,000 as a result of Nichols' conduct. 2006 WL 1752143, *4 (N.D.Ind. June 21, 2006). Nichols counters with the discussion set out in *ResDev* that it is not enough to simply allege any monetary expenditure to assert a cognizable claim under the CFAA; instead, "loss" is limited to costs that are "directly associated with, or with addressing, an unauthorized computer-access event."2005 WL 1924743 at *4. The Supreme Court recently clarified that to properly plead a cause of action, a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief' [with] more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."*Twombly,* 127 S.Ct. at 1959. In its current form, the complaint states only that "Defendant's conduct caused losses to Garelli Wong in excess of $5,000" with no further elaboration. While we agree with Nichols that Garelli Wong does not presently allege loss, we disagree that it cannot do so. Conceivably, Garelli Wong could provide the necessary information in an amended complaint (consistent with its obligations under Fed.R.Civ.P. 11 that such an allegation is made only after reasonable inquiry into its factual foundation). However, in light of our conclusions that both damage and loss are necessary to state a cause of action under the CFAA and that Garelli Wong cannot allege damage, dismissal of Count III is warranted even though Garelli Wong could address the deficiencies within its allegations of loss in an amended complaint.

**II. State Law Claims**

The sole jurisdictional basis asserted for Counts I and II is the supplementary jurisdiction provided by 28 U.S.C. § 1367(a). When a district court dismisses all claims over which it has original jurisdiction, it may decline to exercise supplemental juris-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.))**

diction over the remaining claims. 28 U.S.C. § 1367(c)(3). In our circuit, the preferred course of action is to relinquish jurisdiction in such circumstances without good reasons to do otherwise. *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir.1998). Garelli Wong has not offered a compelling reason for us to maintain jurisdiction over its state-law claims, and in light of the early stage of this case, we will decline to exercise jurisdiction over Counts I and II. Therefore, those counts are dismissed for lack of subject matter jurisdiction.

### *CONCLUSION*

**\*8** For the foregoing reasons, Count III of Garelli Wong's complaint is dismissed for failure to state a claim. Counts I and II are dismissed for lack of subject matter jurisdiction.

N.D.Ill.,2008.
Garelli Wong & Associates, Inc. v. Nichols
--- F.Supp.2d ----, 2008 WL 161790 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939
(Cite as: 2006 WL 2683058 (M.D.Fla.))

Page 1

▷

Lockheed Martin Corp. v. Speed
M.D.Fla.,2006.

United States District Court,M.D. Florida.
LOCKHEED MARTIN CORPORATION, Plaintiff,
v.
Kevin SPEED, Steve Fleming, Patrick St. Romain,
L-3 Communications Corporation, & Mediatech,
Inc. Defendants.
L-3 COMMUNICATIONS CORPORATION, Third
Party Plaintiff,
v.
Jack KELLY, Thomas Dorsey, Michael Homan,
and Thomas Hull, Third Party Defendants.
**No. 6:05-CV-1580-ORL-31.**

Aug. 1, 2006.

Nathaniel H. Akerman, Dorsey & Whitney, LLP,
New York, NY, Lead Attorney, Attorney to be Noticed, for Lockheed Martin Corporation, (Plaintiff).
Ned H. Bassen, Hughes Hubbard & Reed, New
York, NY, Lead Attorney, Attorney to be Noticed,
for L-3 Communications Corporation, (Defendant).
Frank Moor Bedell, Winderweedle, Haines, Ward
& Woodman, P.A., Orlando, FL, Lead Attorney,
Attorney to be Noticed, for Patrick St. Romain,
(Defendant).
Lori R. Benton, Ford & Harrison LLP, Orlando,
FL, Lead Attorney, Attorney to be Noticed, for
Lockheed Martin Corporation, (Plaintiff).
Darryl M. Bloodworth, Dean, Mead, Egerton,
Bloodworth, Capouano & Bozarth, P.A., Orlando,
FL, Lead Attorney, Attorney to be Noticed, for
Kevin Speed, (Defendant).
Jeffrey R. Coleman, Hughes, Hubbard & Reed,
New York, NY, Lead Attorney, Attorney to be Noticed, for L-3 Communications Corporation,
(Defendant).
Carlos M. Colombo, Zimmerman, Kiser &
Sutcliffe, P.A., Orlando, FL, for L-3 Communications Corporation, (Defendant).
Michael V. Elsberry, Lowndes, Drosdick, Doster,

Kantor & Reed, P.A., Orlando, FL, Lead Attorney,
Attorney to be Noticed, for Jack Kelly, (Third Party
Defendant).
Juan J. Farach, Jr., Shubin & Bass, P.A., Miami,
FL, Lead Attorney, Attorney to be Noticed, for L-3
Communications Corporation, (Defendant).
Christine M. Fitzgerald, Hughes, Hubbard & Reed,
New York, NY, Lead Attorney, Attorney to be Noticed, for L-3 Communications Corporation,
(Defendant).
William Cooper Guerrant, Jr., Hill, Ward & Henderson, PA, Tampa, FL US, for Kevin Speed,
(Defendant).
Jason Habinsky, Hughes, Hubbard & Reed, New
York, NY, Lead Attorney, Attorney to be Noticed,
for L-3 Communications Corporation, (Defendant).
David P. Hathaway, Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, FL,
Lead Attorney, Attorney to be Noticed, for Kevin
Speed, (Defendant).
Benjamin H. Hill, III, Hill, Ward & Henderson,
P.A., Tampa, FL, Lead Attorney, Attorney to be
Noticed, for Patrick St. Romain, (Defendant).
David B. King, King, Blackwell, Downs &
Zehnder, P.A., Orlando, FL, Lead Attorney, Attorney to be Noticed, for L-3 Communications Corporation, (Defendant).
K. Judith Lane, Smith, Hood, Perkins, Loucks,
Stout, Daytona Beach, FL, Lead Attorney, Attorney
to be Noticed, for Mediatech, Inc ., (Defendant).
Creighton R. Magid, Dorsey & Whitney LLP,
Washington, DC US, Lead Attorney, Attorney to be
Noticed, for Lockheed Martin Corporation,
(Plaintiff).
Nichole M. Mooney, Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, FL,
Lead Attorney, Attorney to be Noticed, for Kevin
Speed, (Defendant).
Lisa M. Pisciotta, Hughes Hubbard & Reed LLP,
Miami, FL, Attorney to be Noticed, for L-3 Communications Corporation, (Defendant).
Kevin K. Ross, Lowndes, Drosdick, Doster, Kantor
& Reed, P.A., Orlando, FL, Lead Attorney, Attor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                    Page 2
Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939
(Cite as: 2006 WL 2683058 (M.D.Fla.))

ney to be Noticed, for Jack Kelly, (Third Party Defendant).

