# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAM'S WINES & LIQUORS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-cv-00570 |
| | ) | |
| SEAN HARTIG and | ) | Judge John W. Darrah |
| PLINIO GROUP LLC | ) | Mag. Judge Susan E. Cox |
| (d/b/a Italian Wine Merchants) | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JOE THIELMANN

I Joe Thielmann declare as follows:

1.      I am over twenty-one years of age and I am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration.

2.      I am employed with Sam's Wines & Liquors, Inc. ("Sam's Wines") as its Chief Financial Officer. My employment responsibilities include managing the financial affairs of Sam's Wines, and as part of these responsibilities, I am familiar with past and current sales made to customers of Sam's Wines. Also as part of my employment responsibilities, I am familiar with the list created by Sam's Wines of the customers that are members of the Sam's Wines Rewards Club ("Customer List"), past and current sales generated by customers on the Customer List, and the development of the Customer List.

3.      Sam's Wines developed the customer list over the course of over ten years, and at considerable expense to  Sam's Wines. The Customer List provides Sam's Wines with a competitive edge in the marketplace and has substantial value to Sam's Wines.

4.     The Customer List, contained in 2005, and currently contains, the names and contact information of tens of thousands of customers.

5.     A substantial portion of Sam's Wines' total sales were made to customers on the Customer List, and the sales to such customers, both in 2005 and the present, amount to, at a minimum, hundreds of thousands of dollars annually.

6.     Based on the amount of sales the Customer List generates for Sam's Wines, the value of the list to Sam's Wines, both today and in 2005, far exceeds $75,000.

I declare under penalty of perjury that the foregoing is true and correct.

July 30, 2008

Joe Thielmann

# Exhibit B

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

▷C.H. Robinson Worldwide, Inc. v. Command
Transp., LLC
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois, Eastern
                    Division.
    C.H. ROBINSON WORLDWIDE, INC., Plaintiff,
                        v.
    COMMAND TRANSPORTATION, LLC, Paul
    Loeb, and Eric Harrison, Defendants.
                 **No. 05 C 3401.**

              Nov. 16, 2005.

Michael Dale Wexler, J. Scott Humphrey, Seyfarth
Shaw LLP, Chicago, IL, for Plaintiff.
Stephen Fedo, William John Tarnow, Neal, Gerber &
Eisenberg, Mitchell L. Marinello, Joseph S. Nacca,
Novack and Macey, LLP, Chicago, IL, for
Defendants.

        *MEMORANDUM OPINION AND ORDER*

ST. EVE., J.
**\*1** Plaintiff C.H. Robinson Worldwide, Inc.
("C.H.Robinson") filed the present eight-count First
Amended Complaint against Defendants Command
Transportation, LLC ("Command"), Paul Loeb, and
Eric Harrison. C.H. Robinson alleges that Loeb and
Harrison violated the Computer Fraud and Abuse
Act, 18 U.S.C. § 1030*et seq.* ("CFAA"). C.H.
Robinson also alleges state law claims of breach of
contract, misappropriation of trade secrets, unfair
competition, conversion, fraud, conspiracy, and a
constructive trust claim pursuant to the Court's
supplemental jurisdiction. *See*28 U.S.C. § 1367.
Before the Court is Defendants' Motion to Dismiss
C.H. Robinson's First Amended Complaint pursuant
to Federal Rule of Civil Procedure 12(b)(6).[FN1] As
discussed below, the Court grants in part and denies
in part Defendants' Motion to Dismiss.

        FN1. Pursuant to Federal Rule of Civil
        Procedure 10(c), Defendant Eric Harrison
        adopted the arguments set forth by
        Defendants Command Transportation and
        Paul Loeb in their Memorandum in Support

of their Motion to Dismiss. (R. 27-1.)

              *BACKGROUND*[FN2]

        FN2. As required under Rule 12(b)(6), the
        Court presumes the allegations in the
        complaint are true.

Plaintiff C.H. Robinson is a Delaware corporation
with its principal place of business in Eden Prairie,
Minnesota. (R. 15-1; First Am. Compl. ¶ 1.) C.H.
Robinson is in the business of providing commercial
logistics services, and in December 1999, purchased
substantially all of the assets of American
Backhaulers ("Backhaulers"), another logistics
company. (*Id.* ¶¶ 1-2, 25.)C.H. Robinson's purchase
of Backhaulers' assets included, among other things,
(1) the exclusive acquisition of Express, a proprietary
software program (the "Express software"), (2) the
execution of non-competition, non-solicitation, and
confidentiality      agreements      by     Backhaulers'
employees, (3) Backhaulers' know-how, and (4)
Backhaulers' intellectual property rights. (*Id.* ¶¶ 2,
26.)

Defendant Command Transportation, LLC, is a
Delaware limited liability company with its principal
place of business in Skokie, Illinois. (*Id.* ¶ 3.)
Command is a competitor of C.H. Robinson and is in
the business of freight brokerage services. (*Id.*) Also,
Command conducts business under the assumed
names of DND Express and DND Logistics and was
previously known as Command Logistics Systems,
LLC. (*Id.*)

Defendant Paul Loeb, an individual residing at 223
Linden Park Place, Highland Park, Illinois, is the
previous owner of Backhaulers. (*Id.* ¶ 4.) C.H.
Robinson conditioned its purchase of Backhaulers'
assets "upon Loeb ... signing and complying with a
non-compete, non-solicitation, and confidentiality
agreement."(*Id.* ¶ 27.)That agreement precluded
Loeb from (1) "competing with C.H. Robinson," (2)
"soliciting or inducing C.H. Robinson's employees to
leave for a ... period of time," (3) "utilizing or
disclosing    proprietary    information    of    C.H.
Robinson," (4) taking any C.H. Robinson property,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

(5) disclosing any "trade secrets, know-how, [or] other proprietary documents and information related to the business," and (6) "using any such information for [his] own benefit or the benefit of any third party so long as such information is not in the public domain."(*Id.* ¶¶ 27, 29.)Loeb worked at C.H. Robinson from December 1999 until his voluntarily departure on September 30, 2002. During that time, Loeb had exposure to C.H. Robinson's confidential and proprietary information. (*Id.* ¶¶ 27, 57.)Presently, Loeb is affiliated with Command. (*Id.* ¶ 4.)

**\*2** Defendant Eric Harrison, an individual residing at 715 Astor Lane, Wheeling, Illinois, is a former employee of Backhaulers and was a key developer of the Express software. (*Id.* ¶ 5.) After C.H. Robinson purchased Backhaulers' assets in December 1999, Harrison moved to Minnesota and became C.H. Robinson's Director of Technology. (*Id.* ¶¶ 5, 33.)Harrison implemented and further developed the Express software across all of C.H. Robinson's business, at which time he had exposure to confidential and proprietary information, including the Express software source code, object code, and functionality. (*Id.* ¶¶ 5, 33-34, 57.)In April 2002, Harrison voluntarily left C.H. Robinson, at which time he entered into an agreement with C.H. Robinson that contained non-competition, non-solicitation, confidentiality, and invention assignment provisions. (*Id.* ¶ 5.) Harrison is now associated with Command as a software developer. (*Id.* ¶ 51.)According to C.H. Robinson, Loeb and Harrison, now employees of Command, have recently developed a new software program, Slingshot, "which is identical to C.H. Robinson's Express software."(*Id.* at ¶ 52.)

*LEGAL STANDARD*

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assoc., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Centers v. Mortgage, Inc.,* 398 F.3d 930, 933 (7th Cir.2005) (quoting *Coney v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In making its

determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff.*Centers,* 398 F.3d at 333.

*ANALYSIS*

I. Computer Fraud & Abuse Act Claim-Count VIII
[FN3]

> FN3. On June 13, 2005, the Court dismissed C.H. Robinson's initial Complaint based on its failure to properly allege diversity jurisdiction. *See*28 U.S.C. § 1332. In its First Amended Complaint, C.H. Robinson included a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030*et seq.* that confers federal question subject matter jurisdiction on the Court. *See*28 U.S.C. § 1331. The Court will address this count first in order to ensure that the Court has subject matter jurisdiction over the remaining counts.

C.H. Robinson alleges that Loeb and Harrison violated Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the Computer Fraud and Abuse Act ("CFAA"). Defendants argue that C.H. Robinson has failed to state a claim under the CFAA because C.H. Robinson (1) did not properly allege the requisite damage or loss as those terms are defined by the CFAA, and (2) did not allege that Loeb and Harrison unlawfully accessed C.H. Robinson's computer system.

A. Loss or Damage

First, Defendants argue that C.H. Robinson failed to properly allege that it suffered the requisite damage or loss as those terms are defined by the CFAA.Section 1030(g) provides, in relevant part, that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief," and "[a] civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."*See*18 U.S.C. § 1030(g). Thus, a party bringing a civil action under the CFAA must allege both: (1) a violation of one of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

Page 3

the subsections of Section 1030; and (2) one of the listed factors in Section 1030(a)(5)(B)(i)-(v). *See Charles Schwab & Co., Inc. v. Carter,* No. 04 C 7071, 2005 WL 351929, at *3 (N.D.Ill. Feb.11, 2005). The factors in Sections 1030(a)(5)(B)(i)-(v) do not address prohibited conduct, but instead list specific forms of "damage" or "loss" that are "possible harmful results of violations of other parts of the statute." *Id.*

*3 Here, C.H. Robinson alleges that it "suffered damages as a result of Harrison's and Loeb's actions in an amount to be determined at trial." (R. 15-1, First Am. Compl. ¶ 103.) Viewing the allegations in the First Amended Complaint in a light most favorable to C.H. Robinson, C.H. Robinson is claiming "loss to one or more persons during any 1-year period ... aggregating at least $5,000 in value." *See* Section 1030(a)(5)(B)(i). C.H. Robinson's allegations of loss consist of (1) the loss in value of trade secrets such as the Express software and other proprietary and confidential information that was not previously known to the public, and (2) the loss of competitive advantage. (R. 15-1, First Am. Compl. ¶¶ 58, 59.)

In a similar matter where a plaintiff alleged wrongful copying of proprietary financial modeling computer software, the Court discussed damages under the CFAA:

Chief Judge Charles Kocoras recognized that a plaintiff stated a claim under the CFAA when it alleged that the defendant had exceeded his authorized access and acquired trade secrets that were later used to the detriment of the plaintiff. In addition, a district court in the Western District of Washington determined that a former employer properly stated a claim under the CFAA when it alleged that a former employee had sent e-mails including trade secrets and proprietary information to a competitor while still employed by the plaintiff.

*Charles Schwab & Co., Inc.,* 2005 WL 351929, at *3 (citations omitted). Similarly, "[c]aselaw supports an employer's use of the CFAA's Civil Remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system." *Id.* (quoting *Pacific Aerospace & Elec., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003)). C.H. Robinson has properly

alleged "loss" under the CFAA based on its allegations of the loss in value of trade secrets and loss of competitive edge.

Meanwhile, Defendants did not develop their cursory argument that *Nexans Wires S.A. v. Sark-USA, Inc.,* 319 F.Supp.2d 468, 476-78 (S.D.N.Y.2004) should control. Defendants' attempt at developing this argument in their Reply Brief does not save the day because when a defendant fails to raise or develop an issue until reply, he waives the argument because the plaintiff has had no chance to respond. *See Kelso v. Bayer Corp.,* 398 F.3d 640, 643 (7th Cir.2005) (citation omitted). Accordingly, Defendants' argument concerning C.H. Robinson's "loss" fails.

**B. Unlawful Access**

Second, Defendants contend that C.H. Robinson has not alleged unlawful access of its computers as required under Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the CFAA. More specifically, Defendants argue that C.H. Robinson fails to allege that Loeb or Harrison accessed C.H. Robinson's protected computer system to steal the trade secret information at issue. Plaintiff argues that it properly stated a CFAA cause of action by alleging that Loeb and Harrison intentionally exceeded their authorized access when they accessed C.H. Robinson's protected network to acquire the Express software for the benefit of themselves and Command.

*4 The Court turns to the federal notice pleading standards under Federal Rule of Civil Procedure 8(a)(2). In alleging its claim under the CFAA, C.H. Robinson incorporates by reference all allegations from paragraphs 1 through 63, including the allegations of Loeb's and Harrison's inappropriate use of C.H. Robinson's proprietary information and software code in developing Slingshot. (R. 15-1, First Am. Compl. ¶¶ 53-57.) It further alleges that Loeb and Harrison did not have authorization to access C.H. Robinson's "computer systems, computerized information, access software, access source code, access object code, or continue to possess C.H. Robinson electronic files and data for their personal gain." (*Id.* ¶ 101.)C.H. Robinson alleges that Loeb and Harrison violated sections of the CFAA through these actions. (*Id.* ¶ 102.)These allegations satisfy the liberal notice pleading standards of Rule 8(a).*See Gale v. Hyde Park Bank,* 384 F.3d 451, 453 (7th

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Cir.2004) ( "All a complaint need do is narrate a claim for relief.")

Defendants nonetheless assert that C.H. Robinson failed to allege that Loeb or Harrison unlawfully accessed a protected computer to obtain information involving an interstate or foreign communication as required under Section 1030(a)(2)(C) because C.H. Robinson did not suggest that Loeb or Harrison intercepted interstate communications. Defendants, however, ignore relevant language from Section 1030(a)(2)(C) that prohibits a person from unlawfully accessing a computer to "obtain information from any protected computer *if the conduct involved an interstate or foreign commerce.*"18 U.S.C. § 1030(a)(2)(C) (emphasis added). The plain language of this statute indicates that the conduct of unlawfully accessing a computer, and not the obtained information, must involve interstate of foreign commerce. *See Charles Schwab & Co., Inc. v. Carter,* 2005 WL 2369815, at *8 (N.D.Ill. Sep.27, 2005) (downloading substantial volumes of files from plaintiff's computers involved interstate commerce because plaintiff maintained interstate computer network). Here, C.H. Robinson alleges that its "computer system is a protected computer and network which is used across state lines in interstate commerce."(R. 15-1, First Am. Compl. ¶ 100.) Viewing the allegations in a light most favorable to C.H. Robinson, it is reasonable to infer that Defendants' conduct involved interstate commerce.

Finally, Defendants contend that C.H. Robinson failed to allege with the particularity required by Federal Rule of Civil Procedure 9(b) that Loeb or Harrison accessed a protected computer "knowingly and with intent to defraud."Under Rule 9(b), "intent, knowledge and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). The Rule's particularity requirements do not apply to intent allegations. Defendants' motion to dismiss Count VIII is denied.

## II. Breach of Contract-Count I

*5 Defendants contend that C.H. Robinson did not properly allege that Loeb and Harrison breached their non-competition agreements and asset purchase agreements. Citing Illinois law, Defendants specifically argue that C.H. Robinson failed to indicate the essential elements of a contract and the

exact contracts at issue. It is well-established, however, that the Federal Rules of Civil Procedure-not state procedural rules-govern diversity actions and state law claims brought in federal court through supplemental jurisdiction.*Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.,* 412 F.3d 745, 750 (7th Cir.2005); *Houben v. Telular Corp.,* 309 F.3d 1028, 1032-36 (7th Cir.2002). As previously noted, under the liberal federal notice pleading standard, a complaint need only state "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Conley v. Gibson,* 355 U.S. at 47;*see also Shah v. Inter-Cont'l Hotel Chicago Operating Corp.,* 314 F.3d 278, 282 (7th Cir.2002).