M. Susan Sacco, Ford & Harrison LLP, Orlando, FL US, Lead Attorney, Attorney to be Noticed, for Lockheed Martin Corporation, (Plaintiff).

Robert A. Schwartzbauer, Dorsey & Whitney LLP, Minneapolis, MN, Lead Attorney, Attorney to be Noticed, for Lockheed Martin Corporation, (Counter Defendant).

Nicolas Swerdloff, Hughes Hubbard & Reed LLP, Miami, FL, Lead Attorney, Attorney to be Noticed, for L-3 Communications Corporation, (Defendant).

William B. Wilson, Holland & Knight, LLP, Orlando, FL, Lead Attorney, Attorney to be Noticed, for Steve Fleming, (Defendant).

Kay L. Wolf, Ford & Harrison LLP, Orlando, FL US, Lead Attorney, Attorney to be Noticed, for Lockheed Martin Corporation, (Plaintiff).

Terry C. Young, Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, FL, Lead Attorney, Attorney to be Noticed, for Jack Kelly, (Third Party Defendant).

Thomas A. Zehnder, King, Blackwell, Downs & Zehnder, P.A., Orlando, FL, Lead Attorney, Attorney to be Noticed, for L-3 Communications Corporation, (Defendant).

ORDER

PRESNELL, J.

**\*1** This matter comes before the Court upon the Motion to Dismiss by Defendants Kevin Speed ("Speed") and Steve Fleming ("Fleming") (Doc. 53), to which Plaintiff Lockheed Martin Corporation ("Lockheed" or "the company") responded in opposition (Doc. 71), and the Motion to Dismiss by Patrick St. Romain ("St.Romain") (Doc. 68), to which Lockheed responded in opposition (Doc. 75). Lockheed alleges that three of its former employees accessed Lockheed computers, copied proprietary information, and delivered trade secrets to Defendant L-3 Communications Corporation ("L-3") in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. For the reasons herein stated, the Court grants the Motions to Dismiss.

I. Background

Lockheed and L-3, rivals in the defense and aerospace industries, made competing bids on the United States Air Force ("USAF") contract known as the Aircrew Training and Rehearsal Support contract ("ATARS I"). USAF ultimately awarded ATARS I to Lockheed in June 2000. ATARS I is scheduled to terminate on September 30, 2006, and the contract for ATARS II, an extension of ATARS I valued at one billion dollars, is scheduled to be awarded in the third quarter of 2006. Lockheed alleges that L-3, in an effort to gain an unfair advantage in its bid for ATARS II, conspired with three Lockheed employees-Speed, Fleming, and St. Romain (collectively, "the Employees")-to wrongfully obtain ATARS trade secrets. The particular allegations against the Employees are as follows:

(1) Speed, a Lockheed program manager, held ultimate responsibility for ATARS I. (Compl.¶¶ 24-25.) Speed had "complete access to ATARS confidential and proprietary and trade secret protected information."(Compl.¶ 24.) Speed resigned from Lockheed on March 4, 2005 and thereafter became employed with L-3.[FN1] Shortly before resigning, Speed allegedly copied 200 documents (forty-four of which related to ATARS) from his Lockheed computer by burning them onto a compact disc ("CD"). (Compl.¶ 50(a).)

> FN1. After resigning, Speed joined Defendant Mediatech, a Lockheed subcontractor assigned to ATARS I, which allegedly acted as a hiring front for L-3. The hiring front was designed to mask Speed's role in developing a competitive ATARS II bid for L-3. While the Complaint is unclear as to the exact relationship between Mediatech and L-3, Speed admits that he is currently employed by L-3. (Doc. 53 at 1.)

(2) Fleming, a Lockheed senior manager, "had un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                 Page 3
Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939
**(Cite as: 2006 WL 2683058 (M.D.Fla.))**

restricted access to [Lockheed's] shared network drives, including data folders containing ATARS confidential and proprietary and trade secret protected information."(Compl.¶ 27.) Fleming resigned from Lockheed on March 18, 2005 and, like Speed, became employed with L-3. Shortly before resigning, Fleming allegedly: (a) burned 262 files onto a CD; (b) synchronized nine Lockheed data files to his BlackBerry personal digital assistant ("PDA"); and (c) on his last day of work, copied sixty-three data files onto two CDs, including "the most recent and detailed ATARS program review."(Compl.¶ 50(b)-(d).)

(3) St. Romain, a Lockheed site manager, "had access to the confidential and proprietary and trade secret protected financial, technical and strategic data concerning [ATARS I]." (Compl.¶ 28.) St. Romain resigned from Lockheed on March 25, 2005. On St. Romain's last day of employment, he allegedly "synchronized his [Lockheed] computer to a Dell PDA, thereby removing [Lockheed] documents to his PDA."(Compl.¶ 50(e).)

**\*2** Based on these allegations relating to the Employees, Lockheed asserts that this Court has federal question subject matter jurisdiction pursuant to the CFAA.

## II. Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), and must limit its consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.,* 999 F.2d 1508, 1510 (11th Cir.1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In

ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."*Davila v. Delta Air Lines, Inc .,* 326 F.3d 1183, 1185 (11th Cir.2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules [of Civil Procedure] require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief."*U.S. v. Baxter Int'l, Inc.,* 345 F.3d 866, 880 (11th Cir.2003) (*citing*FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.,* 253 F.3d 678, 683 (11th Cir.2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."*Id.* (internal citation and quotation omitted)."A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests."*Sams v. United Food and Commercial Workers Int'l Union,* 866 F.2d 1380, 1384 (11th Cir.1989).

## III. Discussion

A. Lockheed Adequately Alleges Injury Under § 1030(g)

The CFAA, primarily a criminal statute, provides a civil cause of action in § 1030(g):

Any person who suffers *damage* or *loss* by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939

**(Cite as: 2006 WL 2683058 (M.D.Fla.))**

Page 4

the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

**\*3** 18 U.S.C. § 1030(g)(2002) (emphasis added).

Thus, before reaching the merits of the alleged violations, the CFAA's private cause of action sets forth a two-part injury requirement, where a plaintiff must: (1) suffer a root injury of damage or loss; and (2) suffer one of five operatively-substantial effects in subsection (a)(5)(B)(i)-(v).