In its First Amended Complaint, C.H. Robinson identifies which contracts are at issue. (*See* R. 15-1, First Am. Compl. ¶¶ 27-31, 65.) Further, C.H. Robinson alleges how Loeb and Harrison breached these agreements, by listing six different actions, including utilizing or disclosing the Express software.(*Id.* ¶ 67.)As such, C.H. Robinson has given Defendants notice of its breach of contract claim and the grounds upon which it rests. Accordingly, the Court denies Defendants' motion to dismiss Count I of the First Amended Complaint.

## III. Illinois Trade Secrets Act-Count II

As a threshold matter, Defendants contend that C.H. Robinson, as a Delaware corporation with its principal place of business in Minnesota, did not properly allege why the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, *et seq.,* should apply under Count II. Under the *Erie* doctrine "a federal court is not authorized to apply a different substantive law in a diversity case from the law that a state court would apply were the case being litigated in a state court," and thus Illinois law is the source for choice-of-law rules under the circumstances. *FDIC v. Wabick,* 335 F.3d 620, 624-25 (7th Cir.2003) (*Erie* doctrine applies to non-diversity cases where state law supplies the rule of decision). Under Illinois trade secrets law, courts must apply the law of the state where the alleged wrong took place or where the benefit was obtained, which is typically the defendant's principal place of business. *See Mergenthaler Linotype Co. v. Leonard,* 66 Ill.App.3d

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

789, 803, 23 Ill.Dec. 352, 383 N.E.2d 1379 (Ill.App.Ct.1978); *see also Salton, Inc. v. Philips Domestic Appliances & Personal Care B.V.,* 391 F.3d 871, 879 (7th Cir.2004). Because Command's principal place of business is in Illinois and Defendants received the benefits of Harrison and Loeb's alleged misappropriation of C.H. Robinson's trade secrets in Illinois, Illinois law applies.

*6 Next, Defendants contend that Count II does not identify what C.H. Robinson claims is a trade secret. In its First Amended Complaint, C.H. Robinson alleges how Loeb and Harrison unlawfully acquired C.H. Robinson's trade secrets, describes the trade secrets in sufficient detail, and explains how Defendants are using the trade secrets. (R. 15-1, First Am. Compl. ¶¶ 38-63, 70-76.) Further, despite Defendants' contention, litigants are not required to disclose details when alleging the misappropriation of a trade secret "for the simple reason that such a requirement would result in public disclosure of the purported trade secret."*Automed Techs., Inc. v. Eller,* 160 F.Supp.2d 915, 920-21 (N.D.Ill.2001) (citation omitted). Plaintiff has satisfied its pleading requirements for Count II, and the Court denies Defendants' motion to dismiss Count II.

## IV. Preemption Under Illinois Trade Secrets Act-Counts III through VII

Next, Defendants contend that the ITSA preempts C.H. Robinson's common law claims of unfair competition, conversion, fraud, conspiracy, and constructive trust.[FN4]They argue that Section 8 of the ITSA preempts all common law claims if they are arguably based, in whole or in part, on allegations of misappropriation of trade secrets. *See*765 ILCS 1065/8; *see also PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995) ("ITSA abolishes any common law remedies or authority contrary to its own terms").Section 1065/8(a) states that the "Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."*McDonald's Corp. v. American Motorists Ins. Co.,* 321 Ill.App.3d 972, 986, 255 Ill.Dec. 67, 748 N.E.2d 771 (Ill.App.Ct.2001). By its plain terms, the ITSA preempts claims "only when they rest on conduct that is said to misappropriate trade secrets."*Hecny Transp., Inc. v. Chu,* --- F.3d ----, ----, 2005 WL 2842081, at *2 (7th Cir. Oct.31,

2005). In other words, preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information."*Id.* The Court thus reviews the claims that Defendants challenge to determine whether they are dependent on the misappropriation of a trade secret. *See Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968, 972 (N.D.Ill.2000); *see, e.g., McDonald's Corp.,* 321 Ill.App.3d at 986, 255 Ill.Dec. 67, 748 N.E.2d 771.

> FN4. Whether the ITSA preempts C.H. Robinson's constructive trust claim is not at issue, because under Illinois law a constructive trust is not a separate cause of action, but rather an equitable remedy. *See Eychaner v. Gross,* 202 Ill.2d 228, 274, 269 Ill.Dec. 80, 779 N.E.2d 1115 (2002). Indeed, C.H. Robinson admits that it is seeking a constructive trust for remedial purposes, and thus the Court need not dismiss Count VII. *See, e.g., Chicago Park District v. Kenroy, Inc.,* 107 Ill.App.3d 222, 224-25, 63 Ill.Dec. 134, 437 N.E.2d 783 (Ill.App.Ct.1982).

### A. Unfair Competition-Count III

Under its unfair competition claim, C.H. Robinson alleges that "Defendants are unfairly competing in the market place by utilizing C.H. Robinson's confidential information in the marketplace, soliciting and or hiring C.H. Robinson employees, soliciting C.H. Robinson's employees for employment to gain access to C.H. Robinson's confidential information, soliciting confidential information from C.H. Robinson employees, and/or utilizing C.H. Robinson's property or proprietary software."(R. 15-1, First Am. Compl. ¶ 79.)

*7 C.H. Robinson's unfair competition allegations fall squarely within the ITSA's preemption clause because the claim is premised on its confidential information and proprietary software. *See Thomas & Betts Corp.,* 108 F.Supp.2d at 973 (unfair competition allegations simply described how defendants used plaintiff's confidential information). In other words, the unfair competition claim is "dependent upon the existence of competitively significant secret information."*Hecny Transp., Inc. v. Chu,* 2005 WL 2842081, at *2. In fact, in alleging its claim under the ITSA, C.H. Robinson unequivocally

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

states that "[t]he proprietary business, software, and customer information of C.H. Robinson constitute trade secrets."(R. 15-1, First Am. Compl. ¶ 70.) Although C.H. Robinson argues that the unfair competition claim is premised on Defendants' illegal solicitation and hiring of C.H. Robinson's employees, C.H. Robinson cannot ignore its allegations that the unlawful use of its trade secrets underscores its claim. Therefore, the ITSA preempts C.H. Robinson's unfair competition claim and the Court grants Defendants' motion to dismiss Count III with prejudice.

### B. Conversion-IV

Next, C.H. Robinson alleges that "Defendants individually or in concert with another removed from C.H. Robinson or retained its property (software and/or information) without authorization, and converted it to their own use."(R. 15-1, First Am. Compl. ¶ 83.) Due to C.H. Robinson's bare-boned allegation, it is unclear if the "information" or "software" Defendants allegedly converted were trade secrets, and the Court cannot determine whether the ITSA preempts this claim. On that same note, due to these nebulous allegations, C.H. Robinson has not fulfilled the federal notice pleading standard because the allegations do not "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Conley v. Gibson,* 355 U.S. at 47;*see also Conner v. Illinois Dep't of Natural Res.,* 413 F.3d 675, 679 (7th Cir.2005) ( "pleading is still vitally important to inform the opposing party of the grounds upon which a claim rests"). As such, the Court grants Defendants' motion to dismiss Count IV without prejudice and grants C.H. Robinson leave to amend this claim.

### C. Fraud-Count V

In Count V, C.H. Robinson alleges that "Defendants individually or in concert with one another falsely represented to C.H. Robinson that it was exclusively purchasing Express, that the agreements entered into with Harrison and Loeb were being honored and/or that C.H. Robinson's property had been returned upon Harrison's and Loeb's termination of employment."(R. 15-1, First Am. Compl. ¶ 89.) C.H. Robinson further alleges that Defendants' misrepresentations resulted in the loss of monies and goodwill concerning the Express software. (*Id.* ¶ 90.)

Again, the Express software is C.H. Robinson's proprietary software and is a basis for C.H. Robinson's Illinois Trade Secret Act claim. Because C.H. Robinson's fraud claim rests on conduct that is, in essence, the misappropriating of trade secrets, the ITSA preempts this claim. *See Hecny Transp., Inc. v. Chu,* 2005 WL 2842081, at *2. The Court grants Defendants' motion to dismiss Count V with prejudice.

### D. Conspiracy-Count VI

***8** C.H. Robinson also alleges a common law conspiracy claim. In Count VI, C.H. Robinson states that certain individuals had a "meeting of the minds to improperly compete with C.H. Robinson, acquire C.H. Robinson's proprietary software and information, utilize or disclose CH. Robinson's software, property, confidential information or trade secrets information, not allow C.H. Robinson to realize the benefit of its bargains with Harrison and/or Loeb and waste revenues of C.H. Robinson."(R. 15-1, First Am. Compl. ¶ 93.) Because C.H. Robinson unequivocally alleges that these individuals conspired to acquire its proprietary software, confidential information, and trade secrets, the ITSA preempts this conspiracy claim. Hence, the Court grants Defendants' motion to dismiss Count VI with prejudice.

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. The Court dismisses Plaintiff's common law claims under Counts III, V, and VI with prejudice. The Court dismisses Count V without prejudice. Plaintiff has until December 6, 2005 to file a Second Amended Complaint.

N.D.Ill.,2005.
C.H. Robinson Worldwide, Inc. v. Command Transp., LLC
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)
**2005 WL 351929 (N.D.Ill.)**

H Charles Schwab & Co., Inc. v. Carter
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois, Eastern
                        Division.
        CHARLES SCHWAB & CO., INC., Plaintiff,
                           v.
    Brian D. CARTER, Acorn Advisory Management,
       L.L.C., and Acorn Advisory Capital, L.P.,
                      Defendants.
                    No. 04 C 7071.

                     Feb. 11, 2005.

Darrell J. Graham, Eric D. Brandfonbrener, Jonathan
R. Buck, Perkins Coie LLC, Chicago, IL, for
Plaintiff.
Peter Vincent Baugher, Arthur J. Howe, Anna S.
Eisner, Schopf & Weiss, Chicago, IL, for
Defendants.

            *MEMORANDUM OPINION AND ORDER*

ST. EVE, J.
**\*1** Plaintiff Charles Schwab & Co., Inc. ("Schwab")
commenced this action against Defendants Brian D.
Carter ("Carter"), Acorn Advisory Management,
L.L.C. and Acorn Advisory Capital (collectively
"Acorn"), alleging violations of title 18, United
States Code, Sections 1030(a)(2)(A), (a)(2)(C), and
1030(a)(4) of the Computer Fraud and Abuse Act
("CFAA"), and various state law claims. Before the
Court is Defendants' motion to dismiss the CFAA
claim in Count VI pursuant to Federal Rules of Civil
Procedure 12(b)(6). The Court denies this motion for
the reasons discussed below.

                      BACKGROUND

Schwab alleges in its Second Amended Verified
Complaint ("SAVC") that Defendants engaged in a
plan to wrongfully copy Schwab's proprietary
financial modeling computer software and
accompanying files. Specifically, Schwab contends
that Acorn induced Carter, an employee of Schwab,
to copy computer information, resign from Schwab,
and take up employment with Acorn, delivering the

copied information to Acorn.

I. The Parties

Plaintiff Schwab is a California corporation. (SAVC
at ¶ 17.) Schwab formerly had a business division,
Schwab Soundview Capital Markets' Investment
Analytics Division ("IA"), for which Carter worked.
(*Id.* at ¶¶ 2-3.)Schwab closed that division on
November 1, 2004, and either transferred or laid off
all employees. (*Id.*) Defendant Carter is a former
employee of Schwab, where he worked as the
Director of Information Technology for IA. (*Id.* at ¶
1.) He resigned from Schwab on October 22, 2004,
and began working with Acorn. (*Id.* at ¶¶ 11-12.)

II. Relationship between Schwab, Carter, and Acorn

Carter worked as Director of Information Technology
for IA, a division of Schwab. (*Id.* at ¶ 2.) IA provided
analytical research to institutional clients, including
Acorn. (*Id.*) In September 2004, Schwab announced
that it intended to close IA. (*Id* . at ¶ 4.) Upon
learning such information, Acorn made an offer to
purchase the business unit and acquire IA's software
and a number of employees, including Carter. (*Id.* at
¶ 5.) Schwab turned down that offer because it
wanted to protect its business modeling software. (*Id.*
at ¶ 6.) After Schwab rejected Acorn's offer, Acorn
offered employment to Carter and several analysts
from IA. (*Id.* at ¶ 7.) The analysts declined the offer,
but Carter accepted it. (*Id.* at ¶¶ 7-8.)

III. Carter's Actions at the Behest of Acorn

Schwab alleges that on the weekend prior to October
18, 2004, Carter accessed approximately 15,000 of its
computer files. (*Id.* at ¶ 8.) Schwab had furnished
Carter with access to proprietary information, but
required that Carter agree to keep such information
confidential. (*Id.* at ¶¶ 26-27.)Further, Schwab
alleges that it restricts access to information on a
"need-to-know" basis, and that Carter had no reason
to access this information for the purposes of his
employment at Schwab. (*Id.* at ¶¶ 8, 26.)

**\*2** On October 18, 2004, Carter e-mailed confidential

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)
**2005 WL 351929 (N.D.Ill.)**

information to Acorn concerning data sources that IA used in its research. (*Id.* at ¶ 8.) On October 21, 2004, Carter arrived at Schwab with a laptop computer capable of burning large amounts of information onto DVDs. (*Id.* at ¶ 9.) Schwab alleges that Carter, acting at the direction or on behalf of Acorn, used the computer to copy Schwab's proprietary business models. (*Id.*) On October 22, 2004, Carter resigned from Schwab. (*Id.* at ¶ 11.)Schwab alleges that Acorn paid Carter a considerable amount of money to leave Schwab prior to receiving his severance payment, and to deliver Schwab's proprietary business information to Acorn. (*Id.* at ¶ 12.)Finally, Schwab alleges that Defendants' actions caused Schwab to incur costs of at least $5,000 during a one-year period.(*Id.* at ¶ 79.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to <u>Rule 12(b)(6)</u> is to test the legal sufficiency of a complaint, not the merits of the case. *<u>Triad Assoc., Inc. v. Chicago Hous. Auth., 892 F.2d 583, 586</u>* (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*<u>Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)</u>*. When reviewing a motion to dismiss, the Court is restricted to reviewing the pleadings, which consist of the complaint, any attached exhibits, and the supporting briefs. *See <u>Thompson v. Illinois Dept. of Prof'l Regulation,  300  F.3d  750,  753</u>* (7th Cir.2002). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff. *<u>Jet, Inc.  v.  Shell  Oil  Co.,  381 F.3d 627, 629</u>* (7th Cir.2004).

## ANALYSIS

I. Language of the Statute

The CFAA is primarily a criminal statute, but it also creates a private cause of action in <u>Section 1030(g)</u>.*<u>Four Seasons Hotels and Resorts BV v. Consorcio Barr, S.A., 267 F.Supp.2d 1268, 1321 (S.D.Fla.2003)</u>*.<u>Section 1030(g)</u>provides, in relevant part:

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B).

<u>18 U.S.C. § 1030(g)</u>. Defendants claim that this section creates a civil cause of action only for violations of <u>Section 1030(a)(5)(B)(i)-(v)</u>. Because Schwab alleges a violation of <u>Sections 1030(a)(2)(A), (a)(2)(C), and (a)(4)</u>, but not specifically under (a)(5)(B), Defendants argue that Schwab has failed to state a claim upon which relief can be granted. The Court disagrees based on the plain language of the statute.