Subsection (g) first requires civil litigants to suffer "damage" [FN2] and/or "loss." [FN3] The primary injury that Lockheed alleges is the loss of its trade secrets. As this Court has held before, the alleged wrongful taking of trade secrets does not, by itself, fit within the grouping of "damage" or "loss." *Resdev, LLC v. Lot Builders Ass'n, Inc.,* No. 6:04-CV-1374, 2005 WL 1924743, at \*4 (M.D.Fla. Aug. 10, 2005) ("ResDev's position fails to acknowledge that allegedly ill-gotten revenues from a trade secret are neither a 'but-for' nor a proximate consequence of 'damage,' and nor do they fit within the grouping of 'loss.' "). Lockheed, however, also alleges that the unauthorized actions of the Employees caused Lockheed to incur costs in "responding to the ... offenses" and in "conducting a damage assessment." (Compl.¶¶ 70, 75, 79.) These costs are explicitly identified in the CFAA's definition of "loss." [FN4] Lockheed, therefore, sufficiently alleges loss pursuant to § 1030(g).

> FN2. The CFAA defines "damage" as: "any impairment to the integrity or availability of data, a program, a system, or information[.]"18 U.S.C. § 1030(e)(8).

> FN3. The CFAA defines "loss" as follows:

>> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]

>> 18 U.S.C. § 1030(e)(11).

> FN4. *See, supra,* note 3.

Subsection (g) also requires civil litigants to allege one of the following five effects set forth in § 1030(a)(5)(B):

(i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(iii) physical injury to any person;

(iv) a threat to public health or safety; or

(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security[.]

18 U.S.C. § 1030(a)(5)(B).

For each of the alleged violations of the CFAA, Lockheed invokes § 1030(a)(5)(B)(i), alleging that each violation "caused loss of $5,000 in value in the aggregate, including the cost of [Lockheed] responding to the ... offense and conducting a damage

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939
**(Cite as: 2006 WL 2683058 (M.D.Fla.))**

assessment."(Compl.¶¶ 70, 75, 79.) While the Complaint does not explicitly state that the only alleged losses available under the statute (responding to the offense and subsequent damage assessment) amounted to $5,000, the Court finds that the liberal pleading requirements at this motion-to-dismiss stage do not require such particularity. Thus, Lockheed sufficiently alleges a § 1030(a)(5)(B)(i) loss pursuant to § 1030(g). The Court now turns to the three alleged violations of the CFAA.

B. Lockheed Fails to Adequately Allege Violations of § 1030(a)(4)

**\*4** Count I alleges that Defendants violated § 1030(a)(4) of the CFAA, which provides that whoever

knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period[.]

18 U.S.C. § 1030(a)(4).

The Employees assert that the they did not access "without authorization" or "exceed[ ] authorized access" in violation of the statute because Lockheed permitted the Employees, as a function of their respective positions, to access the precise information at issue. Lockheed does not disagree that the Employees were permitted access to the information; instead, Lockheed contends that the Employees' interpretation of "authorization" is too narrow, arguing that the term is properly interpreted in light of the Second Restatement of Agency. Lockheed cites to the Restatment for the proposition that "the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interest or if he is otherwise guilty of a serious breach of loyalty to the principal."Restatement (Second) of

Agency § 112 (1958) (hereinafter "Restatement § 112"). Because the Employees accessed information with intent to steal and deliver to a competitor, Lockheed argues, the Employees acquired adverse interests, terminated their agency authority, and therefore accessed "without authorization." In support of this reliance on Restatement § 112, Lockheed cites two cases: *International Airport Centers, L.L.C. v. Citrin,* 440 F.3d 418, 420-21 (7th Cir.2006) and *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1125 (W.D.Wash.2000).

The Court is not persuaded by the analysis in either *Citrin* or *Shurgard.*Both cases rely heavily on extrinsic materials, particularly the Second Restatement of Agency (*Citrin* and *Shurgard* ) and legislative history (*Shurgard* ), to derive the meaning of "without authorization." Because the plain language of the statute is sufficient to interpret the disputed terms, this Court need not resort to extrinsic materials. In the Eleventh Circuit, there is a presumption that, in drafting a statute, "Congress said what it meant and meant what it said."*Shotz v. City of Plantation, Florida,* 344 F.3d 1161, 1167 (11th Cir.2003)."The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute."*Id.* (internal quotation omitted). Words carry their ordinary meaning, unless otherwise defined. *Am. Bankers v. Ins. Group v. United States,* 408 F.3d 1328, 1332 (11th Cir.2005). If Congress has used clear statutory language, a court need not consider extrinsic materials, such as legislative history, and certainly should not derive from such materials a meaning that is inconsistent with the statute's plain meaning.*Shotz,* 344 F.3d at 1167. Even where Congress has used statutory language that is not entirely transparent, courts are to resort to canons of construction to determine "the meaning of a particular statutory provision by focusing on the broader, statutory context."*Id.* at 1167 (internal quotations omitted). There is one instance where extrinsic materials are permitted to define a term: when the statutory language either produces a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

clearly absurd result or presents a substantial ambiguity. *Id.* at 1167.

**\*5** The term, "without authorization," is not defined by the CFAA. Nonetheless, "authorization" is commonly understood as "[t]he act of conferring authority; permission."*The American Heritage Dictionary,* 89 (1976). On the other hand, the CFAA defines "exceeds authorized access" as follows: "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]"18 U.S.C. § 1030(e)(6). The CFAA targets access "without authorization" in six separate offenses (§§ 1030(a)(1), (a)(2), (a)(3), (a)(4), (a)(5)(ii), (a)(5)(iii)), only three of which also reach persons "exceeding authorized access" (§§ 1030(a)(1), (a)(2), (a)(4)). Thus, it is plain from the outset that Congress singled out two groups of accessers, those "without authorization" (or those *below* authorization, meaning those having no permission to access whatsoever-typically outsiders, as well as insiders that are not permitted *any* computer access) and those exceeding authorization (or those *above* authorization, meaning those that go beyond the permitted access granted to them-typically insiders exceeding whatever access is permitted to them).

By applying the plain meaning of the statutory terms to the facts of this case, it is clear that the Employees accessed *with* authorization, did not exceed their authorization, and thus did not violate § 1030(a)(4). The analysis is not a difficult one. Because Lockheed permitted the Employees to access the company computer, they were not without authorization. Further, because Lockheed permitted the Employees to access the precise information at issue, the Employees did not exceed authorized access. The Employees fit within the very group that Congress chose not to reach, *i.e.,* those with access authorization. It follows that § 1030(a)(4) cannot reach them. The gist of Lockheed's complaint is aimed not so much at the Employees' improper access of the ATARS information, but rather at the Employees' actions subsequent to their accessing the information. As much as Lockheed might wish it to be so, § 1030(a)(4) does not reach the actions alleged in the Complaint. *See Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda,* 390 F.Supp.2d 479, 498 (D.Md.2005) ("Thus, to the extent that Werner-Masuda may have breached the Registration Agreement by *using* the information obtained for purposes contrary to the policies established by the IAM Constitution, it does not follow, as a matter of law, that she was not authorized to access the information, or that she did so in excess of her authorization in violation of the ... CFAA."). Where Congress targeted actions other than access, such as "communication" or "delivery" of confidential information, it explicitly provided such language. *See*18 U.S.C. § 1030(a)(1).