**\*3** "The cardinal rule of statutory interpretation is that courts must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose."*<u>United States v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunitions, 376 F.3d 709, 712</u>* (7th Cir.2004) (quotation and citation omitted).<u>Section 1030(g)</u> does not limit private causes of action to violations of (a)(5)(B), but rather requires that a plaintiff suffer one of the factors listed in (a)(5)(B)(i)-(v) to state a claim under the statute. <u>Sections 1030(a)(5)(B)(i)-(v)</u> list five possible harms that a party might suffer as a result of conduct forbidden by the CFAA. None of the subsections includes any action or behavior that is prohibited. Instead, the subsection lists possible harmful results of violations of other parts of the statute.

In fact, <u>Section 1030(g)</u> defines that a civil action may be established when a "violation of this section" results in any of the "factors" listed in <u>Section 1030(a)(5)(B)(i)-(v)</u>. "This section" refers to <u>Section 1030</u>. *See <u>I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info.  Sys.,  Inc.,  307  F.Supp.2d  521,  526</u>* (S.D.N.Y.2004) ("<u>Section 1030(g)</u> affords a civil action for any CFAA violation"); *<u>Four Seasons, 267 F.Supp.2d at 1322</u>* (recognizing claim under <u>Section 1030(a)(5)(A)</u>). The factors listed in <u>Section 1030(a)(5)(B)(i)-(v)</u> include "loss to one or more persons during any 1-year period ... aggregating at least  $5,000  in  value."*See<u>18  U.S.C.  § 1030(a)(5)(B)(i)</u>*.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Here, Schwab alleges that Acorn induced Carter to copy computer information, resign from Schwab, and take up employment with Acorn, delivering the copied information to Acorn. Schwab also alleges that it incurred costs of at least $5,000 during a one-year period. As such, Schwab has properly alleged a civil cause of action under the CFAA.

## II. Purpose of the CFAA

Despite the plain meaning of the statute, Defendants assert that the CFAA is only an anti-hacking statute that was not meant to create a federal private cause of action for misappropriation of confidential information or trade secrets. When possible, the Court determines Congressional intent from the unambiguous language of the statute. *See Miscellaneous Firearms,* 376 F.3d at 712. As discussed above, the language of Section 1030(g) unambiguously creates a cause of action under the CFFA not restricted to Section 1030(a)(5)(B)(i)-(v)."Where the meaning of a statute is unambiguous, our sole task is to apply it straightforwardly to the facts at issue without referring to legislative history or other devices."*United States v. Jones,* 372 F.3d 910, 913 n. 2 (7th Cir.2004). Accordingly, the Court need not delve into the Congressional record as Defendants suggest.

Further, although Defendants argue that the statute should be narrowly construed as an "anti-hacking" statute, they do not explain why Carter's unauthorized access to Schwab's confidential information on its computer system and distribution of this information is not "hacking." Indeed, several district courts have recognized that damage caused by unauthorized access or access in excess of authorization to a computer system may be redressed under the CFAA. For instance, Chief Judge Charles Kocoras recognized that a plaintiff stated a claim under the CFAA when it alleged that the defendant had exceeded his authorized access and acquired trade secrets that were later used to the detriment of the plaintiff. *See George S. May Int'l Co. v. Hostetler,* No. 04 C 1606, 2004 WL 1197395, *3 (N.D.Ill. May 28, 2004).* In *Four Seasons Hotel,* the Southern District of Florida acknowledged a claim under the CFAA when a licensee accessed the plaintiff's computer system without authorization. *See*267 F.Supp.2d at 1323-4. In addition, a district court in

the Western District of Washington determined that a former employer properly stated a claim under the CFAA when it alleged that a former employee had sent e-mails including trade secrets and proprietary information to a competitor while still employed by the plaintiff. *See Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1124 (W.D.Wash.2000); *see also Pacific Aerospace & Electronics, Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003) ("Caselaw supports an employer's use of the CFAA's Civil Remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system"). In sum, these cases further support the Court's conclusion that Schwab has properly alleged a civil cause of action under Section 1030(g).

## III. Rule of Lenity

**\*4** Finally, Defendants contend that the Court should apply the rule of lenity, and construe any ambiguity in the language of the statute in their favor. The rule of lenity dictates that when a statute's language is "grievously" ambiguous, the court should construe the statute in favor of the accused. *Chapman v. United States,* 500 U.S. 453, 462-463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991). Because the Court concludes that there is no ambiguity in the language of the statute, the rule of lenity does not apply.

## CONCLUSION

For these reasons, the Court denies Defendants' motion to dismiss Count VI.

N.D.Ill.,2005.
Charles Schwab & Co., Inc. v. Carter
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

Page 1

▷Lucini Italia Co. v. Grappolini
N.D.Ill.,2003.
Only the Westlaw citation is currently available.NOT FOR PUBLICATIONNOT FOR PUBLICATIONNOT FOR PUBLICATION
 United States District Court,N.D. Illinois, Eastern Division.
 LUCINI ITALIA COMPANY, Plaintiff,
 v.
 Giuseppe GRAPPOLINI, and Grappolini G. s.r.l., Defendants.
 **No. 01 C 6405.**

April 28, 2003.

Olive oil company brought action against consultant for breach of loyalty and theft of valuable trade secrets. The District Court, <u>Denlow</u>, United States Magistrate Judge, held that: (1) consultant breached his fiduciary duties to olive oil company under Illinois law by usurping company's business opportunity with supplier, misappropriating company's valuable trade secrets for his own financial gain, and then marketing a new olive oil product substantially similar to the one company had planned to market after securing the supply contract; (2) consultant misappropriated olive oil company's valuable trade secrets in violation of Illinois Trade Secret Act; (3) punitive damage award of $1,000,000 against consultant was appropriate; and (4) company was entitled to injunction.

Judgment for plaintiff.

West Headnotes

[1] Principal and Agent 308 ⟸48

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k48 k. Nature of Agent's Obligation.
Most Cited Cases
To establish a claim for breach of fiduciary duty under Illinois law, a principal must prove: (1) the existence of a fiduciary duty on the agent's part, (2) agent's breach of the duty, and (3) damages

proximately resulting from the breach.

[2] Principal and Agent 308 ⟸1

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k1 k. Nature of the Relation in General.
Most Cited Cases

Principal and Agent 308 ⟸48

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k48 k. Nature of Agent's Obligation.
Most Cited Cases
Under Illinois law, an agency relationship engenders a type of fiduciary affiliation in which the principal has the right to control the agent's conduct, and the agent has the power to act on the principal's behalf; once an agency relationship is found, a fiduciary relationship arises as a matter of law.

[3] Principal and Agent 308 ⟸48

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k48 k. Nature of Agent's Obligation.
Most Cited Cases
Under Illinois law, agent owes principal full disclosure of all relevant facts relating to the transaction or affecting the subject matter of the agency.

[4] Principal and Agent 308 ⟸69(1)

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k69 Individual Interest of Agent
                308k69(1) k. In General. Most Cited Cases

Principal and Agent 308 ⟸72

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
       308II(A) Execution of Agency
          308k72 k. Conversion or Embezzlement.
Most Cited Cases
Consultant breached his fiduciary duties to olive oil company under Illinois law by usurping company's business opportunity with supplier, misappropriating company's valuable trade secrets for his own financial gain, and then marketing a new olive oil product substantially similar to the one company had planned to market after securing the supply contract.

**[5] Principal and Agent 308 ⛭79(9)**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
       308II(A) Execution of Agency
          308k79 Actions for Negligence or Wrongful Acts of Agent
             308k79(9) k. Judgment and Measure of Damages. Most Cited Cases
Punitive damages are appropriate under Illinois law where an agent has intentionally breached a fiduciary duty.

**[6] Principal and Agent 308 ⛭79(9)**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
       308II(A) Execution of Agency
          308k79 Actions for Negligence or Wrongful Acts of Agent
             308k79(9) k. Judgment and Measure of Damages. Most Cited Cases
A punitive damages award of $1,000,000 against consultant was appropriate under Illinois law where consultant breached his fiduciary duties to olive oil company by usurping company's business opportunity with supplier, misappropriating company's valuable trade secrets for his own financial gain, and then marketing a new olive oil product substantially similar to the one company had planned to market after securing the supply contract.

**[7] Fraud 184 ⛭12**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
       184k8 Fraudulent Representations
          184k12 k. Existing Facts or Expectations or Promises. Most Cited Cases
Consultant committed promissory fraud under Illinois law by promising olive oil company that he would secure an exclusive worldwide supply arrangement, while never intending to do so because consultant wanted such an arrangement for his own company.

**[8] Principal and Agent 308 ⛭79(9)**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
       308II(A) Execution of Agency
          308k79 Actions for Negligence or Wrongful Acts of Agent
             308k79(9) k. Judgment and Measure of Damages. Most Cited Cases
A punitive damages award of $1,000,000 against consultant was appropriate under Illinois law where consultant committed promissory fraud by promising olive oil company that he would secure an exclusive worldwide supply arrangement, while never intending to do so because consultant wanted such an arrangement for his own company.

**[9] Estoppel 156 ⛭85**

156 Estoppel
    156III Equitable Estoppel
       156III(B) Grounds of Estoppel
          156k82 Representations
             156k85 k. Future Events; Promissory Estoppel. Most Cited Cases
Promissory estoppel claim existed under Illinois law in favor of olive oil company where consultant falsely promised company that he would secure an exclusive worldwide supply arrangement, while never intending to do so because consultant wanted such an arrangement for his own company; company relied on that promise and spent hundreds of thousands of dollars preparing its products for market based on the promise and such reliance was expected and foreseeable to consultant.

**[10] Antitrust and Trade Regulation 29T ⛭417**

29T Antitrust and Trade Regulation
    29TIV Trade Secrets and Proprietary Information

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

29TIV(A) In General
29Tk417 k. Necessity That Information Be Secret. Most Cited Cases
(Formerly 382k987 Trade Regulation, 379k10(5)) Olive oil company's research, design and marketing plans, product formulations and production methods, and customer and supplier identities met the secrecy requirement of the Illinois Trade Secret Act; such information was not readily ascertainable from any source of public information, was developed through great expense and effort, and was not shared with anyone outside of 765 company's senior management, except for a few select individuals who were assisting company and who were subject to non-disclosure agreements, and company took reasonable steps to safeguard its confidential information. S.H.A. 765 ILCS 1065/2(d).

**[11] Antitrust and Trade Regulation 29T ☞420**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(A) In General
29Tk420 k. Particular Cases, in General. Most Cited Cases
(Formerly 382k990 Trade Regulation, 379k10(5)) Consultant misappropriated olive oil company's valuable trade secrets in violation of Illinois Trade Secret Act; consultant acquired company's trade secrets under circumstances giving rise to a duty to maintain their secrecy, and then marketed a new olive oil product substantially similar to the one company had planned to market. S.H.A. 765 ILCS 1065/2(b).

**[12] Injunction 212 ☞56**

212 Injunction
212II Subjects of Protection and Relief
212II(B) Matters Relating to Property
212k56 k. Disclosure or Use of Trade Secrets. Most Cited Cases
(Formerly 382k1008 Trade Regulation) Olive oil company, which established that consultant unlawfully misappropriated its trade secret information, was entitled to injunction under Illinois Trade Secret Act; company established that disclosure of trade secrets was inevitable, that it would suffer irreparable harm if a permanent injunction does not issue, that it had no adequate remedy at law, that the injury to company if injunctive relief does not issue would exceed any

harm to consultant if an injunction was entered, and that the public interest supported the issuance of an injunction. S.H.A. 765 ILCS 1065/3(a).

**[13] Damages 115 ☞40(1)**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k35 Pecuniary Losses
115k40 Loss of Profits
115k40(1) k. In General. Most Cited Cases
Olive oil company, which established that consultant unlawfully misappropriated its trade secret information, was entitled under Illinois Trade Secret Act to recover its lost profits which resulted from consultant keeping company out of the market. S.H.A. 765 ILCS 1065/4(a).

**[14] Damages 115 ☞40(1)**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k35 Pecuniary Losses
115k40 Loss of Profits
115k40(1) k. In General. Most Cited Cases
Consultant engaged in willful and malicious misappropriation of olive oil company's trade secret information as evidenced by his use of the information for directly competitive purposes and his efforts to hide the misappropriation; thus, exemplary damages were warranted under Illinois Trade Secret Act. S.H.A. 765 ILCS 1065/4(b).

**[15] Antitrust and Trade Regulation 29T ☞438**

29T Antitrust and Trade Regulation
29TIV Trade Secrets and Proprietary Information
29TIV(B) Actions
29Tk438 k. Costs and Attorney Fees. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

(Formerly 382k1009 Trade Regulation, 379k30)
Where company was successful on one or more claims all based on a common core of facts, counsel could collect fees for all litigation involving the trade secret count under Illinois Trade Secret Act because willful and malicious conduct was found to have occurred. S.H.A. 765 ILCS 1065/5.

**[16] Declaratory Judgment 118A ☞145**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(G) Written Instruments and Contracts
        118AII(G)1 In General
           118Ak143 Particular Contracts
           118Ak145 k. Employment and Personal Service Contracts. Most Cited Cases
Based on court's determination that consultant willfully misappropriated company's trade secrets, company was entitled to a declaration that it properly terminated its contractual relations with consultant and properly broke off negotiations over a more expanded relationship with consultant. 28 U.S.C.A. § 2201(a).

**[17] Antitrust and Trade Regulation 29T ☞426**

29T Antitrust and Trade Regulation
    29TIV Trade Secrets and Proprietary Information
        29TIV(B) Actions
        29Tk426 k. In General. Most Cited Cases
(Formerly 382k996 Trade Regulation, 379k10(5))
Illinois Trade Secret Act is the exclusive remedy for misappropriation of trade secrets, but does not preempt common law claims based on other theories. 765 ILCS 1065/8(a).

Steven C. Florsheim, Claire P. Murphy, Robert D. Cheifetz, Sperling & Slater, P.C., Chicago, IL, for Plaintiff.
Giuseppe Grappolini, Grappolini G. s.r.l., Loro Ciuffenna, pro se.

*MEMORANDUM OPINION AND ORDER*

DENLOW, Magistrate J.
*1 This case involves a breach of loyalty and theft of valuable trade secrets by a highly paid consultant to a small family business engaged in the sale of olive oil. Defendants vigorously defended this case until shortly before trial at which time their counsel withdrew. Defendants failed to appear at trial. The reason for their failure to appear is clear. They stole an important business opportunity from Plaintiff, misappropriated Defendants' valuable trade secrets for their own financial gain, and they do not wish to face the consequences.

The Court conducted a bench trial on February 24-25, 2003 in connection with the complaint brought by Plaintiff, Lucini Italia Company ("Lucini" or "Plaintiff") alleging that Defendants Giuseppe Grappolini ("Mr.Grappolini") and Grappolini G. s.r.l. ("Grappolini Company")(collectively "Defendants"), seized an exclusive contract with a key supplier for their own benefit and began marketing a new product by means of misappropriating trade secrets from Plaintiff. The Court has carefully considered the testimony of the three witnesses who appeared at trial, the witnesses who appeared through depositions, the Plaintiff's trial exhibits, the Plaintiff's written submissions and arguments.