*1. Disagreement with Citrin and Shurgard*

The Court acknowledges that the Seventh Circuit in *Citrin,* following *Shurgard,* came to a different conclusion with respect to the application of "without authorization." In *Citrin,* an employee accessed his company laptop and deleted the data in it by using a secure-erasure program, which rendered the deleted material irretrievable. *Citrin,* 440 F.3d at 419. The employee's access was "without authorization" at the point "he resolved to destroy files that incriminated himself and other files that were also the property of his employer, in violation of the duty of loyalty that agency law imposes on an employee."*Id.* at 420 (relying on *Shurgard* and Restatement § 112). To the extent *Citrin* holds that an employee accesses "without authorization" at the moment the employee acquires a subjectively adverse interest to the employer, the Court respectfully disagrees.

**\*6** First, by reading Restatement § 112 legalese into the meaning of "without authorization," the term becomes equipped with a breadth that effectively shaves "exceeds authorized access" down to a mere sliver of what its plain meaning suggests. *Citrin'* s use of "without authorization" appears to cover anyone without authorization to begin with (*e.g.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

outsider) or an agent that terminates his authority, including the acquiring of adverse interests. As for "exceeds authorized access" *Citrin* used the following example to illustrate the "paper thin" range that it covers on its own:

[F]or example, the former employee of a travel agent, in violation of his confidentiality agreement with his former employer, used confidential information that he had obtained as an employee to create a program that enabled his new travel company to obtain information from his former employer's website that he could not have obtained as efficiently without the use of that confidential information. The website was open to the public, so he was authorized to use it, but he exceeded his authorization by using confidential information to obtain better access than other members of the public.[FN5]

> FN5. Here, *Citrin* was drawing on the circumstances in *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 583-84 (1st Cir.2001).

*Citrin,* 440 F.3d at 420.

Thus, it appears that *Citrin* relegates the work performed by "exceeds authorized access" to those outside the principal-agent relationship (*e.g.,* ex-employee) that are permitted a minimum level of access to a computer, and then exceed that access. But this effectively turns the plain reading of the statutory definition of "exceeds authorized access" on its head. The statutory definition appears purposefully aimed at the company *insider* that already has authorization-not the non-agent *outsider* with public access to a company website.[FN6][FN7]*Citrin* agreed that the CFAA's distinguished use of "without authorization" and "exceeds authorized access" resulted in "[m]uddying the picture some." *Id.* In this Court's view, the plain meaning brings clarity to the picture and illuminates the straightforward intention of Congress, *ie.,* "without authorization" means no access authorization and "exceeds authorized access" means to go beyond the access

permitted. While *Citrin* attempts to stretch "without authorization" to cover those *with* access authorization (albeit those with adverse interests), Congress did not so stipulate.

> FN6. To reiterate, the CFAA defines "exceeds authorized access" as follows: "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]"18 U.S.C. § 1030(e)(6).

> FN7. Even assuming that "without authorization" is to be understood in light of Restatement § 112, the reach attributed to "exceeding authorized access," would be less than what *Citrin* gives it credit for. In *Citrin'* s example, an ex-employee accessing a company website open to the public was deemed to have a threshold level of authorization that was exceeded by using confidential information to gain better access. But the term "exceeding authorized access" presumes, it would seem, a threshold level of access that is not wide-open to the public. It is odd to consider any internet passerby to the company website as having company authorization. Thus, under a *Citrin* reading, the coverage exclusively belonging to "exceeding authorized access" would be even more limited, presumably applying to those permitted some type of access above what the common public is permitted, but who are non-agents (such as, perhaps, independent contractors and clients). A more straightforward application of the statute (under either the *Citrin* reading or this Court's reading) is to identify that ex-employee for what he is: an outsider who is simply *without* authorization-not someone who is *exceeding* authorization.

Second, *Citrin* slays all three heads of wrongful access when Congress only aimed at two heads. *Cit-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 8
Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939
(Cite as: 2006 WL 2683058 (M.D.Fla.))

*rin* reads: (1) "without authorization" as applying to (a) persons that have no authority to begin with, and (b) agents with authority that do something to terminate that authority (including acquire adverse interests); and (2) "exceeds authorization access" as applying to non-agents exceeding a permitted threshold level of access. But this reading of the two separate terms ("without authorization" and "exceeding authorization") forces them to cover the entire spectrum of wrongful access (wrongful accessers *without* authorization, wrongful accessers *with* authorization, and wrongful accessers *exceeding* authorization). To be sure, the *Citrin* reading has its allure-it gets all of the wrongful accessers. Yet if that was the intent of Congress, why would it bother with "authorization" at all? That is, why wouldn't § 1030(a)(4) simply read as follows: "whoever knowingly and with intent to defraud, accesses a protected computer, and by means of such conduct furthers the intended fraud and obtains anything of value ..."?Section 1030(a)(4) without any reference to "authorization" reaches the same wrongful accessers as the *Citrin* reading with "authorization" in place. Yet, when Congress aimed at an entire spectrum of wrongdoers, it did just that; it omitted any mention of "authorization." [FN8]In § 1030(a)(4), and others like it (§§ 1030(a)(1), (a)(2)), Congress singled out those accessing "without authorization" (or below authorization) and those "exceeding authorization" (or above authorization) while purposefully leaving those in the middle untouched (those accessing *with* authorization), regardless of their subjective intent.

> FN8. For example, in § 1030(a)(5)(A)(i) Congress targeted all transmitters, regardless of authorization. Section 1030(a)(5)(A)(i) provides that whoever "knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."18 U.S.C. § 1030(a)(5)(A)(i). Here, even transmitters *with* authorization do not escape liability,

unless the damage they cause is permitted.

**\*7** Third, by reading Restatement § 112 into "without authorization," employers suddenly have a federal cause of action whenever employees access the company computer with "adverse interests" and such access causes a statutorily recognized injury. In addition to broadening the doorway to federal court, the "adverse interest" inquiry affixes remarkable reach to the statute-a reach that is not apparent by the statute's plain language. Under *Citrin,* would checking personal email on company time without express permission and thereby causing, however unintentionally, impairment to the computer in excess of $5,000 give rise to CFAA liability? It might.[FN9]

> FN9.*See*18 U.S.C. § 1030(a)(5)(A)(iii) (providing that whoever "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage...."). If conducting personal activities on the job is considered an adverse interest, it would appear that § 1030(a)(5)(A)(iii) might apply to the worker checking personal email. *See* Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes,* 78 N.Y.U. L.Rev. 1596, 1634 (2003) (explaining that the apparent effect of *Shurgard* is to extend liability to "an employee's use of an employer's computer for anything other than work-related activities"); *see also* Patricia L. Bellia, *Defending Cyberproperty,* 79 N.Y.U. L.Rev. 2164, 2258 (2004) (cautioning against a broad reading of "without authorization").