The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

**I. FINDINGS OF FACT**

A. Nature of the Action

1. Lucini alleges that Defendants promised to obtain an exclusive contract with a key supplier, Vegetal Progress ("Vegetal"), but instead signed Vegetal to an exclusive contract with defendant Grappolini G. s.r.l. Lucini claims that after usurping Lucini's business opportunity with Vegetal, Defendants began marketing a new olive oil product substantially similar to the one Lucini had planned to market after securing the supply contract. In developing, producing, packaging, and marketing this new product, Defendants are accused of using trade secrets misappropriated from Lucini. Following Lucini's discovery of Defendants' activities, Lucini terminated its relationship with Defendants and pulled out of negotiations over a more expanded

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

relationship. The parties dispute whether Lucini had good cause to terminate the contracts. At trial, Lucini asserted five causes of action: (1) breach of fiduciary duty; (2) fraud; (3) promissory estoppel; (4) violation of the Illinois Trade Secret Act, 765 ILCS 1065/1*et seq.;* and (5) declaratory judgment. Lucini had earlier asserted two other alternative legal theories for recovery, constructive fraud and unjust enrichment, but elected to withdraw these without prejudice at the time of trial.

**B. The Parties**

2. Plaintiff Lucini was an Illinois corporation at the time this action was filed and has since reincorporated in Florida. Plaintiff's principal place of business was in Chicago, Illinois at the time the lawsuit was filed. Lucini imports and sells premium extra virgin olive oil and other products of Italy. It was formed (under its former name, IGOPLX Incorporated) by Arthur Frigo, a Chicago entrepreneur and adjunct professor of management and strategy at Northwestern University's Kellogg Graduate School of Management. The Court will refer to Plaintiff by its current name, Lucini, even though it was named IGOPLX in its early years. Mr. Frigo is the Chairman of the Board of Lucini. The company's CEO is Mr. Frigo's daughter, Renee Frigo, and its President is Renee Frigo's husband, Daniel Graeff. Arthur Frigo, Renee Frigo, and Daniel Graeff testified in person at trial and their testimony was credible and consistent with the documentary evidence.

**\*2** 3. Defendant Giuseppe Grappolini is a resident of Loro Ciuffenna, Italy. Mr. Grappolini served as a consultant to Lucini pursuant to a Consulting Contract dated December 22, 1997. (Px 17). Under the Consulting Contract, Mr. Grappolini worked on behalf of Lucini to develop Lucini Premium Select extra virgin olive oil as well as to develop a number of flavored olive oil products utilizing essential oils. Defendant Grappolini G. s.r.l. (the "Grappolini Company") is an Italian limited liability company, with its principal place of business in Arezzo, Italy. Mr. Grappolini is the sole owner and operator of the Grappolini Company. The Grappolini Company distributes small volumes of extra-virgin olive oil in Chicago and other markets throughout the United States, and larger volumes in Europe. Between December 1997 and June 2000, the Grappolini

Company served as Lucini's supplier of extra virgin olive oil pursuant to a December 1997 Supply Agreement.

4. Both Defendants appeared in this case through Chicago counsel and actively participated in motion practice and discovery. They gave limited deposition testimony, but Giuseppe Grappolini and the Grappolini Company's bookkeeper, Morena Botti, refused to sit for continuations of their depositions ordered by this Court. Defendants' counsel was permitted to withdraw shortly after the close of discovery. Neither Defendants nor any counsel representing them appeared at the pretrial conference or at trial, although notice was sent directly to Defendants. Prior to trial, Defendants sent a letter to the Court indicating that they would not attend the trial or be represented. The Court draws an adverse inference by reason of Defendants' failure to appear at trial to rebut statements attributed to them or to explain, under oath, their position on key events. Although defendants did not appear, Lucini offered deposition designations from the depositions of (i) Giuseppe Grappolini, appearing individually and as a 30(b)(6) representative of the Grappolini Company, (ii) Morena Botti, the bookkeeper from the Grappolini Company, and (iii) Marco Milandri, the former assistant to Mr. Grappolini. (Px 301-303). Defendants' deposition testimony supports several elements of Lucini's claims.

**C. Background of the Relationship Between Lucini and Defendants**

5. Arthur Frigo is an experienced self-made businessman who began his business career working as a youth in his father's Italian food store. Following college and a brief attempt as a pool table designer, he enjoyed a successful business career as a sales engineer, a management consultant and the operator and owner of a consumer products company which he eventually sold. Mr. Frigo formed Lucini in 1996. Lucini's first project was Italian premium select extra-virgin olive oil. After performing an initial category analysis and select market research, Mr. Frigo perceived a lucrative, high-end niche market for the olive oil. Along with Renee Frigo and Daniel Graeff, Mr. Frigo developed a plan to fill the niche. The success of the company and its product was to be based on extensive research and development and a substantial investment in advertising, packaging and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

targeted marketing, and a high-quality product. Because the olive oil market is highly competitive, Lucini felt it was essential that Lucini's product have an appearance designed to attract customer interest even in a supermarket full of divergent olive oil products. It was equally important to have a superior olive oil so that the customer would return to buy more.

*3 6. While Lucini was searching for a supplier of high quality extra virgin olive oil in Italy, it began market research in the United States including: product names, bottle shapes and sizes, and marketing approaches. Lucini's intention was to leave nothing to chance, testing every aspect of its products with focus groups and consumer trials before launching its products nationally. Before Mr. Grappolini agreed to be Lucini's consultant, Lucini had spent in excess of $300,000 researching and laying the groundwork for its future products.

7. After Lucini's representatives investigated and met with many potential olive oil suppliers and consultants, Lucini's officers focused on Giuseppe Grappolini and his company. On June 1, 1997, Mr. Grappolini entered into a non-disclosure agreement with Lucini. (Px 15). Lucini then shared with Mr. Grappolini many of the details of its ongoing research and solicited from Mr. Grappolini his views on the direction Lucini's initial product should take. Lucini believed Grappolini shared its goals to develop high quality Italian olive oil products.

8. Working closely with Defendants, Lucini sought to develop a distinctive extra virgin olive oil that would become its signature product and sell in the range of $10-$12 per bottle at retail. Arthur Frigo, Renee Frigo and Daniel Graeff tasted numerous different blends of extra virgin olive oils before pinpointing a flavor profile that they and Grappolini agreed would be exceptional and likely to appeal to Lucini's target audience in the United States and around the world. The resulting olive oil had a deep green color, unique taste, medium body, acidity of less than 0.4%, and a variety of other trade secret chemical-analytical characteristics. Because the flavor of an olive oil is impacted by such factors as the types of olives used, the soil content, weather, climate, method of picking the olives, the ripeness of the olive when picked, method of pressing, the time between harvest and bottling, and its exposure to light and air, the exact

techniques Lucini developed and uses to produce a consistent product from year to year are also secret. The difficulty in reproducing Lucini's olive oil by persons not versed in Lucini's trade secrets is evidenced by the fact that experienced olive oil purveyors and cultivators-who were solicited to replace the Grappolini Company after the Supply Contract was terminated-could not recreate Lucini Premium Select until Lucini disclosed its methodology and techniques.

9. After forming a friendship with Mr. Grappolini and developing a respect for his ability to taste olive oil, the Frigos and Graeff chose Grappolini and his company to become their primary consultant and supplier. On December 22, 1997, Lucini entered into an Extra-Virgin Olive Oil Supply Agreement with the Grappolini Company and a Consulting Agreement with Grappolini. In these agreements, Defendants acknowledged the valuable and confidential nature of Lucini's customer information, product development plans, marketing plans and strategies, and design products. Grappolini was generously compensated for his consulting efforts on Lucini's behalf. Lucini paid him $12,500 per month in November and December of 1997, $12,500 per month in 1998, $15,000 per month in 1999, and $16,500 per month in 2000 until termination in June 2000. Apart from the hundreds of thousands of dollars in consulting fees paid to Grappolini, Lucini also reimbursed him for all of his travel and related expenses. Lucini also paid the Grappolini Company for the oil it supplied. In respectively becoming Lucini's consultant and supplier, Grappolini and the Grappolini Company entered into an agency relationship with Lucini, the principal.

*4 10. To succeed and distinguish their company in the market, the Frigos created Lucini as a distinctive brand, and also "branded" Grappolini-spending substantial time and money promoting and marketing Giuseppe Grappolini as an olive oil expert and dubbing him a "master cultivator" in its literature, commercials, and in person at speaking engagements with food sector experts. Lucini paid for Grappolini to take courses to make him a better public speaker. He became Lucini's public face. In exchange, Lucini insisted on exclusive rights and confidentiality.

11. At great expense, Lucini also commissioned marketing firms using psychological research

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

techniques to create a marketing plan to target both emotional and intellectual responses from consumers. Lucini engaged in traditional and non-traditional advertising and promotion and refined its marketing message. Lucini shared the results of its extensive research as well as its business plans with Defendants; it did not disclose its plans or the results of its studies with anyone who was not working for Lucini or subject to a confidentiality agreement. In total, Lucini spent more than a million dollars in research and development and other expenses before selling its first bottle of olive oil.

12. After making its first sale of its Lucini Premium Select product in August 1998, Lucini worked to create a brand identity and market the product into the specialty and grocery stores it had targeted. Lucini's efforts paid off. According to A.C. Nielsen's Olive Oil Item Rating Report, in less than five years, Lucini has become the number three (of 40) selling brand of premium olive oil in the United States.

D. The LEO Project

13. In early 1998, Lucini and Grappolini discussed adding a line of extra virgin olive oils blended with "essential oils" (*i.e.,* natural extracts such as lemon or garlic). Grappolini agreed to be primarily responsible for the food-related study (taste, smell) of the new products, and Lucini agreed to be responsible for the advertising, distribution, and marketing. They termed the project the "LEO Project," which stands for *L*ucini *E*ssential *O*ils.

14. Lucini extensively researched the potential market for natural extract premium olive oil products by empaneling focus groups and commissioning other studies. These studies analyzed all elements of packaging, product positioning, label colors, label textures, language and titles. In March of 1998, Lucini received a very strong positive response to the products and was eager to move quickly to develop and market this new product.

15. In a March 11, 1998 letter to Mr. Frigo, Grappolini enthused that he was "really happy to hear that you received a strong interest in the essential oil ... I know that Renee [Frigo] and Daniel [Graeff] told you how much I desire to put my energy in this project."(Px 43).

16. Grappolini ostensibly did put his energy into the LEO project. He attended meetings in Chicago concerning the LEO project in the summer of 1998. Grappolini told the Frigos about the "only" company in Italy that could supply Lucini with the quantity and quality of natural essential oils Lucini would need. This company, Vegetal-Progress s.r.l. ("Vegetal"), was run by the Perotti family. Subsequently, Lucini did its own extensive research looking for an alternative supplier of essential oils, but could find no company in Italy other than Vegetal that was capable of producing the superior product Lucini sought and the variety of flavors needed.

E. Lucini's Efforts To Obtain an Exclusive Supply Agreement With Vegetal

*5 17. In the summer of 1998 Lucini asked Grappolini to approach Vegetal on Lucini's behalf and propose an exclusive worldwide supply arrangement. Although Grappolini told Renee Frigo that he did not believe Vegetal would ever consider an exclusive arrangement with anyone, he agreed to ask Vegetal for an exclusive contract on Lucini's behalf. Lucini explained that it could make the capital commitment necessary to finance the LEO project only if it knew that Vegetal had agreed to an exclusive relationship for the supply of its essential oils for use in the olive oil industry. Lucini explained to Grappolini that exclusivity was crucial for the LEO Project. Lucini could not justify the start-up costs necessary to bring this new and unique product to market and to create consumer demand if, after Lucini had succeeded in creating the demand for the product, the Perottis were free to switch their supply of essential oils to one of Lucini's competitors. Lucini did not seek to limit Vegetal from supplying its essential oils to other industries such as perfumes and cosmetics.

18. In the summer of 1998, Grappolini reported back to Lucini that he had a very positive response from his meeting with the Perottis. He stated that Vegetal was uniquely equipped-from technical and quality standpoints-for the LEO project. On August 8, 1998, he further reported that the Perottis "will work with us exclusively and are ready to sign a contract stating as much."(Px 61). Renee Frigo told Grappolini to have the Perottis send them a contract they had used in the past, and they would work with it.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

F. Grappolini Misleads Lucini About the Status of the Vegetal Negotiations

19. Grappolini attended a meeting in Chicago in December 1998 to further discuss and plan the LEO project. In addition, Grappolini regularly communicated by telephone and fax with Lucini as the project moved forward. Lucini spent hundreds of thousands of dollars testing flavors, designing labels and packaging, creating recipes for the new products, determining a pricing strategy, selecting the types of essential oil products that would be best sold in grocery stores, speciality stores, and to those in the food service industry, and testing everything in focus groups. As it had with Lucini Premium Select, Lucini shared its results with Defendants and regularly included Mr. Grappolini in high level discussions of strategy and plans. Lucini included Grappolini in meetings to discuss feedback regarding its products from world-renowned chef Charlie Trotter (whose company signed a non-disclosure agreement). Chef Trotter advised Lucini on potential flavor possibilities for the LEO products for the line of products Lucini intended to market to the food service industry (the chef's line) as well as for the lines of products Lucini intended to market in specialty stores (the gourmet line) and grocery stores (the grocery line).

20. In December 1998, Grappolini wrote to Arthur Frigo, Renee Frigo, and Daniel Graeff that Vegetal wanted Lucini to provide a draft "world exclusive" contract as soon as possible. (Px 72). The same day, Lucini wrote back that it would begin to draft an agreement. (Px 73). On February 24, 1999, Renee Frigo wrote to Marco Milandri, Grappolini's assistant, stating, "We are ready with the essential oil agreement for Mr. P ... family's company. Let me know if Mr. Grappolini would like it sent to him to give to Mr. P or if he would like us to fax it directly."(Px 76). Mr. Milandri wrote back that Grappolini would prefer to personally deliver the agreement to the Perottis because he has the relationship with Mr. P. (Px 77). Mr. Milandri testified that Mr. Grappolini had specifically directed him to make this response. (Px 302, pgs. 145-46). Later that day, Renee Frigo faxed a draft agreement to Mr. Grappolini with the cover note: "I have attached the Essential Oil Agreement for you to present on Lucini behalf to Mr. Perotti."(Px 78). The attached supply agreement described a worldwide

exclusive supply arrangement between Vegetal and Lucini. *Id.*

*6 21. After February 1999, Mr. Grappolini indicated to Lucini that he had presented the contract to Vegetal and stated, on numerous occasions, that it was only a matter of time before he would have the supply contract signed by Vegetal. He indicated that any delays were due to Vegetal's need to run the proposed agreement past its French parent company. Mr. Grappolini's representations to Lucini were not true. At his deposition, Mr. Grappolini admitted that Lucini had asked him to present the contract to Vegetal, that he had never done so, and that he never told Lucini of his failure to transmit the contract. (Px 303, pgs. 23-27).

22. In May of 1999, Arthur Frigo, Renee Frigo, Daniel Graeff, and Grappolini met with the Perottis. Before the meeting, Grappolini cautioned the Frigos not to mention the proposed supply agreement with Vegetal. He stated that since it was their first meeting, the Perottis would be offended by such an American and aggressive approach. Grappolini reassured the Frigos that he would take care of the business issues with the Perottis. Once again, Lucini relied on Grappolini's advice. After the meeting, Giorgio Perotti wrote to Renee and Daniel, "expressing great confidence in [their] enterprise, which aim is to link to the qualities of the olive oil the numerous and suggestive qualities of the essential oils."(Px 89).

23. As time went by and Lucini spent more and more money developing its flavored oil products, Grappolini continued to reassure Lucini that he would obtain the Vegetal contract for Lucini.