Fourth, the breadth of the statute given under the *Citrin* reading is especially disconcerting given that the CFAA is a *criminal* statute with a civil cause of action. To the extent "without authorization" or "exceeds authorized access" can be considered ambiguous terms, the rule of lenity, a rule of statutory construction for criminal statutes, requires a re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939
(Cite as: 2006 WL 2683058 (M.D.Fla.))

strained, narrow interpretation. *See, e.g., Pasquantino v. U.S.,* 544 U.S. 349, 383 (2005) (speaking of the rule of lenity, the Court explained "[w]e have long held that, when confronted with two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.") (internal quotations omitted).[FN10] The fact that this Court now addresses the CFAA in a civil context does not withdraw the necessity of applying the rule of lenity. *See, e.g., Leocal v. Ashcroft,* 543 U.S. 1, 12 n. 8 (U.S.2004) (explaining in footnote dictum that, if a statute has criminal applications, "the rule of lenity applies" to the Court's interpretation of the statute even in immigration cases because of the need to "interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context"); *United States v. Thompson/Ctr. Arms Co.,* 504 U.S. 505, 517-18, 518 n. 10 (1992) (plurality opinion) (employing the rule of lenity to interpret "a tax statute ... in a civil setting" because the statute "has criminal applications"); *id.* at 519 (Scalia, J., concurring) (invoking the rule of lenity in a concurrence joined by Justice Thomas). Thus, the view of the CFAA adopted by this Court is one that follows the statute's plain meaning, and coincidently, has the added benefit of comporting with the rule of lenity.[FN11]

> FN10.*See also U.S. v. Wiltberger,* 18 U.S. 76, 95 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment .").

> FN11. Because the CFAA has largely been addressed in the civil context, courts may be adopting a more expansive view of

"authorization" than they would have taken in the criminal context. As one commentator points out, it is one thing to say that a defendant must compensate a plaintiff for the harm it caused in a business dispute; "it is quite another to say that a defendant must go to jail for it."Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes,* 78 N.Y.U. L.Rev. 1596, 1641-42 (2003).

C. Lockheed Fails to Adequately Allege a Violation of § 1030(a)(5)(A)(i)

Count II alleges a violation of § 1030(a)(5)(A)(i), which provides whoever "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer[.]"18 U.S.C. § 1030(a)(5)(A)(i). The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information[.]"18 U.S.C. § 1030(e)(8). As noted earlier in Part III(A), the loss of trade secrets does not constitute "damage" under the statute. *Resdev, LLC v. Lot Builders Ass'n, Inc.,* No. 6:04-CV-1374, 2005 WL 1924743, *4 (M.D.Fla. Aug. 10, 2005). Likewise, while Lockheed's remedial measures (the response to the alleged conduct and subsequent damage assessment) fall under the statute's definition of "loss," such measures do not fit in the definition of "damage," which is aimed at the impairment rendered to the computer and information therein.

**\*8** In its response memoranda, Lockheed requests this Court to "infer from the totality of the allegations ... that as a result of ... data synchronizing and the data downloading to CDs, a number of the Lockheed Martin files were permanently deleted from Lockheed Martin's computers."(Doc. 75 at 11; *see also* Doc. 71 at 12.) The Court will not infer an allegation that the Complaint does not itself allege. In the 53 pages and 165 paragraphs devoted to the Amended Complaint, the only reference to perman-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939
**(Cite as: 2006 WL 2683058 (M.D.Fla.))**

ently deleted files is the following: "The Defendants were not authorized to damage, delete or permanently remove data files from [Lockheed] computers."(Compl.¶ 74.) But this statement falls short of alleging that the Employees actually *did* permanently delete or remove documents. In the paragraph of the Complaint that is devoted to providing a detailed account as to the Employees' particular actions, there is no mention of permanent deletion or removal. (Compl.¶ 50.) The copying of information from a computer onto a CD or PDA is a relatively common function that typically does not, by itself, cause permanent deletion of the original computer files. In the absence of an allegation of permanent deletion or removal, the Court will not create one. Count II is accordingly dismissed.

**D. Lockheed Fails to Adequately Allege a Violation of § 1030(a)(5)(A)(ii)**

Count III alleges that Defendants violated § 1030(a)(5)(A)(ii) of the CFAA, which provides that whoever "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage[.]"18 U.S.C. § 1030(a)(5)(A)(ii). In light of Parts III(A), (B), it is easy to see that Count III must fail because the Employees' accessed *with authorization* and did not cause *damage,* as those terms are contemplated and defined under the CFAA. Count III is accordingly dismissed.

**IV. Conclusion**

Lockheed is not entitled to relief under 18 U.S.C. § 1030(a)(4) because the Employees' access was neither "without authorization" nor "exceeding authorization" as those terms are contemplated by the CFFA. Further, relief is unavailable under 18 U.S.C. § 1030(a)(5)(i) because Lockheed fails to allege anything constituting "damage" as that term is defined under the statute. Finally, relief under 18 U.S.C. § 1030(a)(5)(ii) is unavailable because this provision requires an allegation of "without author-

ization" *and* "damage"-both of which Lockheed fails to adequately allege. Accordingly, it is

ORDERED THAT the Employees' Motions to Dismiss (Docs. 53 & 68) are GRANTED. The dismissal of Lockheed's claims is without prejudice and with leave to amend. Lockheed shall have twenty days to replead in a manner consistent with this Order if Lockheed chooses to do so.

DONE and ORDERED.

M.D.Fla.,2006.
Lockheed Martin Corp. v. Speed
Slip Copy, 2006 WL 2683058 (M.D.Fla.), 81 U.S.P.Q.2d 1669, 19 Fla. L. Weekly Fed. D 939

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
**(Cite as: 2006 WL 1069128 (N.D.Ill.))**

Page 1

**C**
Worldspan, L.P. v. Orbitz, LLC
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
WORLDSPAN, L.P., Plaintiff,
v.
ORBITZ, LLC, Defendant.
**No. 05 C 5386.**

April 19, 2006.

John Nicholas Gallo, Daniel Moore Twetten, Kyle
David Rettberg, William F. Conlon, Sidley Austin
LLP, Chicago, IL, for Plaintiff.
Paul Evans Chronis, Aron J. Frakes, Jeffrey J.
Bushofsky, Mark Jacob Altschul, McDermott, Will
& Emery LLP, Chicago, IL, for Defendant.