24. From March to October 1999, Grappolini met nearly every month for extensive, multiple day meetings with Arthur and Renee Frigo, Daniel Graeff, and Lucini's designer, Milana Kosovac, concerning the LEO Project. During the meetings, which took place in Chicago, New York, Miami, Loro Ciuffenna, and Lake Como, as well as through confidential correspondence, the Frigos explained to Grappolini in detail Lucini's confidential and trade secret marketing and design strategies, research results and analysis concerning the LEO Project. This information included:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 9
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

(a) Lucini's targeted marketing strategy for specific sales venues;

(b) Lucini's research into consumer profiles in different sales venues;

(c) Lucini's specific plans for introducing new single flavor and combination LEO products in different venues;

(d) Lucini's testing data and analysis of bottle, package and label design features to determine which elements would maximize the chances that first-time customers would pick Lucini's products off the shelf;

(e) Lucini's advertising strategy and techniques to establish and maintain a "brand" identity and image;

(f) Lucini's research into consumer acceptance of different flavors; and

(g) Lucini's pricing strategy.

25. The information and plans Lucini shared with Grappolini were not shared with anyone outside of Lucini's senior management, its designer, and Grappolini. As Lucini's designer, Ms. Kosovac had signed an agreement specifying that information shared by Lucini would remain strictly confidential. Lucini maintained its marketing, product development and design information as a closely guarded secret because it believed this information would give it a competitive advantage when it began selling LEO products, so long as it was unknown to Lucini's competitors. By the end of 1999, Lucini had spent over $800,000 developing the market information, researching packaging and sales possibilities and generating its trade secrets for the new LEO products. (Px 402).

*7 26. Lucini's extensive expenditures preparing its LEO products for market made good business sense to Lucini based on its sales forecasts for the products. On its grocery line of LEO products, Lucini conservatively forecast sales of at least $1.2 million in its first full year; at least $2.1 million in its second full year; at least $2.5 million in its third full year, and at least $5.0 million in its fourth full year. (Px 401). Lucini anticipated profits of at least $4.17 million on the grocery line over its first four years.

Lucini anticipated additional sales and profits on its gourmet and chef's lines of LEO products, but does not have contemporaneous sales forecasts for these products. Lucini's forecast are conservative, reasonable and credible. They are validated by the fact that Lucini did similar forecasts for its Lucini Premium Select product and for its vinegar products and exceeded its forecasts during the initial years the products were sold. If Lucini gains access to Vegetal essential oil or an alternative supply source immediately, it will be able to launch its products in early 2004, but not sooner, based on the fact that the olive harvest for 2003 has already concluded and Lucini cannot obtain sufficient quantities of the necessary base oil at this time to fill orders for 2003. Defendants have sold olive oil flavored with Vegetal essential oils since some time in 1999 under several different brand names but refused to disclose in discovery their total sales or profits from these products. The Court draws the inference from Defendants' refusal to disclose their actual sales experience with the product lines that Defendants' sales and profits meet or exceed those forecast by Lucini.

G. Defendants Strike Their Own Deal With Vegetal, Shutting Out Lucini.

27. In direct contravention of his representations and Lucini's reasonable expectations, Grappolini secretly negotiated an exclusive, worldwide supply contract with Vegetal for the Grappolini Company, rather than for Lucini. Grappolini never told Lucini that he was negotiating his own deal with Vegetal. The Grappolini-Vegetal agreement was signed on October 4, 1999. (Px 18 and 19). The Grappolini-Vegetal contract expressly prohibited any assignment of the contract to any third party, including Lucini. (Px 19, Art. 12).

28. After entering into his own exclusive arrangement with Vegetal, Grappolini deliberately hid that fact from Lucini. Grappolini continued to represent to Lucini that Lucini would soon have a worldwide exclusive contract with Vegetal. On October 4, 1999, the very day on which the Grappolini Company entered into its exclusive agreement with Vegetal, Renee Frigo and Daniel Graeff were in Italy to finalize details of the LEO Project. During that trip, Mr. Grappolini met with Renee Frigo and Daniel Graeff in Loro Ciuffenna to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 10
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

review labels for the LEO project, discuss Lucini's marketing plans, and conduct tastings. When Renee and Daniel reminded Grappolini of the importance of a direct supply agreement between Lucini and Vegetal, Grappolini responded, "Do not worry." Mr. Grappolini continued in his deception in mid-October 1999, during a day-long meeting about the LEO project, Grappolini told Arthur Frigo, "Do not worry. The Perotti agreement is going to be done in the next 30-45 days. I will have it for you. No problem. Do what you got to do."(Tr. 85). Mr. Grappolini's statements were false and intended to mislead Lucini into continuing to spend money on LEO, to continue sharing its trade secrets with Grappolini, and to continue paying Grappolini his monthly consulting fee even though he had begun to work exclusively for his own interests instead of for Lucini.

**\*8** 29. Because Lucini was nearing its planned launch of the LEO products at the important Fancy Food Show in San Francisco in mid-January 2000, Arthur Frigo insisted on knowing the status of the Vegetal negotiations by mid-October 1999. Mr. Frigo further reminded Grappolini that if the Lucini/Vegetal agreement was not executed within 30-45 days, then Lucini would be in serious risk of ruining its credibility with its customers (some of whom had committed to purchase the product sight unseen based on Lucini's reputation). Again, Grappolini insisted that everything was on track and reassured Frigo that he should not be concerned.

30. On or about November 5, 1999, in reliance on Grappolini's reassurances and representations, Lucini placed an order for LEO products from Grappolini, to be delivered in Chicago on February 21, 2000 and delivered to Lucini's warehouse in San Francisco on February 28, 2000. Grappolini indicated that he would fill this order using Lucini Premium Select oil and essential oil that Vegetal had agreed to provide pursuant to the anticipated exclusive supply arrangement with Lucini. Lucini paid the Grappolini Company $28,000 for the essential oils in anticipation of the contract. Lucini planned to use the LEO products to fill advance customer orders it would take at the Fancy Food Show and to begin its efforts to have the products distributed to stores around the country.

H. Lucini Discovers the Truth

31. On November 9, 1999, Daniel Graeff met with Grappolini in Italy in connection with negotiations over a potential expanded role for Mr. Grappolini with Lucini as it added more product lines. Because Lucini's offer to expand Grappolini's role and nearly double his monthly compensation was explicitly contingent on securing for Lucini the worldwide exclusive contract with Vegetal, Mr. Graeff questioned Mr. Grappolini about the status of the Vegetal negotiations. Under direct questioning from Daniel Graeff, Grappolini admitted that he had already entered into an agreement with Vegetal for himself and his company, but refused to elaborate on the terms of the contract. Graeff expressed shock and disbelief, and immediately informed Arthur and Renee Frigo of the news.

32. Lucini made repeated requests to Defendants to immediately provide Lucini with a copy of the agreement between the Grappolini Company and Vegetal. Nevertheless, Grappolini did not provide a copy of this agreement to Lucini's Italian counsel until December 21, 1999. At this point, Lucini learned for the first time that the Grappolini Company's contract with Vegetal was not assignable and that Grappolini did not intend to transfer the contract to Lucini.

33. Following its discovery of the terms of the Grappolini-Vegetal contract, Lucini contacted the Perottis to explore whether there was any possibility of achieving a direct supply arrangement. Mr. Perotti told Renee Frigo and Daniel Graeff that Vegetal had no objection to supplying essential oil for use in Lucini's LEO products, and acknowledged that Grappolini was a "bad boy" in procuring the contract for his own company rather than Lucini, but Vegetal would not renege on its existing commitments to Mr. Grappolini. (Tr. 228). But for Grappolini's unlawful activities in entering into an exclusive arrangement with Vegetal for his company, Lucini would have been able to enter into an exclusive supply arrangement with Vegetal.

**\*9** 34. Because the olive harvest had concluded by the time Lucini discovered Grappolini's actions, it was too late for Lucini to find an alternative source for its Premium Select Olive Oil for the coming year, so Lucini continued doing business with Grappolini for a few months while it began investigating its alternatives. When all discussions with Defendants'

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                  Page 11
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

representatives seeking a negotiated solution broke down in June 2000, Lucini terminated its consulting and supply agreements with Grappolini and the Grappolini Company. (Px 126 and 127). In his letter terminating the Consulting Contract, Arthur Frigo informed Mr. Grappolini that Lucini was terminating the agreement "due to the repeated violation of your fiduciary duties toward our company."(Px 127). Mr. Frigo specifically noted that a basis for the termination was Mr. Grappolini's bad faith during negotiations over the Vegetal contract.

I. Defendants Compete with Lucini Using Vegetal Essential Oil and Lucini's Trade Secrets

35. Unbeknownst to Lucini, Defendants began selling their own products blending extra virgin olive oil with essential oils as early as 1999. Defendants first marketed their products in Italy and later expanded their sales to the United States, Sweden, Denmark, England, and other parts of Europe. (Px 10, 12, 141, 146, 150). Defendants marketed their products under various names, including Res Essenziale, Cuoco, Ortoliva, Ortointavola, and under the Grappolini name.

36. In the United States, the Grappolini Company sold single flavor products in specialty stores, Liberty Heights Fresh and Sur La Table. Lucini had planned to sell its single flavor gourmet line in specialty stores. Grappolini knew of Lucini's plans to sell its single flavor gourmet line in specialty stores, including Sur La Table, and its combination flavor products in grocery stores, and knew that Lucini made this distinction based on testing and research.

37. Grappolini's flavors consisted of Basil, Rosemary, Garlic, Lemon and Orange. (Px 12 and 139). Lucini's gourmet line had included each of these flavors. Lucini had determined the most promising flavors by testing a wide variety of possibilities with essential oils purchased from Vegetal. Prior to receiving access to the results of Lucini's market research, Mr. Grappolini had believed that the most promising flavors for the essential oil products included rose, lavender, and mint, but not lemon. Lucini's research disclosed that basil, rosemary, garlic, and lemon were more likely to be successful than the flavors Mr. Grappolini had preferred. Mr. Grappolini was told the results of Lucini's research on flavor preferences.

38. Lucini spent several months working with Grappolini to determine the ideal percentage of essential oil that should be blended into extra virgin olive oil. In conducting tests to make this determination, Lucini paid Mr. Grappolini his monthly consulting fee as compensation and paid for all of the essential oils that were used in the tests. Lucini's testing specifically determined the correct percentage of essential oil to use for each of the flavors the Grappolini Company sold. Mr. Grappolini was privy to all of the formulations and used them in creating his own flavored olive oil products.

*10 39. In marketing its essential oil products in the United States, the Grappolini Company offered a selection of each of its flavors in a single box containing sample size bottles of the oil. In addition, the Grappolini Company sold larger single bottles of each flavor, again packaged within a box. In both instances, the box featured a window through which a customer could see the color of the oil and looking through the window and through the bottle could see an image behind of an olive or the flavor source on a value-added package insert. This packaging configuration is exactly what Lucini had designed for its own LEO trial pack and had communicated to Grappolini.

40. On both the Res Essenziale packaging and the Grappolini brand packaging, the Grappolini company used hand drawn images of the flavor source (e.g. garlic, rosemary, basil, lemon) strikingly similar to what Lucini planned to use on its grocery line. Mr. Grappolini had received each of Lucini's images digitally on a computer disk. On the Grappolini brand products, Defendants used the images on a clean white background in a manner that mirrors Lucini's planned labels for its gourmet line. Lucini's selection of its label designs was based on extensive and expensive testing of over 300 candidate labels with focus groups and analyzing the results in the context of demographic information Lucini gathered; Grappolini's selection of his label designs came after reviewing Lucini's selections and learning the results of Lucini's research. Lucini had considered and weighed the possibility of using images depicting product use or what familiar foods the product would enhance before determining that product composition should be depicted in the label image; Grappolini reached the same conclusion for his own products after learning of Lucini's research.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

41. Lucini determined that flavored olive oil products would sell better in smaller bottles than the bottles used for unflavored extra virgin olive oil. This was based on pricing considerations and how quickly it was determined an average consumer would finish a bottle of each respective product. Grappolini was told of Lucini's conclusions. Just as Lucini had planned to use a smaller bottle for its LEO products, Grappolini sold his essential oil products in bottles smaller than those he typically used for unflavored products.

42. Lucini determined that its LEO products should be sold at a single common price, even though the costs of the raw material essential oil varied from flavor to flavor. Such a pricing plan would eliminate potential customer confusion and maximize sales. After learning of Lucini's pricing plan, Grappolini set the prices for his own essential oil products at a common price, without regard to the costs of producing each respective flavor.

43. Lucini determined that in order to win new customers for an unfamiliar product, it was important to include value-added inserts containing recipes and instructions for how to use the product. Lucini hired and worked with chefs to create the recipes and shared its conclusions with Grappolini. Again, Grappolini's U.S. essential oil products contain recipes and instruction on how to use the products.

*11 44. Lucini went through hundreds of drafts of the text for its labels and advertising materials for its LEO products. (See e.g. Px 168-70, 175, 184 and 214). It based these drafts on its market research and tested these drafts in focus groups before deciding on the most effective messages to deliver and the descriptive terms that would best capture the interest of potential consumers. It shared with Mr. Grappolini many of the draft labels and told him of the messages it wanted to deliver. The product literature of both Lucini and the Grappolini Company refer to the "marriage" of extra virgin olive oil with essential oils; both emphasize "natural aromas" and make liberal use of the descriptive terms "fresh," "organic," and "natural;" both refer to "mountain" pepper; Lucini's refers to capturing the "peak of freshness" and the "tastes of the harvest season" while Grappolini's emphasizes "freshness" and "flavor" and states his product "solves the problem of finding quality fresh ingredient only when they are in

season;" both encourage the consumer to "pour" or "drizzle" the oil over the "finished dish."

45. For the products Lucini planned to use to introduce its U.S. customers to essential oil products, it determined that using label coloring and design to create a parchment-like, old-world feel evoked positive responses from grocery store consumers and others new to the product's uses. It used this effect on both the boxes and labels of its original grocery line products. The boxes, the labels, and the reasoning behind them was shared with Grappolini. When Grappolini first introduced his original U.S. product, he elected to use his own parchment-like coloring and design effect. Lucini determined that white labels and black bottles have an impact on gourmet purchasers, and Grappolini used this coloring scheme in Sweden when he sold to sophisticated gourmet store Zeta.

46. While Lucini told select customers of its plans to sell a superior form of flavored olive oil not before sold anywhere in the world, Lucini told no one, outside of its trusted consultants and employees, of its plans to use Vegetal Progress as the key supplier of essential oil for this line of products. Lucini knew that if this information were disclosed to its competitors, this might have required it to pay more to sign Vegetal to an exclusive contract or it might lose its anticipated competitive advantage of being first to market with the new product.

47. Lucini spent in excess of $800,000 developing the marketing, design, and product development information it shared with Grappolini. It treated this information as secret and did not share it with anyone else. The Grappolini Company's bookkeeper, Morena Botti, testified that she could not identify any funds her company had spent on research and development in connection with its essential oil products. (Px 301, p. 37). Mr. Grappolini testified that he never paid money to anyone to conduct any research, that he alone was responsible for selecting the flavors used by his company, for selecting the messages to be delivered in his product labels, for selecting the images to be conveyed on the labels, and for designing the window box packaging. (Px 303, pgs. 101-05, 225). Based on his knowledge of Lucini's research and other confidential information, Mr. Grappolini was able to make more informed decisions about how to formulate and market his

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

products than he would otherwise have been able to do without a significant expenditure of money. (Px 303).