*MEMORANDUM OPINION*

GRADY, J.
**\*1** Before the court is defendant's motion to dismiss
the complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). For the reasons explained be-
low, the motion is granted.

*BACKGROUND*

In this action, plaintiff Worldspan, L.P.
("Worldspan") alleges that defendant Orbitz, LLC
("Orbitz") violated the Consumer Fraud and Abuse
Act and breached the contract between the parties.
The complaint alleges the following facts, which
are taken as true for purposes of the instant motion.

Worldspan is a company that gathers and maintains
worldwide electronic travel data and provides travel
agencies, travel service providers, and corporations
with access to this data. Worldspan provides its
customers with real-time access to schedules, fares,
availability, and other travel data as well as the
ability to process reservations and issue tickets for

the products and services of travel suppliers such as
airlines, hotels, car-rental companies, tour compan-
ies, and cruise lines. In the travel industry, World-
span is referred to as a "computer reservations sys-
tem," or CRS. As a CRS, its primary source of rev-
enue is "segment fees," which are fees that an air-
line or other travel supplier pays to a CRS for each
flight (or equivalent travel service) that is booked
through the CRS. Worldspan passes a portion of the
segment fees along to its travel agency customers in
order to induce those agencies to use Worldspan's
services.

*The Creation of Orbitz and Its Agreement with
Worldspan*

Orbitz is an online travel agency that was created
and developed in late 1999 and early 2000 pursuant
to a partnership among five airlines: American,
Continental, Delta, Northwest, and United. In order
for Orbitz to launch and operate its Web site, Orbitz
signed agreements with several companies, includ-
ing Worldspan, to provide necessary information
and infrastructure.

In August 2000, Worldspan and Orbitz entered into
an "Agreement for CRS Access and Related Ser-
vices" (the "Agreement"). Pursuant to the Agree-
ment, in exchange for Orbitz's payment of a certain
percentage of flight segments booked through any
CRS, Worldspan agreed to provide Orbitz with (1)
information about the availability of airline seg-
ments; (2) the capability to book and issue airline
tickets; and (3) a shopping engine that would dis-
play to Orbitz's users a comparison of available
flight routing options and pricing for international
itineraries.

Also in furtherance of the launch of Orbitz's Web
site, Orbitz and Worldspan in 2000 each individu-
ally entered into contracts with ITA Software, Inc.
("ITA"). Pursuant to its agreement with ITA, Orbitz
paid ITA a fee for ITA to provide a shopping en-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
(Cite as: 2006 WL 1069128 (N.D.Ill.))

gine that would display to Orbitz's users a comparison of available flight routing options and pricing for domestic itineraries. Pursuant to its agreement with Worldspan, ITA in turn paid a fee to Worldspan to obtain availability and other data for Orbitz and other ITA customers.

*Orbitz's Development of the "Direct Connect" Model and the Renegotiated, Amended Agreement with Worldspan*

**\*2** Although Orbitz initially contracted with Worldspan for the use of Worldspan's services, its business model involves a reduction of dependence on CRSs. According to the complaint, one of the primary purposes of Orbitz is to allow bookings to be made directly with certain airlines without the involvement of a CRS (such as Worldspan). These non-CRS bookings are part of Orbitz's "direct-connect" business model; the goal under this model is to obtain the data traditionally provided by a CRS through other means and then book airline tickets through direct connections to the airlines rather than through a CRS. The direct-connect model is "significant" to Worldspan because "when Orbitz books a [flight] segment directly with an airline, Worldspan does not receive any revenue whatsoever from the airline."(Complaint ¶ 17.) <sup>FN1</sup>

> FN1. According to Worldspan, Orbitz has publicly misrepresented that it can operate its direct-connect program and deliver the services historically provided by a CRS without the involvement of a CRS. In Worldspan's view, "Orbitz relies on CRS services for each and every airline segment booked through Orbitz, even where Orbitz characterizes them as 'Direct Connect' segments."(Complaint ¶ 20 .)

Shortly before the summer of 2001, Orbitz indicated its intent to proceed with its plans to implement the direct-connect model, and it began renegotiating its agreement with Worldspan-specific-

ally, the terms under which Orbitz could use Worldspan's data in connection with the direct-connect bookings. Worldspan states that prior to and during the renegotiation process, it "made clear to Orbitz that [Orbitz] was not authorized to use Worldspan's availability data in connection with Direct Connect segments until the parties had negotiated appropriate compensation to Worldspan for such use."(*Id.* ¶ 29.)

In November 2001, Worldspan and Orbitz executed an "Amended and Restated Agreement for CRS Access and Related Services" (the "Amended Agreement"). The parties were not able to reach agreement on all terms. Section 4.4 of the Amended Agreement provided: "ITA Subscription Fee. The parties agree to use their diligent best efforts to reach a definitive agreement by December 31, 2001 whereby Orbitz shall pay Worldspan a subscription fee in exchange for access to Worldspan's availability information on air carrier seat inventory."(Complaint, Ex. A, at 9.)

During 2002, Worldspan continued to attempt to resolve "the manner in which Orbitz would be permitted to use Worldspan's availability data."(Complaint ¶ 31.) In the meantime, Orbitz moved forward with its direct-connect program. American was the first airline to become a direct-connect customer of Orbitz, in August 2002. Worldspan alleges that even though it had previously "warned" Orbitz that Orbitz could not use Worldspan's data in connection with direct-connect segments, and it had "informed" ITA that ITA could not use this data on behalf of Orbitz in connection with these segments, Orbitz "stole" this availability data for the American direct-connect flights and failed to compensate Worldspan for the data.

*The First Amendment to the Amended Agreement*

"In August 2002, when Worldspan learned that Orbitz was improperly using Worldspan's availability data in connection with the Direct Connect pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
(Cite as: 2006 WL 1069128 (N.D.Ill.))