**\*12** 48. Lucini would not have been willing to share its confidential information with a competitor for any price, particularly before it had secured an exclusive supply contract with Vegetal and brought its products to market. With regard to the identity of Vegetal as its key supplier, Lucini is unlikely to have disclosed the information for a fee of anything less than its anticipated profits on its LEO products over some years. With regard to its formulation, design, and packaging information, the Court finds that a reasonable royalty would be at least the substantial sum Lucini spent developing the information.

49. The Lucini trade secrets that defendants have used and will continue to use in the future, unless permanently enjoined, unfairly erode Lucini's competitive position in the market and limit the benefit Lucini can achieve from its investment in market, product formulation and design research. Unless permanently enjoined, Defendants will continue to improperly use Lucini's trade secrets.

J. The Private Label Threat

50. Despite a large investment in time and money studying its competition, Lucini is not aware of any product sold in the United States with a flavor profile identical to Lucini Premium Select extra virgin olive oil.

51. Without knowledge of Lucini's confidential methods for creating its oil, it would be difficult, if not impossible, for a competitor to duplicate Lucini Premium Select without a large investment of time and money.

52. Lucini's competitive position in the premium extra virgin olive oil market is enhanced by the uniqueness of its popular product. If Lucini Premium Select were to become one of several copycat oils, the damage to Lucini's reputation and market position would be irreparable.

53. Several of Lucini's customers sell private label extra virgin olive oils. Although Lucini's customers list (including some 13,000 stores) is maintained as

confidential by Lucini and has not been shared outside the company, Lucini disclosed the identity of its largest and most important customers to Grappolini while he was acting as a consultant subject to multiple confidentiality agreements. Sur La Table has been one of Lucini's major customers.

54. After Lucini terminated Grappolini's consulting contract in June 2000, Grappolini met with Sur La Table and admits he discussed creating a private label extra virgin olive oil for that chain of stores. (Px 303, pgs. 234-35). The flavor profile of the oil Grappolini proposed private labeling for Sur La Table was described in terms matching the flavor profile Grappolini developed with Lucini for its Premium Select flagship product.

55. Unless permanently enjoined, Defendants will use or disclose Lucini's secret methods for producing its Premium Select product.

K. Affirmative Defenses

56. Defendants offered no evidence at trial in support of their affirmative defenses. Defendants have failed to meet their burden to establish sufficient facts to support their affirmative defenses. Going further, the Court finds that there is no evidence in the record supporting a finding of *res judicata* or collateral estoppel. The Court will discuss the issue of preemption in the Conclusions of Law.

L. Defendants Acted Willfully and Maliciously

**\*13** 57. Defendants acted in a willful and malicious manner to misappropriate Lucini's trade secrets and corporate opportunities. They acted to intentionally misappropriate and use Lucini's trade secrets for their own financial gain in conscious disregard for Lucini's right to protect and preserve its trade secret information and in conscious disregard for their duties as an agent to Lucini.

II. CONCLUSIONS OF LAW

A. Jurisdiction

58. The Court has jurisdiction over this diversity action under 28 U.S.C. § 1332.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

B. Illinois Law Applies

59. The parties do not dispute that Illinois law applies. In this regard, the Court finds that Lucini developed its trade secrets primarily in Illinois, that Defendants received certain of Lucini's trade secret information in Illinois, and that Lucini's injury was suffered in Illinois. The June 1997 Non-Disclosure Agreement specifies that Illinois law applies. (Px 15, ¶ 6).

C. Breach of Fiduciary Duty-Count I

[1] 60. To establish a claim for breach of fiduciary duty, Lucini must prove: (1) the existence of a fiduciary duty on the defendant's part, (2) the defendant's breach of the duty, and (3) damages proximately resulting from the breach. _Neade v. Portes,_ 193 Ill.2d 433, 444, 250 Ill.Dec. 733, 739 N.E.2d 496, 502 (2000); _Romanek v. Connelly,_ 324 Ill.App.3d 393, 404, 257 Ill.Dec. 436, 753 N.E.2d 1062, 1072 (1st Dist.2001).

[2][3] 61. An "agency relationship engenders a type of fiduciary affiliation in which the principal has the right to control the agent's conduct, and the agent has the power to act on the principal's behalf. Once an agency relationship is found, a fiduciary relationship arises as a matter of law." _Kirkruff v. Wisegarver,_ 297 Ill.App.3d 826, 830, 231 Ill.Dec. 852, 697 N.E.2d 406, 410 (4th Dist.1998). "The existence of an agency relationship constitutes a question of fact for the trier of fact." _Id._ As agents, Defendants owed Lucini general duties of good faith, loyalty, and trust. _Kirkruff,_ 297 Ill.App.3d at 832, 231 Ill.Dec. 852, 697 N.E.2d at 411. In addition, Defendants owed Lucini "full disclosure of all relevant facts relating to the transaction or affecting the subject matter of the agency." _Id._

[4] 62. Defendants were Lucini's agents and owed Lucini a fiduciary duty to advance Lucini's interests, not their own. When Defendants obtained an exclusive supply agreement with Vegetal for the Grappolini Company instead of for Lucini, they were disloyal and breached their fiduciary duties. Lucini suffered substantial damages as a result of this breach.

63. As a proximate result of Defendants' breach of their fiduciary duties, Lucini suffered lost profits

damages of at least $4.17 million from selling its grocery line of LEO products from 2000 through 2003.

[5][6] 64. Punitive damages are appropriate where the defendant has intentionally breached a fiduciary duty. _Obermaier v. Obermaier,_ 128 Ill.App.3d 602, 610, 83 Ill.Dec. 627, 470 N.E.2d 1047, 1053 (1st Dist.1984); _see also O'Neill v. Gallant Ins. Co.,_ 329 Ill.App.3d 1166, 1177, 263 Ill.Dec. 898, 769 N.E.2d 100, 109 (5th Dist.2002) (stating that "Illinois courts are not hesitant to award punitive damages in cases where there has been a flagrant breach of fiduciary responsibility"). Defendants' breach of their fiduciary duties was flagrant and intentional. Defendants deliberately usurped a corporate opportunity sought by Lucini, which Lucini had entrusted Defendants to secure on Lucini's behalf. Although Defendants explicitly accepted this trust and ensured Lucini that Mr. Grappolini and his company would do as Lucini requested, Defendants failed to do so and hid this fact from Lucini. A punitive damage award of $1,000,000 against Defendants is appropriate in order to punish Defendants and to deter Defendants from committing similar acts in the future.

B. Fraud-Count III

*14 65. In its claim for common law fraud, Lucini must prove: (1) the defendant made a statement, (2) the statement was material in nature, (3) the statement was untrue, (4) the defendant knew it was untrue or made the statement with culpable ignorance of its truth or falsity, (5) the statement was made for the purpose of inducing the plaintiff's reliance, (6) the statement was actually relied upon by the plaintiff, and (7) the plaintiff suffered injury as a result. _Small v. Sussman,_ 306 Ill.App.3d 639, 646, 239 Ill.Dec. 366, 713 N.E.2d 1216, 1221 (1st Dist.1999).

66. Defendants committed fraud when Guiseppe Grappolini falsely told Lucini that he had delivered Lucini's draft contract to Vegetal and when he told Lucini that Vegetal had agreed to enter into a worldwide exclusive agreement with Lucini. These statements were material, known by Defendants to be untrue when made, made to induce reliance by Lucini, actually induced Lucini's reliance, and caused injury to Lucini.

67. While a claim of fraud ordinarily cannot be

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

sustained in connection with a forecast or forward looking statement, the Illinois Supreme Court has recognized that false promises or representations of future conduct is actionable as promissory fraud if made in furtherance of a fraudulent scheme.*HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 168, 137 Ill.Dec. 19, 545 N.E.2d 672, 682 (Ill.1989); *Bensdorf & Johnson, Inc. v. Northern Telecom Ltd.,* 58 F.Supp.2d 874, 881 (N.D.Ill.1999) (accepting promissory fraud claim "where a plaintiff is able to show that the misrepresentations are part of a 'scheme to defraud' ").

68. "Where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where that other party relies upon it to his detriment, the false promise will be considered an intended scheme to defraud the victim and will be actionable."*Concord Indus., Inc. v. Harvey Indus. Corp.,* 122 Ill.App.3d 845, 849-50, 78 Ill.Dec. 898, 462 N.E.2d 1252, 1255 (1st Dist.1984).

[7] 69. In promising Lucini that they would secure an exclusive worldwide supply arrangement with Vegetal, while never intending to do so because Mr. Grappolini wanted such an arrangement for his own company, Defendants committed promissory fraud. Because Lucini has established that Defendants' fraud was in furtherance of a scheme to beat Lucini to market and unlawfully compete, Lucini has met its burden of proving promissory fraud.

70. But for Lucini's reliance on defendant's false statements, it would have directly sought a worldwide exclusive supply arrangement with Vegetal. Vegetal would have willingly entered into such an arrangement with Lucini on at least the same terms as the contract it entered into with the Grappolini Company. As a result of Defendants' fraud and promissory fraud, Lucini has suffered damages in the amount of its lost profits on LEO products.

71. In seeking to recover punitive damages on its fraud claim, Lucini must show in addition to simple fraud, "gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice and willfulness."*Jannotta v. Subway Sandwich Shops, Inc.,* 125 F.3d 503, 511 (7th Cir.1997) (internal quotations omitted)."One way to satisfy that standard is through evidence indicating that a fraud was designed to enrich the defendant without regard to its effect on others or was intended by him to harm the plaintiff."*Id.; see also Los Amigos Supermarket, Inc. v. Metro. Bank and Trust Co.,* 306 Ill.App.3d 115, 129-30, 239 Ill.Dec. 155, 713 N.E.2d 686, 696 (1st Dist.1999) (holding punitive damages may be awarded where the wrongful act committed by the defendant is characterized by wantonness, malice, oppression or other circumstances of aggravation as well in a fraud action where false representations are wantonly and designedly made).

**\*15** [8] 72. Defendants were willful and malicious in making statements to induce Lucini to believe they were working on Lucini's behalf to secure the Vegetal contract. Defendants' fraud was designed to enrich themselves without regard to the harm it would inflict on Lucini. Defendants' misrepresentations were wantonly and designedly made to cheat Lucini for their own benefit. Lucini is entitled to an award of $1,000,000 in punitive damages to punish Defendants and to deter them from engaging in such conduct in the future.

C. Promissory Estoppel-Count IV

73. A claim for promissory estoppel must establish: (1) the defendant made an unambiguous promise, (2) the plaintiff relied on the promise, (3) the reliance was expected and foreseeable from the defendant's perspective, and (4) the plaintiff's reliance on the promise was detrimental. *Pickus Construction and Equip. v. Am. Overhead Door,* 326 Ill.App.3d 518, 523, 260 Ill.Dec. 512, 761 N.E.2d 356, 361 (2nd Dist.2001).

74. Defendant Giuseppe Grappolini promised that he would deliver to Lucini an exclusive worldwide supply contract with Vegetal. This promise was unambiguous and clearly within Defendant's power to carry out based on the assurances he had received from Vegetal and the fact that he was ultimately able to secure just such a contract for his own company. Lucini relied on this promise and spent hundreds of thousands of dollars preparing its products for market based on the promise. Lucini also accepted commitments to order its LEO products from its customers based on Defendants' unambiguous promises that they would deliver the Vegetal contract and the LEO product in time for the 2000 San Francisco Fancy Food Show. Lucini's reliance was

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

expected and foreseeable to Grappolini and his company and worked to the detriment of Lucini.

[9] 75. The presumptive measure of damages for promissory estoppel is the value of the promise. *Goldstick v. ICM Realty,* 788 F.2d 456, 464 (7th Cir.1986). However, Illinois courts do allow a plaintiff in a promissory estoppel case to recover damages for the profits it would have made had the defendant kept his promise-provided it was necessary to do justice to the plaintiff. *Id.* at 463.This is such a case because the value of the Vegetal contract is directly related to Lucini's business plan for its LEO project. Accordingly, this Court awards Lucini its lost profits of $4,170,000 on its promissory estoppel claim.

### D. Illinois Trade Secret Act-Count VI

76. To establish a misappropriation of a trade secret, a plaintiff must prove: 1) the existence of a trade secret, 2) misappropriation of the secret information, and 3) that the secret information was used in the defendant's business. *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265-66 (7th Cir.1992).

### Trade Secrets

77. The Illinois Trade Secret Act defines a "trade secret" as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."765 ILCS 1065/2(d). A plaintiff must prove that the true value of the information lies in the fact that it is not generally known to others who could benefit from using it, and that it made reasonable effort to maintain secrecy.*Mangren Research & Dev. Corp. v. National Chem. Co., Inc.,* 87 F.3d 937, 942, 943 (7th Cir.1996).

*16 78. Whether the information sought to be protected qualifies as a trade secret focuses

fundamentally on the secrecy of such information. *Thermodyne Food Serv. Products, Inc. v. McDonald's Corp.,* 940 F.Supp. 1300, 1304 (N.D.Ill.1996) (*citing Mangren,* 87 F.3d at 942);*see also Stampede Tool Warehouse, Inc. v. May,* 272 Ill.App.3d 580, 588, 209 Ill.Dec. 281, 651 N.E.2d 209, 215 (1st Dist.1995) (stating that the key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort or expense"); *RKI, Inc. v. Grimes,* 177 F.Supp.2d 859, 874 (N.D.Ill.2001) (finding customer information not readily available from any source of public information to be a trade secret).

79. The following factors are significant in determining whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by the employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *ILG Indus., Inc. v. Scott,* 49 Ill.2d 88, 93, 273 N.E.2d 393, 396 (1971); *Strata Mktg., Inc. v. Murphy,* 317 Ill.App.3d 1054, 1068, 251 Ill.Dec. 595, 740 N.E.2d 1166, 1177 (1st Dist.2000) (stating that a customer list can be a trade secret if it takes considerable effort, time, and money to compile).

80. Information meeting the Illinois Trade Secret Act "secrecy" criterion may include customer lists that are not readily ascertainable, pricing distribution and marketing plans, and sales data and market analysis information. *RKI,* 177 F.Supp.2d at 873.

[10] 81. Lucini's research, design and marketing plans, product formulations and production methods, and customer and supplier identities meet the secrecy requirement of the Illinois Trade Secret Act. Such information is not readily ascertainable from any source of public information, was developed through great expense and effort, and was not shared with anyone outside of Lucini's senior management, except for a few select individuals who were assisting Lucini and who were subject to non-disclosure agreements. Lucini took reasonable steps to

Not Reported in F.Supp.2d                                                                           Page 17
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

safeguard its confidential information. *See Service Centers of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 453-54, 129 Ill.Dec. 367, 535 N.E.2d 1132, 1136 (1st Dist.1989). Further, the information would be extremely valuable to Lucini's competitors, as it has been to the Grappolini Company. Lucini's trade secrets derive a substantial part of their value from being known to Lucini and not its competitors. If Lucini's competitors were to have access to Lucini's information, it would give them an unfair competitive advantage over Lucini because (i) they would know Lucini's plans and strategies while Lucini would not know theirs, (ii) they would be able to utilize detailed knowledge of the market and consumer preferences without incurring the cost of obtaining such information from studies and research, and (iii) they would be able to anticipate and undercut the effectiveness of Lucini's market and design schemes.