Page 3

gram, Worldspan informed Orbitz that its access to the Worldspan system would be terminated unless Orbitz's improper conduct ceased."(*Id.* ¶ 41.)This notice led to further negotiations between the parties regarding Orbitz's use of the availability data. The result was the "First Amendment" to the Amended Agreement. In Worldspan's view, the First Amendment altered the Amended Agreement "in at least three significant ways."(*Id.* ¶ 48.)First, Orbitz agreed to book all of its "Airline Non-Direct Connect Segments"[FN2](Complaint, Ex. B, § 4(a).) Second, Orbitz agreed to not "directly or indirectly acquire or use any products or services from a CRS other than Worldspan to support or use with the Orbitz Website for Airline Direct Connect Customers."(Orbitz's Memorandum in Support of Motion to Dismiss, Ex. A, First Amendment, § 4(c).) Third, the First Amendment provided that "Orbitz shall not use the Worldspan System to search for fares, rates, schedules or itineraries that involve Airline Direct Connect Segments," and required Orbitz to "discontinue all access, either directly or through ITA, to the Worldspan System" with respect to Airline Direct Connect Segments for a particular airline within ninety days of that airline becoming a participant in the Direct Connect program. (*Id.,* §§ 4(c)(vii) & 6(a).) The First Amendment further provided that in the event Orbitz (or ITA on behalf of Orbitz) continued to access Worldspan's availability data after the end of that ninety-day period, Orbitz would be required to pay Worldspan a "monthly processing fee" as specified in a schedule to the First Amendment.

> FN2. The First Amendment defines an "Airline Non-Direct Connect Segment" as "each direct or through flight booked by means of the Orbitz Website that is not an Airline Direct Connect Segment."(Complaint, Ex. B, at 12.) An "Airline Direct Connect Segment" is defined as "each nonstop or direct airline flight booked by means of the Orbitz Website with an Airline Direct Connect customer using that carrier's internal airline reservation system and not using a CRS or global distribution system."(*Id.*)

*The Alleged "Misconduct"*

*3 The complaint alleges that, since the execution of the First Amendment, "Orbitz has repeatedly stolen Worldspan's data and violated the [Amended Agreement] and First Amendment."(Complaint ¶ 58.) First, beginning in January 2004 and continuing through at least part of February 2004, Orbitz obtained "Power Shopper" data from Worldspan when it was not authorized to do so by issuing repeated data queries during overnight periods. Second, Orbitz sent "far in excess" of the 500 queries per day it was permitted to send to Worldspan regarding airline taxes and surcharges. Third, Orbitz improperly used Worldspan's seatmap data for direct-connect flights. Worldspan also alleges that Orbitz used Galileo, a CRS, as well as ITA, which in Worldspan's view has now become a CRS, in violation of the First Amendment.

Worldspan filed the complaint in this action on September 19, 2005. Count I is a claim for violation of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(iii). Counts II-IV are claims for breach of contract. In Count V, Worldspan seeks to enjoin Orbitz from accessing Worldspan's seatmap data and from using ITA and Galileo.

Orbitz now moves to dismiss the complaint. Also pending is Worldspan's motion to transfer and consolidate.

*DISCUSSION*

*A. Orbitz's Motion to Dismiss*

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 354 (3d ed.2004). When evaluating such a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
(Cite as: 2006 WL 1069128 (N.D.Ill.))

Page 4

motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1173 (7th Cir.1999). Dismissal is appropriate only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997).

Worldspan's only federal claim is for violation of the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030. Worldspan alleges that Orbitz violated § 1030(a)(5)(A)(iii), which prohibits the intentional access of a protected computer [FN3] "without authorization" and thereby "caus[ing] damage." The CFAA is a criminal statute, but it permits a civil action by "[a]ny person who suffers damage or loss" from conduct prohibited by the statute if the plaintiff can satisfy one of five factors. 18 U.S.C. § 1030(g). The factor relevant to Worldspan's claim is whether defendant's conduct caused "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value."18 U.S.C. § 1030(a)(5)(B)(i).

> FN3. The CFAA defines a "protected computer" as, *interalia,* a computer that is used in interstate or foreign commerce or communication. 18 U.S.C. § 1030(e)(2).

Orbitz's first argument for dismissal of Count I is that the documents attached to Worldspan's complaint contradict Worldspan's allegation that Orbitz accessed Worldspan's computers "without authorization," as required by § 1030(a)(5)(A)(iii). The Amended Agreement and its amendments are attached to Worldspan's complaint and thus considered part of the pleadings.

**\*4** The Amended Agreement states: "During the Term of this Agreement, WORLDSPAN will provide Orbitz ... with access to the WORLDSPAN System for purposes of the operation of the Orbitz Website and in accordance with the provisions of this Agreement."(Complaint, Ex. A, at 2.) In its re-

sponse to Orbitz's motion, Worldspan concedes that "Orbitz was permitted access to Worldspan's computer and the use of information found there for some purposes, but Orbitz exceeded the permitted access and misused the seat map data."Worldspan argues that it nevertheless has stated a claim for violation of the CFAA because, in its view, accessing a computer "without authorization" includes "exceeding the degree of permissible access."(Worldspan's Mem. in Opposition to Motion at 4 .)

As the Seventh Circuit has noted, see *International Airport Centers, L.L.C. v. Citrin,* 440 F.3d 418, 420 (7th Cir.2006), the CFAA explicitly distinguishes between the act of accessing a computer "without authorization" and the act of "exceeding authorized access." The CFAA provides a definition for the latter phrase. To "exceed authorized access" is "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."18 U.S.C. § 1030(e)(6).

In the complaint, Worldspan alleges that Orbitz accessed its computers "without authorization" in violation of § 1030(a)(5)(A)(iii). As noted above, § 1030(a)(5)(A)(iii) addresses the intentional access of a protected computer solely "without authorization" and not in excess of authorized access. In other words, that subsection does not prohibit "exceeding authorized access." It is significant that the language of § 1030(a)(5)(A)(iii) contrasts with that of other subsections of the statute, which target both types of access.

Worldspan argues that case law supports its position that "unauthorized access" includes "exceeding authorized access." The cases Worldspan cites in support of its argument, however, do not stand for that proposition. They involved alleged violations of other subsections of the statute, which do prohibit "exceed[ing] authorized access," in contrast to the subsection involved here. In any event, even assuming those decisions support Worldspan's construction of the statute, we are disinclined to follow

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
(Cite as: 2006 WL 1069128 (N.D.Ill.))

them because such an interpretation of the phrase "without authorization" would ignore the carefully-drawn statutory distinction between wholly unauthorized access and access beyond that which is authorized.

We agree with Orbitz that the allegation that Orbitz accessed Worldspan's computers "without authorization" is belied by the Agreement, which permits Orbitz to access Worldspan's computers. "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."*Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998) (citing, *interalia,Bell v. Lane,* 657 F.Supp. 815, 817 (N.D.Ill.1987) (stating that where exhibits attached to a complaint negate its allegations, a court is not required to credit the unsupported allegations)). Moreover, it is clear from the language of the CFAA that accessing a computer "without authorization" does not include "exceed[ing] authorized access." Because Worldspan has not adequately alleged that Orbitz accessed its computers "without authorization," Count I must be dismissed.