### Misappropriation by Defendants

*\*17* 82. The Illinois Trade Secret Act defines "misappropriation" as:

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of the disclosure or use, knew or had reason to know that knowledge of the trade secret was: (I) derived from or through a person who utilized improper means to acquire it; (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS 1065/2(b). The Act further specifies that improper means of acquiring a trade secret include "breach of a confidential relationship or other duty to maintain secrecy or limit use." 765 ILCS 1065/2(a).

### Defendants' Use of Trade Secrets

83. The user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret. *Mangren,* 87 F.3d at 944; *see also Thermodyne,* 940 F.Supp. at 1308 ("Although a product appears to be a new or modified product, a violation of the ITSA occurs if the modification or new product was substantially derived from another's trade secret."). The limited extent to which defendant modified Lucini's essential oil products and packaging to suit themselves does not change the fact that such products and packaging are substantially derived from Lucini's trade secret information.

[11] 84. Defendants misappropriated Lucini's valuable trade secrets. Defendants acquired Lucini's trade secrets under circumstances giving rise to a duty to maintain their secrecy. Defendants' assistant Marco Milandri testified that he understood that Lucini's Premium Select and LEO product formulations were company secrets. Likewise, Grappolini testified that he understood the secrecy of trade secret information communicated to him. Indeed, his various contracts specified that he would maintain the confidentiality of Lucini's research conclusions. After Defendants had secretly secured their own exclusive supply contract with Vegetal, they hid this fact from Lucini in order to induce Lucini to continue sharing its trade secret research, strategies, and plans with Grappolini.

85. Lucini's decision to focus its LEO project around essential oils from Vegetal Progress was a closely guarded trade secret. When Mr. Grappolini used this information on behalf of the Grappolini Company to allow it unfettered access to negotiate its own exclusive arrangement with Vegetal, it is necessary to conclude that the Grappolini Company "acquired" the information with full knowledge that: (i) Lucini had not consented to the use of the information by a competitor, and (ii) Mr. Grappolini had no right to transmit or use the information for his own purposes or on behalf of the Grappolini Company.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

**\*18** 86. Defendants also unlawfully misappropriated Lucini's trade secret information because it is inevitable, absent an injunction, that Defendants will use the information they obtained under a duty of secrecy in connection with their consulting and olive oil businesses. The inevitable use of Lucini's trade secrets would give defendants a substantial unfair competitive advantage over Lucini. *PepsiCo, Inc.,* 54 F.3d at 1269-70;*Strata Marketing, Inc.,* 251 Ill.Dec. 595, 740 N.E.2d at 1178 ("We believe *PepsiCo* correctly interprets Illinois law and agree that inevitable disclosure is a theory upon which a plaintiff in Illinois can proceed under the [Illinois Trade Secrets] Act").

87. Lucini has established that the disclosure of trade secrets is inevitable by demonstrating: (i) that it is in direct competition with the Grappolini Company with respect to premium extra virgin olive oil and essential flavored olive oils, (ii) that within his company, Mr. Grappolini has responsibility for all product design, formulation, and marketing-the very subject about which he received Lucini's trade secret information, and (iii) there are no steps the Grappolini Company has taken or could take to prevent Mr. Grappolini from using Lucini's trade secret information as he fulfills his duties to the Grappolini Company. *PepsiCo, Inc.,* 54 F.3d at 1269-70. As in the Seventh Circuit's *PepsiCo* case, by virtue of his position with the Grappolini Company, it is inevitable that Mr. Grappolini will use or disclose Lucini's trade secrets as his company competes with Lucini.

[12] 88. Under the Illinois Trade Secret Act, "actual or threatened misappropriation may be enjoined."765 ILCS 1065/3(a)."[W]here a statute expressly authorizes injunctive relief, a plaintiff need only show defendant's violation of the Act and that plaintiff has standing to pursue the cause.... The general rules of equity requiring a showing of irreparable injury and a lack of an adequate remedy at law need not be shown."*Illinois Bell Tel. Co. v. Lake County Grading,* 313 Ill.App.3d 184, 189, 245 Ill.Dec. 821, 728 N.E.2d 1178, 1181 (2d Dist.2000) (interpreting the Illinois Underground Utility Facilities Damage Prevention Act) (internal citations omitted). Thus, to the extent that Lucini's request for injunctive relief is based on Grappolini's violation of Lucini's trade secret, Lucini is not required to establish irreparable injury and a lack of adequate

legal remedy.

89. Alternatively, Lucini has established that it will suffer irreparable harm if a permanent injunction does not issue, that Lucini has no adequate remedy at law, that the injury to Lucini if injunctive relief does not issue would exceed any harm to Defendants if an injunction is entered, and that the public interest supports the issuance of an injunction. *Chicago School Reform Bd. of Trustees v. Diversified Pharm. Serv., Inc.,* 40 F.Supp.2d 987, 991 (N.D.Ill.1999) (to obtain a permanent injunction, plaintiff must show: (1) actual success on the merits; (2) plaintiff does not have an adequate remedy of law or that it will suffer irreparable harm without the injunction; (3) the balance of harms between the parties favors entry of an injunction; and (4) entry of the injunction will not harm the public interest). The Court will issue an injunction to protect Lucini from the future use of its trade secret information. The damage award is inadequate because the LEO project could produce profits to Lucini for many years beyond the four years for which this Court has awarded damages. In addition, the damages have been conservatively computed.

**\*19** 90. In addition to injunctive relief, Lucini is entitled to damages from the unauthorized use and disclosure of Lucini's trade secret information in addition to an injunction. *See RKI, Inc. v. Grimes,* 200 F.Supp.2d 916, 926 (N.D.Ill.2002). Under the ITSA,

[d]amages can include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. If neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by a misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

765 ILCS 1065/4(a). Actual damages can include lost sales as a result of the competitor's entry into a market, as well as price erosion. *Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1119-20 (Fed.Cir.1996).

[13] 91. While Lucini's lost profits are necessarily

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

uncertain, that poses no barrier to an award of actual damages. The United States Supreme Court has held on many occasions that when a defendant's unlawful act keeps a plaintiff out of a market, specific and certain proof of the actual amount of losses is not required. *J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 565-66, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).*"Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain ."*Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65, 66 S.Ct. 574, 90 L.Ed. 652 (1946); see also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931)* ( "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."). In this case, Lucini has established its lost profits through credible forecasts which would meet its ordinary burden of proof of establishing the amount of its lost profit damages. Alternatively, to the extent Lucini's lost profits are necessarily uncertain as a result of Defendants' acts to keep Lucini out of the essential oil market, the Court finds that Lucini has provided sufficient evidence to meet the lesser burden that is applicable to such a situation. Defendants' failure to disclose in discovery (much less, offer proof at trial) of their own sales and profits from essential oil products leads the Court to draw the inference that such information would support Lucini's forecasts.

92. The Court will award Lucini its lost profits of $4,170,000, together with its $800,000 of development costs for LEO project.

Punitive Damages

[14] 93. "If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a)."*765 ILCS 1065/4(b).* Willful and malicious misappropriation includes intentional misappropriation as well as "misappropriation resulting from the conscious disregard of the rights of another."*Mangren, 87 F.3d at 946.* Defendants

engaged in willful and malicious misappropriation as evidenced by their use of the information for directly competitive purposes and their efforts to hide the misappropriation and, accordingly, the Court will award $1,000,000 in exemplary damages. Such an award is necessary to discourage Defendants from engaging in such conduct in the future.

Attorney's Fees

*20 94. The Illinois Trade Secret Act authorizes an award of reasonable attorneys' fees to the prevailing party where willful and malicious conduct is found to have occurred. *765 ILCS 1065/5.* This is an appropriate case for an award of attorney's fees and computerized research in the total amount of $750,065.28 as set forth in Lucini's petition for attorney's fees and costs. The Court finds the time and effort to be reasonable, the hourly rates are the market rates for Plaintiff's counsel. Counsel has done an excellent job in this difficult, hard fought litigation.

95. Lucini seeks a total of $736,311.54 for attorney's fees and computerized research in the amount of $13,753.74. Included in the petition for fees is $24,400.29 for attorney's fees rendered by the Milan, Italy firm of Simmons & Simmons related to this litigation. The Court finds these fees to be reasonable and necessary for the prosecution of this case.

96. Lucini bears the burden of proving the reasonableness of its attorney's fees. *Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).* The process of determining a proper fee award begins with a calculation of the "lodestar"-the number obtained by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Eddleman v. Switchcraft, Inc., 965 F.2d 422, 424 (7th Cir.1992).* The Court may then reduce or augment the lodestar based on a variety of factors: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 20
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

length of the professional relationship with the client; and (12) awards in similar cases. *Hensley,* 461 U.S. at 430 n. 3. Finally, the degree of a party's overall success is critical in determining the reasonableness of a fee award. *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case. *Bankston v. State of Illinois,* 60 F.3d 1249, 1256 (7th Cir.1995).

97. The first step in calculating the lodestar is to determine a reasonable hourly rate. Reasonable hourly rates are determined by the prevailing market rates in the relevant community. *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)."[T]he market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question."*Bankston,* 60 F.3d at 1256. The Court has reviewed the affidavits of Lucini's counsel and finds that the hourly rates set forth in the fee petition are reasonable.

**\*21** 98. Lucini has excluded from its request time which was expended on claims other than the Illinois Trade Secrets Act claims, services performed overseeing the European arbitration and Italian criminal proceedings. In addition, over $50,000 in time was previously excluded for time spent by junior lawyers who participated in hearings primarily for training purposes and where the firm felt work was not performed as efficiently as possible.

[15] 99. This Court recognizes that Lucini is only entitled to compensation for the time spent in furtherance of the specific action for which fees are allowed. Where, as here, Lucini is successful on one or more claims all based on a common core of facts, counsel can collect fees for all litigation involving the trade secret count against Defendants. *Rosario v. Livaditis,* 963 F.2d 1013, 1020 (7th Cir.1992); *Becovic v. City of Chicago,* 296 Ill.App.3d 236, 242, 230 Ill.Dec. 766, 694 N.E.2d 1044, 1048 (1st Dist.1998) (applying Illinois law). Lucini has excluded the time devoted to claims other than the trade secret claim. The Court finds the exclusion to be proper.

100. The Court allows the computerized legal research charges in the amount of $13,753.74, which represents a 10% reduction for non-ITSA research. *In the Matter of Continental Illinois Securities Litigation,* 962 F.2d 566, 570 (7th Cir.1992) (allowing recovery for computerized research costs).

Sanctions

101. The Court awards non-taxable costs in the amount of $41,848.00 as a result of sanctions previously entered by Judge Norgle. These out-of-pocket costs were the result of last minute deposition cancellations on two separate occasions and for violation of this Court's standing order regarding settlement.

E. Declaratory Judgment-Count VII

[16] 102. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration."28 U.S.C. § 2201(a). A court may hear such a declaratory judgment action when it will settle a particular controversy and clarify the legal relations in issue. "In other words, there must be 'an actual, substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." ' *Johnson v. Rohr-Ville Motors, Inc.,* 64 F.Supp.2d 737, 739 (N.D.Ill.1999) (internal quotations omitted).

103. Lucini asserts that it had a right to terminate its contractual relationships with Defendants and to break off negotiations over a more expanded relationship based on its discovery of Defendants' breach of fiduciary duty and misappropriation and use of Lucini's trade secrets. Defendants dispute that they committed any of the underlying acts (although they offered no evidence at trial in support of their position) and therefore deny that Lucini had any right to terminate the contracts or break off negotiations. There is an actual dispute between the parties as to the right to terminate if material fraud or breach of fiduciary duty occur. A determination of the validity of Lucini's termination for the stated reasons is of sufficient immediacy and importance that it merits the issuance of a declaratory judgment because it will impact the parties' resolution of ongoing disputes from their fractious "divorce."

**\*22** 104. Based on the Court's determination that Defendants willfully misappropriated Lucini's trade

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)
**2003 WL 1989605 (N.D.Ill.)**

secrets, the Court finds that Lucini is entitled to a declaration that it properly terminated its contractual relations with Defendants and it properly broke off negotiations over a more expanded relationship with Defendants.

### F. Preemption Revisited

[17] 105. The ITSA displaces "conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."765 ILCS 1065/8(a). This preemption does not affect contractual remedies or "other civil remedies that are not based upon misappropriation of a trade secret."765 ILCS 1065/8(b). Interpreting this language, courts have determined that the ITSA is the exclusive remedy for misappropriation of trade secrets, but it does not affect common law claims based on other theories. *Automed Technologies, Inc. v. Eller,* 160 F.Supp.2d 915, 922 (N.D.Ill.2001). Thus, claims based on something more than the trade secret misappropriation are not preempted. *Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968, 971 (N.D.Ill.2000).

106. At the motion to dismiss stage, this Court's decision denying Defendant's motion to dismiss counts I-V of the First Amended Complaint was made without the aid of a definitive interpretation of the clause from the Supreme Court of Illinois. *Lucini Italia Co. v. Grappoini,* 231 F.Supp.2d 764, 767 (N.D.Ill.2002). The Supreme Court still has not clarified the issue; however, the Court makes the following determination based on the same law, but with a more developed factual record.

107. At the motion to dismiss stage, the Court sustained the common law claims to the extent they were independent of the trade secret claim. At this stage, the Court finds that the facts relating to the breach of fiduciary duty, fraud, and promissory estoppel claims are inextricably linked to the trade secret claim. All facts are part of the same trade secret theft: Defendants abused their position to obtain and inappropriately use secret information to their advantage and the Plaintiff's detriment. Accordingly, all damages are awarded under the trade secret count. This Court made findings and entered judgment regarding the other counts, in the event on later review they are deemed to survive

independently. The Court intends that Plaintiff's recover no more than the damages awarded under the Illinois Trade Secrets Act count.

### III. CONCLUSION

Defendants stole Plaintiff's trade secrets and their corporate opportunity. They deprived a family of their financial future and business dreams. Justice requires that Defendants be made to pay for the damages they caused to Plaintiff and that Defendants be stopped from further unlawful conduct involving Plaintiff's trade secrets. For the reasons set forth in this opinion, the Court directs the Clerk of the Court to enter judgment in favor of Plaintiff, Lucini Italia Company, and against Defendants, Guiseppe Grappolini and Grappolini G. s.r.l., an Italian limited liability company, by means of the Final Judgment Order dated April 24, 2003, granting Plaintiff monetary damages in the amount of $6,761,913.20, a declaratory judgment, and a permanent injunction against Defendants.

### FINAL JUDGMENT ORDER

**\*23** This matter was heard by the Court in a bench trial on February 24 and 25, 2003. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The parties were given notice of the trial and the opportunity to present their evidence. The issues have been tried and the Court has entered a Memorandum Opinion and Order dated April 24, 2003.

IT IS HEREBY ORDERED AND ADJUDGED that with respect to Plaintiff's First Amended Complaint, judgment is entered in favor of Plaintiff, Lucini Italia Company ("Lucini"), and against Defendants, Giuseppe Grappolini and Grappolini G.s.r.l., ("Defendants") on Counts I (breach of fiduciary duty), III (fraud), IV (promissory estoppel), VI (Illinois Trade Secrets Act) and VII (declaratory judgment), and that Counts II (constructive fraud) and V (unjust enrichment) were withdrawn before trial. Because the Court finds that Count VI preempts the claims under Counts I, III and IV, no relief will be awarded pursuant to Counts I, III and IV.