*5 An alternative ground for dismissal is Worldspan's failure to allege that Orbitz's conduct caused damage, as required by § 1030(a)(5)(A)(iii). The term "damage" is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system, or information."18 U.S.C. § 1030(e)(8). The CFAA does not define "integrity," but the dictionary definition is "an unimpaired or unmarred condition: entire correspondence with an original condition: SOUNDNESS."Webster's Third New International Dictionary 1174 (1971). The use of the word "integrity" "contemplates, in [CFAA] context, some diminution in the completeness or useability of data or information on a computer system."*Resdev, LLC v. Lot Builders Ass'n,* No. 6:04-CV-13740RL31DAB, 2005 WL 1924743, at *5 n. 3 (M.D.Fla. Aug.10, 2005). Given these definitions of "damage" and "integrity," we reject

Worldspan's argument that the mere "taking of information" constitutes "damage" under the CFAA.

Orbitz correctly asserts that the complaint merely parrots the "causing damage" text of the CFAA in conclusory fashion and fails to allege any facts indicating that the completeness, useability, or availability of Worldspan's data was impaired. The conduct that is alleged is the mere "access" of Worldspan's computer system. One cannot draw the reasonable inference from this allegation that the integrity or availability of Worldspan's data was impaired, especially considering that the Amended Agreement authorized Orbitz to access the data in accordance with the contract terms. Accordingly, Worldspan's failure to adequately allege damage is an alternative ground for dismissal of the complaint. We need not reach Orbitz's remaining argument.

We have dismissed the federal claim in this case. In this circuit, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on their merits."*Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir.1998). We see no reason to continue to exercise supplemental jurisdiction, see 28 U.S.C. § 1367(c); therefore, the state law claims are dismissed for lack of subject matter jurisdiction. (The dismissal is without prejudice to the refiling of the state-law claims in state court.)

B. *Worldspan's Motion to Transfer and Consolidate*

Around the same time Worldspan filed the instant complaint against Orbitz, Orbitz filed a complaint against Worldspan in the Circuit Court of Cook County. Worldspan removed that case to federal court; the case was assigned to Judge Bucklo and given case number 05 C 5972. Worldspan then filed a motion in the instant case to transfer 05 C 5972 to our docket and to consolidate that case with this proceeding. On April 3, 2006, Judge Bucklo granted Orbitz's motion to remand 05 C 5972 to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 1069128 (N.D.Ill.)
**(Cite as: 2006 WL 1069128 (N.D.Ill.))**

Page 6

state court. Therefore, Worldspan's motion to transfer and consolidate will be denied as moot.

### CONCLUSION

**\*6** Defendant's motion to dismiss the complaint is granted. Plaintiff's motion to transfer and consolidate is denied as moot.

N.D.Ill.,2006.
Worldspan, L.P. v. Orbitz, LLC
Slip Copy, 2006 WL 1069128 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SAM'S WINES & LIQUORS, INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 08 C 0570 |
| | ) |
| v. | ) Hon. John W. Darrah |
| | ) United States District Court Judge |
| SEAN HARTIG and PLINIO GROUP LLC | ) |
| (d/b/a Italian Wine Merchants), | ) Hon. Susan E. Cox |
| | ) United States Magistrate Judge |
| Defendants. | ) |

**DECLARATION OF SEAN HARTIG**

Sean Hartig, under penalty of perjury, states as follows:

1.     I worked at Sam's Wines & Liquors in Chicago, Illinois ("Sam's Wines") from approximately October 2000 until May 2005.  Prior to joining Sam's Wines, I worked as a sommelier at a popular New Orleans restaurant.

2.     I began working as a portfolio manager with Italian Wine Merchants on November 6, 2007.  My responsibilities as a portfolio manager included working with clients on selecting and ordering wines.

3.     Clients who placed orders with Italian Wine Merchants through me and whom I may have encountered while working with Sam's Wines prior to my departure from there in May 2005 include George Middlemas, Marquis Sauvage, Daniel Grant, Michael Lewis, David Miers, and John Mediary.

4.     I have reviewed the Complaint filed by Sam's Wines in this case.  I am aware that while I was employed by Sam's Wines that Sam's Wines maintained a Sam's Wines Rewards Club customer list.  I did not take a copy of the Sam's Wines Rewards Club customer list with me when my employment with Sam's Wines ended in May 2005 or at any time.  I did not use the

Sam's Wines Rewards Club customer list for my personal use or during my employment with Italian Wines Merchants at any time.

The undersigned certifies, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the statements set forth herein are true and correct.

Executed on May 28, 2008

_____
Sean Hartig

-2-

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SAM'S WINES & LIQUORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 0570 |
| | ) | |
| v. | ) | Hon. John W. Darrah |
| | ) | United States District Court Judge |
| SEAN HARTIG and PLINIO GROUP LLC | ) | |
| (d/b/a Italian Wine Merchants), | ) | Hon. Susan E. Cox |
| | ) | United States Magistrate Judge |
| Defendants. | ) | |

### DECLARATION OF JULIE LEE

Julie Lee, under penalty of perjury, state as follows:

1.     I am the Comptroller of Plinio Group LLC, d/b/a Italian Wine Merchants ("Italian Wine Merchants"). Italian Wine Merchants is a New York limited liability company with its principal place business in New York, New York. I have been employed by Italian Wine Merchants for the past 4 years. During this time, I have become familiar with the business operations of Italian Wine Merchants and its business records relating to the pricing of goods and customer sales.

2.     I have reviewed information from the sales database at Italian Wine Merchants from November 2007 through the present. The information from this sales database includes all monies spent by clients on purchases of wine from Italian Wine Merchants for any given time period and includes information on the time the order was placed, which portfolio manager accepted the order, and the total gross dollars spent per order.

3.     I have reviewed the Declaration of Sean Hartig which contains a list of all clients who placed orders with Italian Wine Merchants from November 2007 through the present and

who, according to Sean Hartig, he may have encountered during the time while he was working at Sam's Wines & Liquors prior to his departure in May 2005.

4.    I reviewed the sales database of Italian Wine Merchants and counted the number of sales made by Sean Hartig to persons he claims he may have encountered while working at Sam's Wines & Liquors prior to his departure from Sam's Wines & Liquors in May 2005. I also calculated the sum of gross dollars spent on all of those sales. The results of my review were that of all the sales made by Sean Hartig since he has been employed by Italian Wine Merchants, less then $20,000.00 of those gross sales were to persons who were entered into the Italian Wine Merchants sales database after Sean Hartig's arrival in November 2007 and whom Sean Hartig may have encountered while working at Sam's Wines & Liquors prior to his departure from there in May 2005.

The undersigned certifies, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the statements set forth herein are true and correct.

Executed on May 2?, 2008

_____
Name
Position
Julie Lee
Comptroller

-2-