In accordance with the findings of fact and conclusions of law set forth in the Memorandum Opinion and Order of the Court, judgment is entered

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

in favor of Plaintiff, Lucini Italia Company, and against Defendants, Giuseppe Grappolini and Grappolini G. s.r.l, jointly and severally as follows:

### MONETARY DAMAGES

1. Defendants are ordered to pay to Plaintiff compensatory damages for lost profits in the amount of $4,170,000.00.

2. Defendants are ordered to pay to Plaintiff compensatory damages for development costs of its Lucini Essential Oils product in the amount of $800,000.

3. Defendants are ordered to pay to Plaintiff punitive damages in the amount of $1,000,000.00.

4. Defendants are ordered to pay to Plaintiff attorney's fees and nontaxable costs in the amount of $750,065.28.

5. Defendants are ordered to pay to Plaintiff sanctions in the amount of $41,848.00.

6. The total amount of monetary damages awarded to Plaintiffs against Defendants as set forth in paragraphs 1. through 5. above is $6,761,913.20.

### DECLARATORY JUDGMENT

7. The Court declares that Plaintiff had good and sufficient cause to withdraw from its contractual relationship with Defendants and to cease its negotiations of new contracts with Defendants based on Defendants' misappropriation of Lucini's trade secrets.

### PERMANENT INJUNCTION

8. Because Defendants have unlawfully stolen and are using Plaintiff's trade secrets for their own benefit, the Court hereby issues a permanent injunction barring Defendants, and any of their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, who receive actual notice of this order by personal service or otherwise, from disclosing or using, directly or indirectly, the results of Plaintiff's marketing research, marketing plans, product designs, formulations and/or flavor profiles for premium extra virgin olive oil products, including essential oil flavored products. Without limitation, the Court's Order bars Defendants (a) from marketing essential oil flavored olive oils either in the single flavors of garlic, rosemary, lemon, pepper, or basil or in combination flavors substantially similar to Lucini's Savory Lemon with Mountain Black Pepper, Robust Garlic with Wild Rosemary, Tuscan Herb with Summer Basil; (b) from marketing or selling any products utilizing essential oils purchased from Vegetal Progress; (c) from using drawings or images substantially similar to those Lucini disclosed to Defendants (which include the drawings and images on Trial Exhibits 9-12); (d) from using the packaging configuration of Lucini's LEO Trial Pack; and (e) from selling, disclosing, private labeling, or offering consulting services with respect to extra virgin olive oil with the chemical and organoleptic characteristics of Lucini Premium Select (or any substantially similar oil) or the methods of creating such oil.

*24 9. The Court finds there is no just cause to delay enforcement or appeal of this Final Judgment Order.

10. Plaintiff is awarded its court costs and shall file its bill of costs on or before May 7, 2003.

11. The Court shall retain jurisdiction to enforce the terms of this Final Judgment Order.

N.D.Ill.,2003.
Lucini Italia Co. v. Grappolini
Not Reported in F.Supp.2d, 2003 WL 1989605 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 4293635 (N.D.Ill.)
**2007 WL 4293635 (N.D.Ill.)**

**C** Jansen v. American Exp. Corp.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
Christopher A. JANSEN f/k/a/ Christopher Jankowski, Plaintiff,
v.
AMERICAN EXPRESS CORPORATION, a New York for-profit corporation, Defendant.
**No. 06 C 2700.**

Dec. 6, 2007.

Robert A. Holstein, Holstein Law Offices LLC, Chicago, IL, for Plaintiff.
James Andrew Klenk, Sonnenschein, Nath & Rosenthal, LLP, Julie P. Samuels, Loeb & Loeb LLP, Chicago, IL, Stephen J. Newman, Stroock & Stroock & Lavan LLP, Los Angeles, CA, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

WAYNE R. ANDERSEN, District Judge.
**\*1** This matter is before the court on defendant American Express Corporation's motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. For the following reasons, we grant the motion.

### *BACKGROUND*

On August 31, 2007, plaintiff Christopher A. Jansen filed this third amended complaint alleging fraud and breach of contract by American Express. He invoked jurisdiction pursuant to 28 U.S.C. § 1332 on the basis of diversity of citizenship, alleging that the amount in controversy exceeded $100,000.

Plaintiff sought class action status in previous iterations of this suit, including a state court action he filed in November 2003 and then voluntarily dismissed, and his original federal court action, filed on May 16, 2006. In both the state court action and in the original complaint filed in this court, plaintiff said he was not seeking "individual compensatory

damages in excess of $65,000."This court dismissed plaintiff's first amended complaint on May 15, 2007, finding that plaintiff had not satisfied by a preponderance of the evidence the jurisdictional requirements of the Class Action Fairness Act of 2005 (CAFA), namely that the amount in controversy exceeded five million dollars and that the proposed class had 100 or more members. We denied plaintiff's motion for leave to file a second amended complaint but granted him permission to file this third amended complaint.

Plaintiff's allegations in his third amended complaint are similar to those in his previous complaints and stem from a purchase he made in 1984 of what were purported to be limited edition, autographed lithographs of paintings by the well-known Spanish painter, Salvador Dalí. Jansen alleges that, as a premium American Express account holder, he took advantage of an offer from American Express to purchase four investment-quality, limited edition lithographs signed by Dalí. Jansen alleges that the brochure describing the lithographs characterized them as "original" works of art, "individually hand-numbered," and "individually pencil signed by Dalí himself."The lithographs cost $975 each or $3,510 for all four. Plaintiff purchased the set for $3,510.

Plaintiff alleges that he relied on American Express's representations as to the authenticity of the Dalí works in deciding to purchase the lithographs. He also alleges that he expected the lithographs to appreciate in value in accordance with other investment-quality lithographs, and that the lithographs should have increased even more after Dalí's death. Plaintiff alleges, however, that after he made the purchase, American Express learned that the lithographs were fakes. He alleges that American Express never notified him that the lithographs were frauds, despite having his contact information, and that American Express claims it has no record or evidence of notifying him. Plaintiff also alleges that American Express sold far more of the "limited edition" prints than it promised when the original offer was made.

**\*2** Plaintiff alleges that he did not discover the lithographs were worthless until the summer of 2003

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4293635 (N.D.Ill.)
**2007 WL 4293635 (N.D.Ill.)**

Page 2

when he inquired at art galleries about the value of his investment and was informed that he owned "a set of those American Express frauds."Plaintiff alleges that, if the lithographs had been authentic, today they would be worth in excess of $30,000 each or more than $100,000 collectively.

## LEGAL STANDARD

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) challenges the subject matter jurisdiction of a complaint. United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 946 (7th Cir.2003). There are two ways to challenge subject matter jurisdiction under Rule 12(b)(1): a) a challenge as a matter of law, in which the factual allegations of the complaint are assumed to be true; or b) an attack on the jurisdictional facts on which the complaint relies, in which no presumptive truthfulness attaches to plaintiff's allegations. W. Transp. Co. v. Couzens Warehouse & Distrib., Inc., 695 F.2d 1033, 1038 (7th Cir.1982).

When a defendant has properly raised a factual attack concerning the trial court's power to proceed with the action, the court is not bound to accept as true allegations in the complaint seeking to establish jurisdiction. Grafon Corp. v. Hausermann, 602 F.2d 781, 783 (7th Cir.1979). In evaluating a Rule 12(b)(1) motion that makes a factual attack, the court may look beyond the jurisdictional allegations of the complaint to the evidence that has been submitted to determine whether, in fact, jurisdiction exists. Id. Moreover, the existence of issues of material fact will not preclude a court from first evaluating the merits of the jurisdictional claims. W. Transp., 695 F.2d at 1038. While the court is free to weigh the evidence and satisfy itself as to the existence of subject matter jurisdiction, the plaintiff has the burden of proof that jurisdiction exists. Id. Here, American Express challenges as a factual matter the basis of plaintiff's subject matter jurisdiction, attacking plaintiff's assertion that the amount in controversy exceeds $75,000.

## DISCUSSION

Federal district courts have original jurisdiction over all civil actions "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States."28 U.S.C. § 1332(a)(1). American Express claims that there is no subject matter jurisdiction in this case for three reasons: a) because plaintiff has previously claimed in this court and in state court that he was not seeking more than $65,000 in compensatory damages; b) because plaintiff is not entitled to punitive damages in this action; and c) because plaintiff has not shown that he is entitled to legal fees that would enable him to exceed the minimum amount in controversy.

The amount in controversy is the amount required to satisfy the plaintiff's demands in full on the day the suit begins. Hart v. Scherin-Plough Corp., 253 F.3d 272, 273 (7th Cir.2001). Generally, unless a plaintiff's amount in controversy claim is false to a "legal certainty," the amount will be taken as true for purposes of jurisdiction. Smoot v. Mazda Motors of Am., Inc., 469 F.3d 675, 677 (7th Cir.2006). But when jurisdiction is challenged as a factual matter by the opposing party, the party invoking jurisdiction bears the burden of supporting its allegations by competent proof. Meridian Sec. Ins. Co. v. Sadowski, 441 F.3d 536, 540, 543 (7th Cir.2006). In this case, plaintiff has not supported his allegations of jurisdiction by competent proof.

### I. Compensatory Damages

**\*3** Plaintiff alleges in his third amended complaint that each Dalí print, if authentic, would be worth in excess of $30,000 today, and that the set of four would be worth in excess of $100,000. American Express challenged that assertion in its motion to dismiss because a) plaintiff only paid $3,510 for the four prints in 1984 and b) when plaintiff filed a state court action in November 2003 and his original federal court action in May 2006, he asserted that he was not seeking "individual compensatory damages in excess of $65,000."American Express alleged that, as a result of these previous court filings, plaintiff was estopped from claiming damages in excess of $65,000. This court, however, does not have to reach that argument because plaintiff, in his memorandum in opposition to defendant's motion to dismiss, implicitly admits that he is not seeking compensatory damages in excess of the jurisdictional minimum.

The amount in controversy that is relevant to whether subject-matter jurisdiction exists is the amount that is in dispute on the day the case begins, not some future

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

dollar amount. _Meridian,_ 441 F.3d at 538 (citing _St. Paul Mercury Indem. Co. v. Red Cab Co.,_ 303 U.S. 283, 293, 58 S.Ct. 586, 82 L.Ed. 845 (1938)). What happens later is irrelevant. _Gardynski-Leschuck v. Ford Motor Co.,_ 142 F.3d 955, 958 (7th Cir.1998). Plaintiff, in his memorandum in opposition to defendant's motion to dismiss, asserts that today "authentic Dalí limited edition, hand signed lithographs can easily retail for $10,000 to $15,000 or more."Next, he asserts that "consistent with that level of appreciation," his Dalí lithographs, if real, would be worth $25,000 to $30,000 if he held on to the investment "for even 30 to 35 years."Plaintiff concludes that "those valuations alone put [his] compensatory damages at the jurisdictional minimum."

Plaintiff's argument is fatally flawed. Plaintiff bought the lithographs in 1984. By his own math, plaintiff said he did not expect the lithographs to be worth $25,000 to $30,000 until 2014 or 2019. But for purposes of determining subject matter jurisdiction, this court is not concerned with what the lithographs might be worth in the future. _See Gardynski-Leschuck,_ 142 F.3d at 958. Only the hypothetical value of the lithographs as of August 31, 2007-the date plaintiff filed his third amended complaint-is relevant. _See Meridian,_ 441 F.3d at 538. In this context, plaintiff's own math does him in again. He admits that the most expensive, signed Dalí lithograph retails today for $15,000. Others retail for between $9,000 and $12,000. Plaintiff owns four lithographs. Thus, they would be worth, at most, $60,000 today, which is well short of the jurisdictional minimum.

## II. Punitive Damages

Plaintiff alleges in his third amended complaint that he is entitled to punitive damages. When punitive damages are recoverable, those damages must be considered when determining the jurisdictional amount. _Anthony v. Sec. Pac. Fin. Serv., Inc.,_ 75 F.3d 311, 315 (7th Cir.1996) (internal citations omitted). A two-part inquiry is necessary when punitive damages are required to satisfy the jurisdictional requirement in a diversity case. _Id._ First the court must ask whether punitive damages are recoverable as a matter of state law. "If the answer is yes, the court has subject matter jurisdiction unless it is clear 'beyond a legal certainty that the plaintiff would

under no circumstances be entitled to recover the jurisdictional amount.'"_Id._ In this case, punitive damages would not be recoverable as a matter of state law.

**\*4** Illinois law permits punitive damages in fraud cases, but "Illinois courts do not favor punitive damages and insist that plaintiffs must establish not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness."_Europlast, Ltd. v. Oak Switch Sys., Inc.,_ 10 F.3d 1266, 1276 (7th Cir.1993) (internal quotation marks omitted) (citing _AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.,_ 896 F.2d 1035, 1043 (7th Cir.1990); _Cornell v. Langland,_ 109 Ill.App.3d 472, 65 Ill.Dec. 130, 440 N.E.2d 985, 987 (Ill.App.Ct.1982)). Furthermore, the Illinois Supreme Court has said that "[b]ecause of their penal nature, punitive damages are not favored in the law, and courts must be cautious or seeing that they are not improperly or unwisely awarded."_Europlast, Ltd.,_ 10 F.3d at 1276 (citing _Deal v. Byford,_ 127 Ill.2d 192, 130 Ill.Dec. 200, 537 N.E.2d 267, 272 (Ill.1989); _Home Sav. & Loan Ass'n of Joliet v. Schneider,_ 108 Ill.2d 277, 91 Ill.Dec. 590, 483 N.E.2d 1225, 1228 (Ill.1985) (holding that deceit alone cannot support a punitive damage award, but that such damages may be allowed where the fraud is gross, or the case presents other extraordinary or exceptional circumstances clearly showing malice and willfulness)).

In this case, plaintiff admits that American Express did not learn "that the Salvador Dalí art works that it had marketed as investment quality originals were in fact worthless fraudulent fakes" until after plaintiff purchased the prints. In addition, the Federal Trade Commission never accused American Express of violating federal law in conjunction with the production, marketing, and sale of the lithographs, and there is evidence in the record that American Express refunded approximately $2.5 million to customers who purchased the Dalí prints. As such, plaintiff has not established the gross fraud, breach of trust, or other showing of malice or willfulness on the part of American Express that Illinois courts require in order to collect punitive damages. _See Europlast, Ltd.,_ 10 F.3d at 1276.

## III. Attorney Fees

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Lastly, plaintiff asserts that the court must take attorney fees claims into account in assessing the jurisdictional minimum. "Legal fees may count toward the amount in controversy when the prevailing party is entitled to recover them as part of damages."*Gardynski-Leschuck v. Ford Motor Co., 142 F.3d 955, 958 (7th Cir.1998)*. However, only fees already incurred at the time that federal jurisdiction is invoked, *not* anticipated fees, may be counted toward the requisite amount in controversy because jurisdiction depends on the events that existed on or before the date of filing. *Gardynski-Leschuck,* 142 F.3d at 958;*Hart v. Schering-Plough Corp., 253 F.3d 272, 274 (7th Cir.2001)*. In this case, plaintiff has not demonstrated that he is entitled to attorney fees that, when combined with potential compensatory damages, would exceed the minimum amount in controversy.

## *CONCLUSION*

*5 Because plaintiff has not supported his allegations of jurisdiction by competent proof, and for all the aforementioned reasons, defendant's motion to dismiss for lack of subject matter jurisdiction [68] is granted.

It is so ordered.

N.D.Ill.,2007.
Jansen v. American Exp. Corp.
Slip Copy, 2007 WL 4293635 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.